Jerome J. Schlichter (SBN 054513)
jschlichter@uselaws.com
Troy A. Doles (admitted *pro hac vice*)
tdoles@uselaws.com
Heather Lea (admitted *pro hac vice*)
hlea@uselaws.com
Kurt C. Struckhoff (admitted *pro hac vice*)
kstruckhoff@uselaws.com
Sean E. Soyars (admitted *pro hac vice*)
ssoyars@uselaws.com
SCHLICHTER BOGARD & DENTON LLP
100 South Fourth Street, Suite 1200
St. Louis, MO 63102
Telephone: (314) 621-6115
Facsimile: (314) 621-5934

*Counsel for Plaintiffs*

William H. Edmonson (SBN 243445)
will@whelawfirm.com
LAW OFFICE OF WILL EDMONDSON
8335 Sunset Boulevard, Suite 350
West Hollywood, CA 90069
Telephone: (424) 248-9581

*Local Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
(Southern Division)**

| | |
|---|---|
| ROBERT LAUDERDALE, JOSHUA CARRELL, TING SHEN WANG, LEONARD DICKHAUT, ROBERT CROW, AUBIN NTELA, and RODNEY AARON RIGGINS, individually and as representatives of a class of participants and beneficiaries on behalf of the Wood 401(k) Plan (fka the Wood Group 401(k) Plan), | Case No. 21-cv-00301-JVS-KES |
| | AMENDED COMPLAINT— CLASS ACTION |
| *Plaintiffs*, | JURY TRIAL DEMANDED |
| v. | |
| NFP RETIREMENT, INC., FLEXPATH STRATEGIES, LLC, WOOD GROUP U.S. HOLDINGS, INC, WOOD GROUP MANAGEMENT SERVICES, INC. (NKA | |

WOOD GROUP USA, INC.), THE
COMMITTEE OF THE WOOD 401(K)
PLAN, and JOHN DOES 1–10,

*Defendants*.

1.     Plaintiffs Robert Lauderdale, Joshua Carrell, Ting Shen Wang, Leonard Dickhaut, Robert Crow, Aubin Ntela and Rodney Aaron Riggins, individually and as representatives of a class of participants and beneficiaries of the Wood 401(k) Plan (fka the Wood Group 401(k) Plan) (the Plan), bring this action under 29 U.S.C. §1132(a)(2) and (a)(3) on behalf of the Plan against Defendants NFP Retirement, Inc. (NFP), flexPATH Strategies, LLC (flexPATH), Wood Group U.S. Holdings, Inc., Wood Group Management Services, Inc. (nka Wood Group USA, Inc.), the Committee of the Wood 401(k) Plan, and John Does 1–10, for breach of fiduciary duties and prohibited transactions under ERISA.[1]

2.     As Plan fiduciaries, Defendants are obligated to act for the exclusive benefit of Plan participants and beneficiaries and to ensure that Plan expenses are reasonable and Plan investments are prudent. These duties are the "highest known to the law" and must be discharged with "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982). Instead of acting in the exclusive best interest of participants, Defendants caused the Plan to invest in flexPATH's proprietary collective investment trusts, which benefitted the NFP Defendants at the expense of Plan participants' retirement savings. The Wood Defendants and NFP also failed to use their Plan's bargaining power to obtain reasonable investment management fees, which caused unreasonable expenses to be charged to the Plan.

[1] The Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461. Unless otherwise indicated, NFP Retirement, Inc. and flexPATH are referred to as the NFP Defendants, and Wood Group U.S. Holdings, Inc., Wood Group Management Services, Inc., and the Committee of the Wood 401(k) Plan are referred to as the Wood Defendants.

- 2 -

3.      To remedy these breaches of duty, Plaintiffs, individually and as representatives of a class of participants and beneficiaries of the Plan, bring this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (a)(3) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and to restore to the Plan profits made through Defendants' use of Plan assets. In addition, Plaintiffs seek equitable or remedial relief for the Plan as the Court may deem appropriate.

## JURISDICTION AND VENUE

4.      **Subject-matter jurisdiction.** This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2).

5.      **Venue.** This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district where the Plan is or was administered, where at least one of the alleged breaches took place, or where at least one defendant resides or may be found.

6.      **Standing.** An action under §1132(a)(2) allows recovery only for a plan and does not provide a remedy for individual injuries distinct from plan injuries. *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256 (2008). The plan is the victim of any fiduciary breach and the recipient of any recovery. *Id.* at 254. Section 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to bring a civil action to seek relief on behalf of a plan. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and remains exposed to harm and continued future losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs. To the extent the Plaintiffs must also show an individual injury, each Plaintiff has suffered such an injury, in at least the following ways:

    a. The Named Plaintiffs suffered harm to their individual accounts as a result of Defendants' fiduciary breaches. During the proposed class

- 3 -

period, the Named Plaintiffs invested in the flexPATH collective investment trusts provided in the Plan. For instance, all of the Named Plaintiffs except for Plaintiff Ntela and Riggins invested in a flexPATH target date fund. Plaintiff Riggins invested in the International Stock, Core Bond and Large Cap Value funds, which were managed by flexPATH. Plaintiff Lauderdale also invested in the Core Bond Fund, and Plaintiff Ntela invested in the International Stock Fund. By providing flexPATH's proprietary collective investment trusts, Defendants caused millions of dollars in performance losses to all participants who invested in these funds.

b. The Named Plaintiffs suffered harm to their individual accounts as a result of the Wood Defendants selecting and retaining higher-cost versions of the Plan's investments. For instance, Plaintiff Lauderdale, Carrell, Wang, Dickhaut, Crow and Ntela invested in the Vanguard Target Retirement Trust target date funds when lower-cost shares were available to the Plan. Had the Wood Defendants provided the lowest-cost shares or versions of the Plan's investments, every participant's account would have had fewer investment management fees deducted and would have been of higher value in light of those fees and the investment return on those fees.

## PARTIES

### The Wood 401(k) Plan (fka the Wood Group 401(k) Plan)

7.     The Wood 401(k) Plan (fka the Wood Group 401(k) Plan) is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34). The Plan is intended to be a multiple employer defined contribution plan in accordance with 26 U.S.C. §413(c). A multiple employer plan is an employee pension benefit plan adopted by two or more employers established and maintained for the purpose of providing benefits to employees of the adopting

- 4 -

employers. There were 24 adopting employers in 2014, and 15 in 2019.

8.      The Plan was established on January 1, 1999 and is maintained under a written document in accordance with 29 U.S.C. §1102(a)(1), last amended and restated effective January 1, 2020.

9.      Under the Plan, participants are responsible for investing their individual accounts and will receive in retirement only the current value of that account, which will depend on the amount contributed to the account by the employee and employer and on the performance of investment options net of fees and expenses. Plan fiduciaries control what investment options are provided in the Plan and the Plan's fees and expenses.

10.      As of December 31, 2013, the Plan had $261.7 million in assets and 4,997 participants with account balances. Effective December 31, 2015, the Wood Group Mustang 401(k) Plan, the Wood Group PSN, Inc. 401(k) Plan, and the Elkhorn Holdings, Inc. Profit Sharing Plan merged into the Plan, which increased the Plan's size to $836.6 million in assets and 10,881 participants with account balances. The Plan continued to dramatically grow in size over the years. By December 31, 2019, the Plan had $2.4 billion in assets and 18,013 participants with account balances.

**Plaintiffs**

11.      Robert Lauderdale was formerly employed by Wood Group Mustang, Inc. (nka Wood Group USA, Inc.). He resides in Brandon, Florida. He is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

12.      Joshua Carrell was formerly employed by Wood Group, PSN (fka Elkhorn Holdings, Inc.), an adopting employer of the Plan. He resides in Windsor, Colorado. He participated in the Plan until approximately September 2019. However, he is still a "participant" under 29 U.S.C. §1002(7) for purposes of bring this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) because he is eligible

- 5 -

to receive his share of the amounts by which his account would have been greater had Defendants not breached their fiduciary duties.

13. Ting Shen Wang was formerly employed by Wood Group Mustang, Inc. (nka Wood Group USA, Inc.), an adopting employer of the Plan. He resides in Chicago, Illinois. He is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

14. Leonard Dickhaut was formerly employed by Wood Group Mustang, Inc. (nka Wood Group USA, Inc.), an adopting employer of the Plan. He resides in Ocean Springs, Mississippi. He is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

15. Robert Crow was formerly employed by Wood Group Mustang, Inc. (nka Wood Group USA, Inc.), an adopting employer of the Plan. He resides in Houston, Texas. He is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

16. Aubin Ntela was formerly employed by Amec Foster Wheeler, an adopting employer of the Plan. He resides in Houston, Texas. He is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

17. Rodney Aaron Riggins was formerly employed by Wood Group Mustang, Inc. (nka Wood Group USA, Inc.), an adopting employer of the Plan. He resides in Seneca, South Carolina. He is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

**Defendants**

18. Wood Group U.S. Holdings, Inc. is a domestic corporation

- 6 -

incorporated in Nevada. The company is a wholly owned subsidiary of John Wood Group PLC, a multinational company that provides project, engineering and technical services to energy and industrial markets with headquarters in Aberdeen, Scotland. Wood Group U.S. Holdings, Inc. is located in Houston, Texas.

19.    Wood Group U.S. Holdings, Inc. is the Plan sponsor under 29 U.S.C. §1102(a)(1) and Plan administrator under 29 U.S.C. §1002(16). It has served in this capacity since June 1, 2016. As alleged herein, Wood Group U.S. Holdings, Inc. exercises discretionary authority or discretionary control respecting the management of the Plan, exercises authority or control respecting the management or disposition of Plan assets, and/or has discretionary authority or discretionary responsibility in the administration of the Plan and is a fiduciary under 29 U.S.C. §1002(21)(A)(i) and (iii).

20.    Until June 1, 2016, Wood Group Management Services, Inc. was the Plan sponsor under 29 U.S.C. §1102(a)(1) and Plan administrator under 29 U.S.C. §1002(16). Effective June 1, 2016, the Board of Directors of Wood Group Management Services, Inc. transferred sponsorship of the Plan to Wood Group U.S. Holdings, Inc. The Board of Directors of Wood Group U.S. Holdings, Inc. adopted the resolution.

21.    Effective July 1, 2016, Wood Group Management Services, Inc. merged with Wood Group Mustang, Inc. and later changed its name to Wood Group USA, Inc. on May 29, 2017. Wood Group USA, Inc. is a domestic corporation with a principal place of business in Houston, Texas. It is a wholly owned subsidiary of Wood Group U.S. Holdings, Inc.

22.    As alleged herein, Wood Group Management Services, Inc. (nka Wood Group USA, Inc.) exercised discretionary authority or discretionary control respecting the management of the Plan, exercised authority or control respecting the management or disposition of Plan assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and was a fiduciary

- 7 -

under 29 U.S.C. §1002(21)(A)(i) and (iii).

23.     Wood Group U.S. Holdings, Inc. appointed a "Committee" to carry out its fiduciary duties with respect to the Plan. The Committee will be referred to herein as the "Fiduciary Committee". The Fiduciary Committee and its individual members are responsible for the selection, monitoring and removal of Plan investments and service providers, including the investment consultant. The Fiduciary Committee establishes and maintains the Plan's investment policy or guidelines and monitors the fees charged by service providers and the Plan's investment options. As alleged herein, the Fiduciary Committee and its individual members exercise discretionary authority or discretionary control respecting the management of the Plan, exercise authority or control respecting the management or disposition of Plan assets, and/or have discretionary authority or discretionary responsibility in the administration of the Plan and are fiduciaries under 29 U.S.C. §1002(21)(A)(i) and (iii).

24.     John Does 1–10 are Plan fiduciaries unknown to Plaintiffs who exercise or exercised discretionary authority or discretionary control respecting the management of the Plan, exercise or exercised authority or control respecting the management or disposition of its assets, or have or had discretionary authority or discretionary responsibility in the administration of the Plan and are fiduciaries under 29 U.S.C. §1002(21)(A)(i) and (iii).

25.     Because the Wood Group individuals and entities described above acted as alleged herein as agents of Wood Group U.S. Holdings, Inc., these defendants are collectively referred to hereafter as the "Wood Defendants" unless otherwise indicated.

26.     NFP Retirement, Inc. (dba 401k Advisors, Inc.) is a registered investment adviser under the Investment Advisers Act of 1940 with its principal place of business in Aliso Viejo, California. Effective July 16, 2015, Wood Group Management Services, Inc. appointed NFP as the Plan's investment consultant or

- 8 -

fiduciary investment advisor as defined by 29 U.S.C. §1002(21)(A)(ii). NFP provides investment advice to the Wood Defendants related to the selection, monitoring and replacement of Plan investments, the selection of service providers, the development and ongoing evaluation of the Plan's Investment Policy Statement (IPS), and the assessment of the reasonableness of Plan expenses.

27.    flexPATH Strategies, LLC is a registered investment adviser under the Investment Advisers Act of 1940 with its principal place of business in Aliso Viejo, California. On or about March 21, 2016, Wood Group Management Services, Inc. appointed flexPATH as the Plan's discretionary investment manager under 29 U.S.C. §1002(38) and delegated to flexPATH the authority to select the Plan's qualified default investment alternative (QDIA), which has been the Plan's target date fund investment option. flexPATH also was the subadvisor of the Plan's flexPATH Index target date funds, and currently serves in that capacity for the Plan's International Stock Fund, the Core Bond Fund and the Large Cap Value Fund, which are investment options in the Plan.

28.    On November 19, 2020, in accordance with 29 U.S.C. §1024(b), Plaintiffs requested from the Plan administrator documents related to the operation and administration of the Plan. On January 11, 2021, the Plan administrator responded to that request for information but refused to provide documents related to the process employed by the Wood Defendants in making decisions on behalf of the Plan, including minutes of meetings of the Plan's fiduciaries and materials presented during those meetings. The Plan administrator also refused to produce service provider agreements, including those with NFP.

## ERISA'S FIDUCIARY STANDARDS

29.    ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. 29 U.S.C. §1104(a), states, in relevant part, that:

[A] fiduciary shall discharge his duties with respect to a plan solely in the

- 9 -

interest of the participants and beneficiaries and –

(A)  for the exclusive purpose of

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

[and]

(B)  with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

30.   Under ERISA, fiduciaries that exercise any authority or control over plan assets, including, but not limited to, the selection of plan investments and service providers, must act prudently and for the *exclusive* benefit of participants in the plan, monitor the funds in the plan and remove imprudent or excessively expensive funds. Fiduciaries cannot act for the benefit of third parties, including service providers to the plan, affiliated businesses or brokerage firms and those who provide investment products. Fiduciaries must ensure that the amount of fees paid to service providers is no more than reasonable. DOL Adv. Op. 97-15A; DOL Adv. Op. 97-16A; *see also* 29 U.S.C. §1103(c)(1) (plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan").

31.   An ERISA "trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). Prudence requires a review at "regular intervals." *Id.* When making investment decisions, an ERISA fiduciary "is duty-bound 'to make such investments and only such investments as a prudent [person] would make of his own property[.]'" *In re Unisys*, 74 F.3d 420, 434 (3d Cir. 1996) (quoting RESTATEMENT (SECOND) OF TRUSTS §227 (1959)). "[T]he duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment

- 10 -

fiduciary duties." *Id*. at 435.

32.    A defined contribution plan fiduciary cannot "insulate itself from liability by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009). Instead, fiduciaries must "initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007) (emphasis original); *see also* 29 C.F.R. §2550.404a-1; DOL Adv. Op. 98-04A; DOL Adv. Op. 88-16A. Fiduciaries have "a continuing duty to monitor investments and remove imprudent ones" within a reasonable time. *Tibble*, 135 S. Ct. at 1828–29.

33.    ERISA also imposes explicit co-fiduciary liability on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]
>
> (2)    if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy

- 11 -

the breach.

## BACKGROUND FACTS

34.	"Defined contribution plans dominate the retirement plan scene today." *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008). In the private sector, such plans have largely replaced the defined benefit pension plans that were America's retirement system when ERISA was enacted in 1974. The consulting firm Towers Watson studied Fortune 100 companies from 1985 to 2012 and found that the type of retirement plan offered by the companies has essentially flipped over the last three decades.[2] The survey found that whereas in 1985, 89 of the Fortune 100 companies offered a traditional defined benefit plan, in 2012, only eleven of the Fortune 100 companies offered defined benefit plans to newly hired employees. Defined contribution plans have become America's retirement system.

35.	A fundamental difference between traditional pension plans and defined contribution plans is that, in the former, the employer's assets are at risk. Because the employer is responsible for funding the pension plan to satisfy its commitments to employees, it bears all investment risks. In a defined contribution plan, the employees and retirees bear all investment risks.

36.	Each participant in a defined contribution plan has an individual account and directs plan contributions into one or more investment alternatives in a lineup chosen by the plan's fiduciaries. "[P]articipants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826. Plan expenses can "significantly reduce the value of an account in a defined-contribution plan." *Id.* The fees assessed to participants are generally attributable to two types of services: plan administration

---

[2] Towers Watson, *Retirement Plan Types of Fortune 100 Companies in 2012*, TOWERS WATSON RESEARCH INSIDER, Oct. 2012.

- 12 -

and investment management.

37.    The plan's fiduciaries have control over these expenses. The fiduciaries are responsible for hiring administrative service providers and negotiating and approving their compensation. The fiduciaries also have exclusive control over the menu of investment alternatives to which participants may direct the assets in their accounts. The investment alternatives each have their own fees, usually expressed as a percentage of assets under management, or "expense ratio." For example, if a fund deducts 1.0% of fund assets each year in fees, the fund's expense ratio would be 1.0%, or 100 basis points (bps). (One basis point is equal to 1/100[th] of one percent.) The fees deducted from a fund's assets reduce the value of the shares and hence reduce the returns that participants receive on their investments.

38.    These fiduciary decisions have the potential to dramatically affect the amount of money that participants are able to save for retirement. According to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of *28%* in savings at retirement.[3] Over a 40-year career, this difference in fees can reduce a participant's retirement savings by almost $500,000.[4]

39.    Academic and financial industry literature demonstrate that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG.

[3] U.S. Dept. of Labor, *A Look at 401(k) Plan Fees,* at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.
[4] Michael Bird, *Pandemic Highlights Reasons for Reviewing Plan Fees,* PLANSPONSOR, May 15, 2020, https://www.plansponsor.com/pandemic-highlights-reasons-reviewing-plan-fees/.

- 13 -

871, 873 (2008); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. PA. L. REV. 1961, 1993 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed mutual funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

40.     Accordingly, fiduciaries of defined contribution plans must engage in a rigorous process to control costs and ensure that participants pay no more than a reasonable level of fees. This is particularly true for large defined contribution plans which have the bargaining power to obtain the highest level of service and the very lowest fees. The fees available to these plans are orders of magnitude lower than the much higher retail fees available to small investors.

41.     The entities that provide services to defined contribution plans have an incentive to maximize their fees by putting their own higher-cost funds in plans and collecting the highest amount possible for plan-related services. For each additional dollar in fees paid to a service provider, participants' retirement savings are directly reduced by the same amount, and participants lose the potential for those lost assets to grow over the remainder of their careers through investment returns. The level of diligence used by plan fiduciaries to control, negotiate, reduce the plan's fees, and safeguard plan assets directly affects participants' retirement security.

42.     Fiduciaries must be cognizant of a service provider's self-interest in

- 14 -

maximizing fees and cannot simply accede to the provider's desires and recommendations to include the provider's proprietary funds and services that will maximize the provider's fees without negotiating or considering alternatives. In order to act in the exclusive interest of participants and not in the service provider's interest, fiduciaries must conduct their own independent investigation into the merits of a particular investment or service by considering alternatives.

## DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

**I.     Through conflicted fiduciary decisions, Defendants used flexPATH's proprietary collective investment trusts in the Plan that benefitted Plan fiduciaries to the detriment of Plan participants.**

> **A.     NFP and flexPATH acted under profound conflicts of interest in causing the Plan to use their proprietary investments in the Plan.**

43.     In July 2015, the Wood Defendants hired NFP as the Plan's investment consultant or fiduciary investment advisor. Under the Investment Advisory Agreement (IAA) between NFP and Wood Management Services, Inc., NFP was charged with advising the Wood Defendants on the selection, monitoring, and retention of Plan investments and to provide assistance on the selection of service providers, among other duties. No amendment was executed by the parties thereto to modify the agreement or the scope of NFP's fiduciary obligations.

44.     Shortly after the appointment of NFP, in March 2016, the Wood Defendants hired NFP's affiliate (flexPATH) as the Plan's discretionary investment manager with authority over the selection, monitoring, and replacement of the Plan's QDIA as defined by 29 U.S.C. §1104(c)(5),[5] which was the Plan's moderate

---

[5] Section 1104(c)(5) provides that "a participant or beneficiary in an individual account plan meeting the notice requirements" "shall be treated as exercising control over the assets in the account" with respect to contributions or earnings invested by the plan in the QDIA when the participant or beneficiary does not make an investment election. 29 U.S.C. §1104(c)(5)(A). A QDIA is limited to specific categories of investments, including life-cycle or target date funds, balanced funds, and professionally managed accounts. 29 CFR §2550.404c-5(e)(4).

- 15 -

target date fund option. As described in detail *infra* (¶¶53–55), NFP and flexPATH are closely related companies, which are operated and controlled by the *same* senior executives in the *same* office. For the Plan's QDIA, the Wood Defendants expressly authorized flexPATH to use affiliated investment options, including its flexPATH proprietary funds for the Plan. Despite this delegation, the Wood Defendants retained the fiduciary responsibility to ensure flexPATH carried out its fiduciary obligations loyally and prudently and had the duty to prevent any fiduciary breach by flexPATH in the selection or removal of Plan investments.

45.     Upon hiring flexPATH, Wood Management Services, Inc. represented in its Investment Manager Agreement (IMA) with flexPATH that neither flexPATH nor any affiliate of flexPATH provided investment advice nor recommended, advised, or exercised discretion over Wood Management Services, Inc.'s decision to *engage* flexPATH as the Plan's discretionary investment manager for the QDIA options in the Plan. No such representation, however, was made with respect to the monitoring and investment advice related to the ongoing retention of the Plan's QDIA, or the selection, monitoring, or retention of non-QDIA investment options, including, but not limited to, the flexPATH-advised funds within the large cap, international and fixed income asset categories. Accordingly, NFP retained the ongoing responsibility to monitor and provide advice to the Wood Defendants on all investments in the Plan.

46.     By June 2016—only months after flexPATH was hired—flexPATH exercised its delegated fiduciary authority over the selection or retention of the Plan's QDIA and selected its proprietary target date funds for the Plan called the flexPATH Index target date funds (flexPATH target date funds). In particular, the flexPATH Index Moderate target date fund was designated as the Plan's QDIA to receive participant contributions for those who do not make an investment election.

47.     In 2018, the Wood Defendants removed the flexPATH target date funds from the Plan, and thus, terminated flexPATH as the discretionary investment

- 16 -

manager over the Plan's QDIA. At or around the time of the replacement of the flexPATH target date funds, NFP was still the Plan's investment advisor and advised the Wood Defendants on the selection of other flexPATH-advised investments to be added to the Plan called the International Stock, Core Bond and Large Cap Value funds. (The flexPATH proprietary investments are collectively referred to herein as the flexPATH funds.)

48.   Although NFP purportedly did not advise the Wood Defendants with respect to the *engagement* of flexPATH as the discretionary investment manager over the Plan's QDIA, NFP was charged with advising the Wood Defendants with respect to the selection, monitoring, and retention of other Plan investments, including flexPATH's International Stock, Core Bond and Large Cap Value funds, which were not included in the Wood Defendants' agreement with flexPATH. As indicated *supra,* neither the IMA with flexPATH nor the IAA with NFP contain any provision that limited the scope of NFP's fiduciary investment services regarding advice for non-QDIA investments.

49.   The flexPATH funds are collective investment trusts maintained by Wilmington Trust, N.A. (Wilmington Trust), a bank that serves as the trustee for the funds. Collective investment trusts are investment vehicles maintained by a bank that consist of pooled assets of "retirement, pension, profit sharing, stock bonus or other trusts exempt from Federal income tax". 29 C.F.R. §9.18(a)(2). A collective investment trust is similar to a mutual fund or other pooled investment vehicle because it also invests in a variety of securities to create a diversified investment portfolio.

50.   Apart from serving as the Plan's discretionary investment manager over the Plan's QDIA, flexPATH is the subadvisor of the flexPATH funds. As the subadvisor, flexPATH provides investment advisory services and has authority over investing fund assets and developing the investment strategies for the funds. The financial statement for the target date fund series describes the fees charged to

- 17 -

investors as:

"All asset-based fees are based upon the net assets as determined at the end of each preceding business day as set forth in the table below:

| flexPATH Index I Series | Fee Class I1 |
|---|---|
| Trustee Fee | 0.030% |
| Service Provider Fee | 0.000% |
| Investment Consultant Fee | 0.060% |
| Management Services Fee | 0.100% |

flexPATH Strategies, LLC is compensated for its investment advisory and consultant services provided to each fund."

51.     Separately, flexPATH contracted for a quarterly asset-based fee for discretionary investment management services through the IMA. Although the IMA noted that flexPATH did not charge the Client or the Plan "additional fees if flexPATH CITs are selected in performing the Management Services," fund disclosures indicate that Plan participants paid net total operating expenses for the flexPATH target date funds that included additional fees, as noted in the chart above.[6] Further, because the IMA only pertains to flexPATH's services as the discretionary investment manager over the Plan's QDIA, the referenced provision in the IMA does not apply to any revenue or benefits received by flexPATH from the other flexPATH funds that were not the QDIA (*e.g.,* International Stock, Core Bond and Large Cap Value funds).

52.     flexPATH had limited experience managing assets when the flexPATH funds were first added to the Plan, which was known by the Wood

---

[6] The fees reported to Plan participants do not indicate a reduction in the net operating expenses on the funds to account for any rebate of the management services fee charged on the flexPATH target date funds. flexPATH's own documents also report approximately the same net operating expenses charged on the flexPATH target date funds as reported to Plan participants, further indicating that flexPATH was paid from fund assets.

- 18 -

Defendants prior to appointing flexPATH as the discretionary investment manager to act on behalf of the Plan. flexPATH was not registered as an investment adviser with the SEC until February 2015 and did not begin managing assets until June 2015. Shortly thereafter, in December 2015 and January 2016, flexPATH launched the flexPATH Index target date funds, which were included in the Plan within six months of their inception.

53.    The flexPATH funds are proprietary investment products of flexPATH and affiliated with NFP. National Financial Partners Corporation (NFP Corporation) owns NFP. NFP Corporation, along with NFP's Chief Executive Officer (CEO) and President, own flexPATH. In particular, NFP's CEO has a 25%–50% ownership interest in flexPATH, and NFP's President has a 10%–25% ownership interest. flexPATH and NFP are operated by the *same* corporate officers and headquartered in the *same* office. The CEO, President, Chief Operations Officer, and Chief Compliance Officer for NFP also hold those positions for flexPATH. As reported on the companies' Forms ADV filed with the SEC, these individuals are control persons with authority to direct the management of each company (flexPATH and NFP). The Wood Defendants were aware of this relationship since the time they engaged NFP in 2015.

54.    Based on these facts, the-NFP Defendants acted under profound conflicts of interest as Plan fiduciaries while using the Plan to grow their collective investment trust business. flexPATH and NFP had an incentive to include their proprietary funds in the Plan. Relevant disclosures indicate flexPATH receives additional compensation, such as in the form of bonuses and other incentives for the individual NFP or flexPATH investment advisors, when clients invest in affiliated products or services.

55.    NFP's Form ADV Brochure Part 2A for NFP dated March 2020 confirms this inherent conflict of interest in recommending the use of affiliated products or services— NFP or "its associated persons may receive compensation"

- 19 -

for "services and/or products" affiliated with NFP Corporation or its affiliates. Moreover, NFP employs Investment Advisor Representatives (IARs), who are individuals within the firm that provide investment advice to clients. The IARs are commonly co-employed by flexPATH. These individuals therefore may also receive compensation as an IAR of flexPATH. In fact, certain NFP IARs derive their entire compensation from flexPATH. Apart from the IARs, NFP's President, Chief Executive Officer and Chief Investment Officer are co-employed by flexPATH.[7] Every IAR listed in the flexPATH ADV is co-employed by NFP.

56.     The IMA further acknowledges this revenue sharing arrangement between NFP and flexPATH when NFP's clients invest in flexPATH's proprietary target date funds. The IMA states: "Any compensation received by an affiliate of flexPATH in connection with the utilization of flexPATH CITs (if utilized) as part of the Plan will be paid out of amounts received by flexPATH for the performance of the Management Services without additional cost to the Client or the Plan."

57.     Plan participants were not informed that flexPATH was the entity that selected the flexPATH target date funds, that NFP was the entity that recommended the other flexPATH funds for the Plan, or that flexPATH and NFP had profound conflict of interests when causing the Plan to use of their own funds. Plan participants also were not informed of the internal decision-making process that Defendants employed prior to including the flexPATH funds. The Wood Defendants did not even inform the Department of Labor in the Financial Statements to the Plan's Forms 5500 that flexPATH was a party-in-interest or the Plan's investment in the flexPATH funds were party-in-interest transactions under ERISA. *See* 29 U.S.C. §1002(14) (a party in interest includes any plan fiduciary or person providing services to the plan).

_____

[7] In 2015, NFP Securities, Inc. also received finder's or placement fees from the Plan.

- 20 -

58.     The decision to add the flexPATH target date funds to the Plan benefitted flexPATH by providing an immediate and substantial transfer of approximately $565 million of the Plan's assets into these brand-new, untested target date funds. The Plan's investment of over $500 million in seed money substantially increased NFP's and flexPATH's assets under management in these investment vehicles, which materially benefitted their retirement business by enhancing the marketability of these new funds.

59.     The material benefit NFP and flexPATH derived from the Plan is illustrated by the Plan's investment in the flexPATH Index Moderate funds, which was one of the three risk profile models used for the Plan's flexPATH target date funds and the Plan's QDIA for which flexPATH had discretion over its selection. *See infra* Section I.B.1. As of January 1, 2016, NFP and flexPATH attracted only $77.7 million in qualified plan assets. However, by December 31, 2016, the Plan added $552.8 million in assets to these investments. In total, by year-end 2016, the Plan's assets represented the majority of the assets invested in the flexPATH Index Moderate funds.

60.     The material benefit NFP and flexPATH derived from the Plan was not limited to the flexPATH target date funds. As described in further detail *infra*, the International Stock, Core Bond and Large Cap Value funds did not exist until 2017 or 2018. As a result of NFP's conflicted advice, the Plan immediately transferred approximately $159 million in these newly established funds less than one year after their inception. Like the flexPATH target date funds, the Plan's substantial transfer of seed money to these affiliated investments materially benefitted NFP and flexPATH.

- 21 -

**B.    A prudent and loyal fiduciary would not have invested in flexPATH's proprietary funds that served to only benefit the Plan's fiduciaries.**

**1.    The flexPath Index target date funds.**

61.    Target date funds are designed to provide a single diversified investment vehicle for participants. In general, they can be attractive to participants who do not want to actively manage their retirement savings to maintain a diversified portfolio. Target date funds rebalance their portfolios to become more conservative as the participant gets closer to retirement. The "target date" refers to the participant's target retirement date. For instance, target date "2030" funds are designed for individuals who intend to retire in 2030.

62.    The flexPATH target date funds utilized a novel and untested target date fund management style by combining index or passive management strategies with multiple glidepaths. A glidepath refers to how the fund's target asset allocations among a mix of investments, such as stocks, bonds and cash equivalents, are expected to change over time. As the participant's target date approaches, the asset allocations transition to a mix of more conservative investments.

63.    The flexPATH target date funds were "off-the-shelf" target date funds or funds designed for and offered to defined contribution plans generally. They were not "custom" or "customized" target date funds, which are funds designed by an investment adviser or consultant for a single plan sponsor taking into account that plan's unique demographics and participant base. Because custom target date funds are constructed for a specific defined contribution plan, they are only available to that plan's participant population. In contrast, the flexPATH target date funds are marketed and sold to unrelated defined contribution plan sponsors, including NFP Corporation's own employees' plan.

64.    When the flexPATH target date funds were launched, their

- 22 -

management style had never been used in any target date fund solution offered in the marketplace. Each "target date" fund had three glidepaths varying by investment style and risk tolerance. For instance, for the 2030 target retirement date, flexPATH provided three separate target date funds: flexPATH Index Aggressive 2035 Fund, flexPATH Index Moderate 2035 Fund, and flexPATH Index Conservative 2035 Fund. Because three separate target date funds are offered for a single target retirement date, the number of target date funds offered for a plan triples. This adds further complexity to the fund lineup from which participants select options to invest for retirement.

65.   flexPATH did not actually invest the flexPATH target date funds' underlying assets. Rather, flexPATH utilized a "fund of funds" structure for the target date funds, whereby it allocated fund assets among various underlying funds managed by an unaffiliated investment manager.

66.   The Financial Statements for the Wilmington Trust Collective Investment Trust Funds Subadvised by flexPATH reported the underlying assets of the flexPATH target date funds. For the flexPATH Aggressive target date funds, the funds invested in one or two BlackRock LifePath Index target date funds, *e.g.*, the flexPATH Index Aggressive 2025 Fund invests in the BlackRock LifePath Index 2030 and 2035 funds (F shares). The flexPATH Moderate target date funds invested in the BlackRock LifePath Index target date fund corresponding to the target retirement date, *e.g.,* the flexPATH Index Moderate 2025 Fund invests in the BlackRock LifePath Index 2025 Fund (F shares). And the flexPATH Conservative target date funds invested in the BlackRock LifePath Index Conservative target date fund corresponding to the target retirement date, *e.g.,* the flexPATH Index Conservative Index 2025 Fund invests in the BlackRock LifePath Index Conservative 2025 Fund (F shares).

67.   Because flexPATH invested the underlying assets of the flexPATH target date funds in BlackRock target date funds, additional fees were charged than

- 23 -

would otherwise be charged to investors had they invested directly in BlackRock's funds. In its Form ADV Brochure Part 2A, NFP concedes that it does not make any representation that affiliated products are "offered at the lowest cost and the client may be able to obtain the same products or services at a lower cost from other provides." The additional fees are revealed by comparing the fees charged by the underlying BlackRock funds. The BlackRock LifePath Index target date funds charge 8 bps. In contrast, flexPATH charged Plan participants 26 bps. This resulted is an additional 18 bps—225% more—to invest in flexPATH's version of the target date funds.

68.    Within months of the Wood Defendants hiring NFP as the Plan's fiduciary investment advisor and flexPATH as the discretionary investment manager over the Plan's target date funds, flexPATH selected itself as the Plan's target date fund provider even though it had no established track record as an investment manager and its target date fund management style had never been used in any target date fund offered to a 401(k) plan. flexPATH did not first start managing assets for investors until June 2015 by launching its first version of target date funds called the flexPATH Index + target date funds. Shortly thereafter, flexPATH launched the version of the target date funds included in the Plan, the flexPATH Index target date funds. These target date funds did not even exist until December 2015 (for the Aggressive and Conservative funds) and January 2016 (for the Moderate funds). However, they were placed in the Plan on June 21, 2016.

69.    Therefore, at most, the flexPATH target date funds had only *one* full quarter of live performance history when they were added to the Plan, which, on information and belief, was known by the Wood Defendants before the funds were placed in the Plan. Despite the inferior track record of both the investment manager and the flexPATH target date funds, and the conflicted decision made by flexPATH, the Wood Defendants authorized the use of these untested investments and made no reasonable efforts to remedy or otherwise prevent the flexPATH target

- 24 -

date funds from being added to the Plan.

70.     When making investment decisions, prudent fiduciaries of defined contribution plans consider the performance history, portfolio manager experience, and manager tenure of available investment alternatives. A consistent performance history and investment strategy, among other factors, demonstrate the ability of the investment manager to generate consistently superior long-term investment results. At a minimum, prudent fiduciaries require an actual five-year performance history for an investment option prior to its inclusion in a 401(k) plan.

71.     A prudent and loyal fiduciary would not have selected the flexPATH target date funds without a five-year performance history to assess the investment manager's ability to provide superior long-term investment returns relative to prudent alternatives available to the Plan. A prudent and loyal fiduciary would not rely on backtested or hypothetical performance data when selecting an investment for a defined contribution plan because that data can be easily manipulated and does not reflect how the investment manager would perform under actual market conditions. That is especially so when the Plan's investment manager with discretion over the selection of the QDIA (flexPATH) had less than one year of actual experience managing assets and the decision to add the funds benefitted itself and its affiliated investment advisor (NFP) charged with advising the Plan's named fiduciaries.

72.     Given the lack of any meaningful performance history to evaluate flexPATH or the flexPATH target date funds relative to prudent alternatives available to the Plan, the Wood Defendants failed to conduct an independent investigation into the merits of hiring flexPATH as the Plan's discretionary investment manager or allow the flexPATH target date funds as the Plan's QDIA to be placed in the Plan. It is further evident that the Wood Defendants failed to conduct a prudent investigation of flexPATH's qualifications to determine whether flexPATH was sufficiently capable of managing the Plan's assets through an

- 25 -

untested investment strategy. The inadequate track record of the flexPATH funds and investment manager would have been apparent to a prudent and loyal fiduciary. Therefore, by failing to satisfy their own fiduciary obligations as the appointing fiduciary prior to engaging flexPATH as the Plan's discretionary investment manager or allowing the flexPATH funds to be added to the Plan, the Wood Defendants enabled flexPATH to commit a breach by including its own imprudent investments in the Plan.

73.    In using flexPATH and the flexPATH target date funds, the foregoing facts demonstrate that the Wood Defendants and flexPATH failed to "balance the relevant factors and make a reasoned decision as to the preferred course of action— under circumstances in which a prudent fiduciary would have done so," which is a breach of fiduciary duty. *See George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 788 (7th Cir. 2011). There was no loyal or prudent reason to cause the flexPATH target date funds to be placed in the Plan, which were managed by an inexperienced investment manager under a novel and untested target date fund investment strategy.

74.    The decision to use the flexPATH target date funds also was inconsistent with the Scorecard System Methodology set forth in the Wood Defendants' Investment Policy Statement (IPS) for the Plan, which governs the selection, monitoring and removal of Plan investment options. The IPS documents the investment process by which the Plan's fiduciaries determined was prudent when overseeing the Plan's investments. Although the most recent IPS is dated January 1, 2019, on information and belief, the standards set forth therein were contained within a prior IPS applicable at the time flexPATH selected the flexPATH target date funds. When evaluating Plan investments, the IPS initially contemplates that Plan investments have an average historical performance history of three or five years for target date fund strategies to evaluate (or score) those funds under the Scorecard System Methodology developed by NFP. (For asset

- 26 -

allocation funds, the IPS specifies a five-year time period.) Therefore, when the flexPATH target date funds were added to the Plan, the Wood Defendants and NFP were unable to score those funds under the system developed to evaluate target date fund strategies.

75.     The significance of a plan's target date fund option underscores the importance of a prudent and loyal selection process and continuous oversight of that option. Participants may solely rely on their single target date fund selection over their investment horizon to meet their retirement goals. In addition, the flexPATH Moderate target date fund was the Plan's QDIA.[8] No prudent fiduciary would subject Plan participants to an unproven fund that they heavily rely on to invest for retirement.

76.     At the time the flexPATH target date funds were added to the Plan, there was no shortage of prudent target date funds managed by experienced and reputable investment managers available to the Plan. The market for target date funds provided to defined contribution plans has been highly developed since target date funds were first offered to the marketplace in March 1994.[9] Vanguard's target date funds, called the Vanguard Target Retirement Funds, are one such example of a prudent target date solution to the flexPATH target date funds that has been available in the market for 17 years.

77.     Vanguard has extensive experience in the investment management industry. Founded on May 1, 1975, Vanguard has offered investment products to investors for over 45 years.[10] Vanguard has offered target date funds since 2003,[11]

---

[8] As indicted *supra,* if a participant has not made or does not make an investment election, any contributions she receives or makes to the Plan are invested in the QDIA. 29 CFR §2550.404c-5(a)(1).

[9] Jeffrey Ptak, *Success Story: Target-Date Investors*, MORNINGSTAR (Feb. 19, 2018), https://www.morningstar.com/articles/850872/success-story-target-date-fund-investors.

[10] Vanguard Chester Funds, Form N-1A, Jan. 27, 2017, https://www.sec.gov/Archives/edgar/data/752177/000093247117000194/chester485b.htm.

- 27 -

and lower-cost collective investment trust versions (I shares) since 2007.[12] Each year from 2012–2017, Vanguard received the highest Morningstar Analyst Rating for Target-Date Series mutual funds.[13] Vanguard also has been the top target date fund provider (by assets under management) since 2014.[14] Since before 2016, Vanguard's target date mutual funds have been strong performing target date funds,[15] and the Vanguard collective investment trust versions have experienced even better performance because they charge lower fees than their mutual fund equivalents.

78.    The Vanguard Target Retirement collective trust target date funds also charge low investment management expenses. Since 2016, the Vanguard Target Retirement Trust Plus shares charge 6–7 bps, and the lower-cost Trust Select shares charge 5 bps. The Trust Plus shares have been available since August 2011, while the Trust Select shares have been available since June 2015. Relative to the Trust Select Shares at the time of selection, the flexPATH target date funds (I1 shares) charged 420% higher expenses—26 bps compared to 5 bps. The Plan later transitioned to M shares for the flexPATH target date funds at or around February 2018. These shares were still more than twice the cost of the Vanguard collective

---

[11] Vanguard Chester Funds, Form N-CSR, Mar. 31, 2006, https://www.sec.gov/Archives/edgar/data/752177/000093247106000887/chesterfundsfinal.htm.

[12] Vanguard Chester Funds, Form N-CSR, Mar. 31, 2006, https://www.sec.gov/Archives/edgar/data/752177/000093247106000887/chesterfundsfinal.htm; Vanguard Target Retirement 2020 Trust I Fact Sheet, https://institutional.vanguard.com/iippdf/pdfs/FS1464.pdf.

[13] John Croke, *Vanguard Earns Morningstar Gold,* June 21, 2019, https://institutional.vanguard.com/VGApp/iip/site/institutional/researchcommentary/article/InvComVanguardMorningstarGold. Morningstar, Inc. is a leading provider of investment research and investment services, and is relied on by industry professionals.

[14] Morningstar, 2019 Target Date Fund Landscape, at 9, 11 https://institutional.vanguard.com/iam/pdf/TDFLNDSCP.pdf.

[15] *E.g.,* Morningstar, 2019 Target Date Fund Landscape at 33; Vanguard Chester Funds, Form N-1A, Jan. 27, 2017, https://www.sec.gov/Archives/edgar/data/752177/000093247117000194/chester485b.htm.

- 28 -

trusts—12 bps compared to 5 bps.

79.     The Wood Defendants recognized the prudence of using Vanguard as the Plan's target date fund manager, which further demonstrates that the Wood Defendants concede the Vanguard target date funds were a prudent alternative to the flexPATH target date funds. As of December 31, 2018, the Wood Defendants made the decision to replace the flexPATH target date funds with the Vanguard Target Retirement Trust Plus target date funds. The Wood Defendants only came to this conclusion after Defendants subjected Plan participants to an untested target date fund solution that put at risk hundreds of millions of dollars of participants' retirement savings. This decision caused Plan participants to lose substantial retirement savings.

80.     A prudent alternative to the flexPATH target date funds was the Vanguard Target Retirement Trust target date funds. From June 30, 2016 through September 30, 2018, the Plan's flexPATH target date funds substantially underperformed the Vanguard Target Retirement Trust Select target date funds. Had the Wood Defendants used the Vanguard alternative rather than the flexPATH target date funds, Plan participants would not have lost in excess of $17.6 million of their retirement savings.[16]

### 2.  International Stock Fund (I1).

81.     In late 2018, the Wood Defendants added the International Stock Fund (I1) to the Plan on the advice and recommendation of NFP. The International Stock Fund replaced the Dodge & Cox International Fund (DODFX), which resulted in over $16 million mapped to that fund. "Mapping" refers to the process where the fund assets are sold, and the proceeds are transferred to the new investment option where they are reinvested. As indicated *supra,* the International Stock Fund is an

---

[16] Plan losses have been brought forward through September 30, 2020 to account for lost investment opportunity.

- 29 -

affiliated investment of NFP, as flexPATH serves as the subadvisor for this fund.

82. Using an active investment management strategy, the International Stock Fund seeks to achieve long-term capital growth by investing primarily in non-U.S. equity securities. Morningstar classifies the Fund in the foreign large cap value asset category and uses the Morgan Stanley Capital International All Country World Index Excluding U.S. (MSCI ACWI Ex-US Index) as its style-specific benchmark. The MSCI benchmark index captures large and mid-cap securities across 22 developed markets countries (excluding the United States) and 27 emerging markets countries.

83. In an active investment strategy, the investment manager uses her judgment in buying and selling individual securities (*e.g.*, stocks, bonds, etc.) in an attempt to generate investment returns that surpass a benchmark index, net of fees, which are higher in actively managed than passively managed funds. In a passive investment strategy, the investment manager attempts to match the performance of a given benchmark index by holding a representative sample of securities in that index. Because no stock selection or research is necessary for the manager to track the index and trading is limited, passively managed investments charge significantly lower fees for investment management services.

84. In light of the effect of fees on expected returns, fiduciaries must carefully consider whether the added cost of actively managed funds is realistically justified by an expectation of higher returns. RESTATEMENT (THIRD) OF TRUSTS ch. 17, intro. note; *id*. § 90 cmt. h(2). Nobel Prize winners in economics have concluded that virtually no investment manager consistently beats the market over time after fees are taken into account. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs." William F. Sharpe, *The Arithmetic of Active Management,* 47 FIN.

- 30 -

ANALYSTS J. 7, 8 (Jan./Feb. 1991);[17] Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 J. FIN. 1915, 1915 (2010) ("After costs . . . in terms of net returns to investors, active investment must be a negative sum game.").

85.     To the extent managers show any sustainable ability to beat the market, the outperformance is nearly always dwarfed by fund expenses. Fama & French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, at 1931–34; *see also* Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. FIN. 1655, 1690 (2000) ("on a net-return level, the funds underperform broad market indexes by one percent per year").

86.     If an individual high-cost mutual fund exhibits market-beating performance over a short period of time, studies demonstrate that outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. FIN. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. FIN. 57, 57, 59 (1997) (measuring thirty-one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). But the *worst-performing* mutual funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57.

87.     Accordingly, a prudent fiduciary would not select as a plan investment option a more-expensive actively managed fund without determining that the fund is reasonably expected to outperform a cheaper index fund.

88.     The International Stock Fund did not exist until December 29, 2017

---

[17] https://www.tandfonline.com/doi/10.2469/faj.v47.n1.7.

- 31 -

when flexPATH launched the fund. Wilmington Trust is the trustee and flexPATH is the subadvisor of the fund. Rather than actually investing the underlying assets of the International Stock Fund, flexPATH invests the assets in an investment vehicle selected by flexPATH, which is managed by an unaffiliated investment manager. From the fund's inception to March 27, 2020, the Templeton Foreign CIT was the underlying fund, and since that time, the PIMCO RAE International collective trust has been the underlying fund.

89.    The International Stock Fund had less than one year of performance history at the time the Wood Defendants selected it for inclusion in the Plan. And flexPATH had only managed assets in general for barely three years. By December 31, 2018, when the International Stock Fund had one full calendar year of performance, the fund underperformed its benchmark index. Although the underlying fund (Templeton Foreign Fund CIT) had a longer performance history, it was not made available to Plan participants. Even though the Templeton Foreign Fund had a 10-year performance history (through its mutual fund equivalent in R or R6 shares), it underperformed its benchmark index over 1-, 5- and 10-year periods as of December 31, 2017.[18] From 2014 through 2017, the Templeton Foreign Fund also ranked in the 80th percentile or worse of its peer group for three of those four years.

90.    The International Stock Fund charges 40 bps. flexPATH caused the Plan to invest in a higher-cost version of the underlying fund managed by Templeton Global Advisors. This caused Plan participants to pay higher expenses than would be charged if the Plan invested directly in the lowest-share class of the underlying fund. This caused participants to suffer from lower returns on their investment due to higher expenses. For instance, during the time period that the

---

[18] Templeton Funds, Form N-1A, Dec. 27, 2018, https://www.sec.gov/Archives/edgar/data/225930/000137949118006477/filing1906.htm.

Templeton Foreign CIT was the fund's underlying investment, Wilmington Trust offered the Templeton Foreign CIT (Class 0TS), which charged 33 bps—close to 20% less—for the same investment managed by the same investment manager. The Plan's investment in this higher-cost version by flexPATH for the same investment only benefitted NFP and flexPATH.[19]

91.     The International Stock Fund was inferior to other comparable funds in the market. The Vanguard Total World Stock Index Fund (Instl) (VTWIX) is a passively managed foreign index fund that provides shareholders broad exposure to stock markets around the world, including developed and emerging markets. The Vanguard index fund charged substantially lower expenses than the International Stock Fund. In 2018, the flexPATH fund charged 40 bps compared to 10 bps charged by Vanguard, which is 300% more. The Vanguard index fund also was superior to the International Stock Fund in terms of performance. As of December 31, 2017, the Vanguard alternative outperformed the Templeton Foreign Fund (as measured by its mutual fund equivalent) over the trailing one-, three- and five-year periods.[20]

92.     Another lower-cost alternative to the International Stock Fund is the Vanguard Total International Stock Index Fund (VTPSX). The Vanguard Total International Stock is a passively managed foreign index fund that provides shareholders exposure to developed and emerging markets, excluding the United States. The Vanguard index fund is benchmarked to the MSCI ACWI ex US and other comparative indexes. In 2018, flexPATH charged 40 bps for the International

---

[19] The harm to Plan participants is further shown when the International Stock Fund is compared to the Templeton Foreign CIT's mutual fund equivalent. In 2019, the International Stock Fund underperformed than the Templeton Foreign Fund (R6) (FTFGX), which charged higher expenses. In 2019, the Templeton mutual fund outperformed the International Stock Fund by 28 bps (13.05% vs. 12.77%).

[20] Vanguard International Equity Index Funds, Form N-1A, Feb. 23, 2018, https://www.sec.gov/Archives/edgar/data/857489/000093247118005160/merged.htm; Templeton Funds, Form N-1A, Dec. 27, 2018; Morningstar.

Stock Fund, which were 471% higher than 7 bps charged by Vanguard. The Vanguard index fund also was superior to the International Stock Fund in terms of performance. As of December 31, 2017, the Vanguard alternative outperformed the Templeton Fund (as measured by its mutual fund equivalent) over the trailing one-, three-, and five-year periods.[21]

93.     Since 2018 when the International Stock Fund was added to the Plan, it has underperformed its benchmark index, comparable Plan investments and passively managed equivalents. For 2019 and year-to-date (as of Sept. 30, 2020), the International Stock Fund underperformed its benchmark index by 879 bps to 1,118 bps and underperformed the Vanguard Total World Stock Index Fund by 1,401 bps to 1,779 bps. Relative to the Vanguard Total International Stock Index, the International Stock Fund underperformed by 879 bps to 1,179 bps.

94.     Because the International Stock Fund had an inferior performance history at the time of selection and flexPATH had insufficient experience managing assets, the Wood Defendants and NFP failed to make a reasoned decision that adding the actively managed fund to the Plan was in the best interest of Plan participants or prudent, and failed to determine whether participants would be better served by other prudent and better performing alternatives available to the Plan after considering all relevant factors. The decision to include the International Stock in the Plan only served to benefit NFP and flexPATH.

95.     By using the International Stock Fund as a Plan investment, the Wood Defendants and NFP caused Plan participants to suffer performance losses. A prudent alternative to the International Stock Fund was the Vanguard Total World Stock Index Fund (VTWIX). Had the Wood Defendants used the Vanguard alternative instead of the International Stock Fund, Plan participants would not have

---

[21] Vanguard Star Funds, Form N-1A, Feb. 22, 2018, https://www.sec.gov/Archives/edgar/data/736054/000093247118005104/star485b0 22018.htm; Templeton Funds, Form N-1A, Dec. 27, 2018; Morningstar.

- 34 -

lost in excess of $5.1 million of their retirement savings.[22]

### 3. Core Bond Fund (I1).

96.    In late 2018, the Wood Defendants added the Core Bond Fund (I1) to the Plan on the advice and recommendation of NFP. The Core Bond Fund replaced the PIMCO Total Return Fund (PTTRX), which resulted in over $57 million mapped to that fund. As indicated *supra,* the Core Bond Fund is an affiliated investment of NFP because flexPATH serves as the fund's subadvisor.

97.    Using an active investment management strategy, the Core Bond Fund seeks to achieve a total return from current income and capital appreciation by investing in a diversified portfolio of fixed-income securities. Morningstar classified the fund in the intermediate-term bond asset category and identifies the Barclays U.S. Universal Bond Index as its benchmark. The Barclays U.S. Universal Bond Index measures the performance of investment grade or high-yield U.S. dollar-denominated, fixed-rate taxable bonds, including Treasuries, government-related and corporate securities, and mortgage-backed securities.

98.    The Core Bond Fund did not exist until January 2, 2018 when flexPATH launched the fund. Wilmington Trust is the trustee and flexPATH is the subadvisor of the fund. Rather than actually investing the underlying assets of the Core Bond Fund, flexPATH invests the assets in an investment vehicle selected by flexPATH, which is managed by an unaffiliated investment manager called the Lord Abbett Total Return Trust II. The underlying investment strategy seeks to outperform its benchmark by 100–150 bps gross of fees over a full market cycle. The performance of the Core Bond Fund is based on the performance of the Core Plus Total Return Composite restated to reflect fees and expenses of the applicable share class.

---

[22] Plan losses have been brought forward through September 30, 2020 to account for lost investment opportunity.

- 35 -

99.     The Core Bond Fund had far less than one year of performance history at the time the Wood Defendants selected it for inclusion in the Plan. By December 31, 2018, when the Core Bond Fund was added to the Plan, the fund still had no one-year performance. Although the underlying fund (Lord Abbett Total Return Trust II) had a longer performance history, it was not made available to Plan participants.

100.    The Core Bond Fund charges 23 bps. flexPATH caused the Plan to invest in a higher-cost version of the underlying fund managed by Lord Abbett & Co., LLC. This causes Plan participants to pay higher expenses than would be charged if the Plan invested directly in the lowest-share class of the underlying fund, thereby causing participants to suffer from lower investment returns. For example, Wilmington Trust offered the Lord Abbett Total Return Trust II (Class 0TS), which charged 16 bps—over 30% less—for the same investment managed by the same investment manager. The Plan's investment in the higher-cost version by flexPATH for the same investment only benefitted NFP and flexPATH.

101.    The Core Bond Fund replaced the PIMCO Total Return Fund (PTTRX), which was a comparable intermediate-term bond fund benchmarked to the Barclays U.S. Aggregate Bond Index. The Barclays U.S. Aggregate Bond Index is the most popular benchmark for the U.S. investment-grade market. The index measures the investment grade, U.S. dollar denominated, fixed-rate taxable bond market. As of December 31, 2017, the PIMCO Total Return Fund outperformed its benchmark index over all reporting periods.[23] It also outperformed the Lord Abbett Total Return mutual fund over the trailing one- and three-year periods. The historical performance of the PIMCO fund would not have caused a prudent fiduciary to remove that option from the Plan in favor of an investment vehicle

---

[23] PIMCO Funds, Form N-1A, July 30, 2018, https://www.sec.gov/Archives/edgar/data/810893/000119312518228168/d550613d485bpos.htm#chapter_2-sect1_11_5425.

- 36 -

offered by an inexperienced investment manager, particularly when that decision directly benefited the Plan's fiduciary investment advisor.

102. The Core Bond Fund was also inferior to comparable funds in the market. The Vanguard Intermediate-Term Bond Index Fund (Instl Plus) (VBIUX) is a passively managed intermediate-term bond fund. Morningstar classified the Vanguard index fund in the intermediate-term bond asset category and uses the Barclays U.S. Aggregate Bond Index as its benchmark. The Vanguard index fund charged substantially lower fees relative to the Core Bond Fund. In 2018, the flexPATH fund charged 23 bps compared to 4 bps charged by Vanguard, which is 475% more.

103. Because the Core Bond Fund had an inferior performance history at the time of selection and flexPATH had insufficient experience managing assets, the Wood Defendants and NFP failed to make a reasoned decision that adding the actively managed Core Bond Fund to the Plan was in the best interest of Plan participants or prudent, and failed to determine whether participants would be better served by other prudent and better performing alternatives available to the Plan after considering all relevant factors. The decision to include the Core Bond in the Plan only served to benefit NFP and flexPATH.

104. During the period the Core Bond Fund was included in the Plan, it has underperformed its benchmark index, comparable Plan investments, and passively managed equivalents. In particular, by underperforming its benchmark index, the fund has consistently failed to meet its underlying investment strategy by outperforming its benchmark by 100–150 bps gross of fees. Despite this, the Wood Defendants retained the fund as a Plan investment based on the investment advice of NFP. By including the Core Bond Fund in the Plan, the Wood Defendants and NFP caused Plan participants to suffer performance losses. A prudent alternative to the Core Bond Fund was the Vanguard Intermediate-Term Bond Index Fund (VBIUX). Had the Wood Defendants used the Vanguard alternative instead of the

- 37 -

Core Bond Fund, Plan participants would not have lost in excess of $3 million of their retirement savings.[24]

### 4. Large Cap Value (I1).

105. In late 2018, the Wood Defendants added the Large Cap Value Fund (I1) to the Plan on the advice and recommendation of NFP. The Large Cap Value Fund replaced the MFS Value Fund (MEIKX), which resulted in over $84 million mapped to that fund. As indicated *supra,* the Large Cap Value Fund is an affiliated investment of NFP that is subadvised by flexPATH.

106. Using an active investment management strategy, the Large Cap Value Fund seeks to outperform the market the long-term by employing a value-oriented approach to identify potential opportunities by investing in large capitalization securities and identifies the Russell 1000 Value Index as its benchmark. The Russell 1000 Value Index measures the performance of the large-cap value segment of domestic equity securities. The index includes companies within the Russell 1000 Index with lower price-to-book ratios and lower expected growth values.

107. The Large Cap Value Fund did not exist until December 3, 2018 when flexPATH launched the fund. Wilmington Trust is the trustee and flexPATH is the subadvisor of the fund. Rather than actually investing the underlying assets of the Large Cap Value Fund, flexPATH invests the assets in an investment vehicle selected by flexPATH, which is managed by an unaffiliated investment manager called the Putnam Large Cap Value Trust. The performance of the Large Cap Value Fund is based on the performance of the Putnam's mutual fund equivalent, the Putnam Equity Income Fund (R6) (PEQSX).

108. The Large Cap Value Fund charges 29 bps. flexPATH caused the Plan to invest in a higher-cost version of the underlying fund managed by Putnam

---

[24] Plan losses have been brought forward through September 30, 2020 to account for lost investment opportunity.

- 38 -

Investment Management, LLC. This causes Plan participants to pay higher expenses than would be charged if the Plan invested directly in the lowest-share class of the underlying fund. For instance, Putnam Fiduciary Trust Company offers the Putnam Large Cap Value Trust in Class IB shares, which allowed plan fiduciaries to negotiate a lower investment management fee directly with Putnam Fiduciary Trust Company. As a result, the investment returns of the Putnam Large Cap Value Trust (Class IB shares) provided higher returns than the Plan's Large Cap Value Fund. By causing the Plan to invest in the Large Cap Value Fund, Defendants caused Plan participants to pay unnecessary investment management fees, thereby reducing their investment returns relative to the Putnam Large Cap Value Trust (IB).

**II.     The Wood Defendants and NFP caused the Plan to pay unreasonable investment management fees by using higher-cost versions of Plan investments.**

109.   Academic and financial industry literature demonstrate that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2008); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1993 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-

- 39 -

one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed mutual funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

110. When providing investments to plan participants, the importance of fees cannot be overstated. Indeed, "the duty to avoid unwarranted costs is given increased emphasis in the prudent investor rule" under the common law of trusts, which informs ERISA's fiduciary duties. Restatement (Third) of Trusts ch. 17, intro. note (2007); *see Tibble*, 135 S. Ct. at 1828 (*citing* Restatement (Third) of Trusts § 90 in finding a continuing duty to monitor under ERISA). As the Restatement explains, "cost-conscious management is fundamental to prudence in the investment function." Restatement (Third) of Trusts § 90 cmt. b.

111. It is a simple principle of investment management that the larger amount an investor has available to invest, the lower the investment management fees that can be obtained in the market for a given investment vehicle. Large retirement plans have substantial bargaining power to negotiate low fees for investment management services. Multi-billion-dollar defined contribution plans, such as the Plan, have even greater bargaining power.

112. Mutual funds and collective investment trusts frequently offer multiple share classes. Because the only difference between the share classes is fees, selecting higher-cost shares results in the plan paying wholly unnecessary fees. Accordingly, absent a compelling reason to opt for the higher-cost version, prudent fiduciaries will select the lowest-cost share class available to the plan. As a prominent legal counsel to defined contribution fiduciaries explained:

> The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the

- 40 -

circumstances. In other words, the "prevailing circumstances"—such as the size of the plan—are a part of a prudent decision making process. The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach.[25]

113.   Given the Plan's size, the Plan had tremendous bargaining power to obtain share classes with far lower costs than that of higher-cost shares. Lower-cost share classes of mutual fund and collective investment trust investments were readily available to the Plan. Minimum investment thresholds for the lowest-cost institutional shares are routinely waived by the investment provider even if not reached by a single fund.

> For large 401(k) plans with over a billion dollars in total assets…mutual funds will often waive an investment minimum for institutional share classes. It is also common for investment advisors representing large 401(k) plans to call mutual funds and request waivers of the investment minimums so as to secure the institutional shares.

*Tibble v. Edison Int'l*, No. 07-5359, 2010 WL 2757153, at *9 (C.D. Cal. July 8, 2010), *affirmed* 729 F.3d 1110 (9th Cir. 2013).

114.   In fact, Vanguard expressly "reserves the right to establish higher or lower minimum amounts for certain investors", including when the "plan sponsor's aggregate assets within the Vanguard Funds will likely generate substantial economies in the servicing of their accounts."[26]

115.   During the proposed class period, the Wood Defendants had the

---

[25] Fred Reish, *Class–ifying Mutual Funds*, PLANSPONSOR (Jan. 2011)., http://www.plansponsor.com/MagazineArticle.aspx?id=6442476537.
[26] *See* Vanguard Funds Multiple Class Plan, https://www.sec.gov/Archives/edgar/data/1409957/000093247113007109/multiplec lassplanvanguardfun.pdf.

- 41 -

fiduciary authority over the selection and retention of share classes used for the Plan's investments. As the Plan's fiduciary investment advisor, NFP advised the Wood Defendants regarding Plan investments and the reasonableness of Plan expenses, which would necessarily include the share class to be used for each Plan investment. Despite the fact that lower-cost shares for the exact same investment option were available to the Plan, the Wood Defendants selected and continue to retain higher-cost shares for Plan investments than were available to the Plan based on its enormous size.

116.   In 2015, the Wood Defendants provided the MFS Emerging Markets Debt Fund (R4) (MEDGX) that charged 84 bps when lower-cost R5 shares (renamed R6) (MEDHX) were available for 73 bps,[27] and the MFS Value (R4) (MEIJX) that charged 62 bps when lower-cost R5 shares (renamed R6) (MEIKX) were available for 50 bps.[28] This caused Plan participants to pay unnecessary and unreasonable expenses for the identical investments. The Wood Defendants also provided the Vanguard 500 Index Fund (VFIAX) (Admiral shares) that charged 5 bps when the lower-cost Institutional Plus shares (VIIIX) were available for 2 bps, a cost savings of 60%.[29]

117.   During the fourth quarter of 2018, the Wood Defendants added the Vanguard Target Retirement target date funds to the Plan. By December 31, 2018, the Plan invested over $1 billion in these target date funds. From 2018 through the present, the Wood Defendants selected and maintained the Trust Plus shares that

[27] MFS Series Trust X, Form N-CSR, July 31, 2015, https://www.sec.gov/Archives/edgar/data/783740/000119312515328385/d90069dn csr.htm#tx90069_5.
[28] MFS Series Trust I, Form N-CSR, Aug. 31, 2015, https://www.sec.gov/Archives/edgar/data/798244/000119312515367579/d66368dn csr.htm.
[29] Vanguard Index Funds, Form N-CSR, Dec. 31, 2015, https://www.sec.gov/Archives/edgar/data/36405/000093247116012795/indexfunds final.htm; Vanguard Institutional Index Funds, Form N-CSR, Dec. 31, 2015, https://www.sec.gov/Archives/edgar/data/862084/000093247116012807/institiutio nalindex_final.htm.

- 42 -

charge 7 bps when the lower cost Select shares were available for 5 bps, a cost savings of almost 30%. Moreover, as indicated *supra*, the Wood Defendants used the flexPATH funds when lower-cost versions of the underlying funds were available to the Plan.

118.   According to the Plan's Forms 5500, none of the higher-cost shares of the Plan's investments identified herein paid revenue sharing that was used by the Wood Defendants to offset Plan expenses charged by service providers.

119.   By providing Plan participants the more expensive share classes of Plan investment options, the Wood Defendants caused participants to lose substantial retirement savings.[30]

## CLASS ACTION ALLEGATIONS

120.   29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. §1109(a).

121.   In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §1132(a)(2), Plaintiffs seek to certify this action as a class action on behalf of all Plan participants and beneficiaries. Plaintiffs seek to certify the follow class:

> All participants and beneficiaries of the Wood 401(k) Plan from February 16, 2015 through the date of judgment, excluding Defendants and members of the Committee of the Wood 401(k) Plan.

122.   This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

> a.   The Class include over 10,000 members and is so large that

---

[30] Plan losses have been carried forward through December 31, 2020 using the investment return of an S&P 500 index fund, the Vanguard Institutional Index (VIIIX), to account for lost investment returns on those assets.

- 43 -

joinder of all its members is impracticable.

b.     There are questions of law and fact common to the Class because Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions and made omissions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendants' breaches of duty.

c.     Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct.

d.     Plaintiffs are adequate representatives of the Class because they were participants in the Plan during the Class period, have no interest that is in conflict with any other member of the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e.     Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or

- 44 -

impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

123.   A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

124.   Plaintiffs' counsel, Schlichter Bogard & Denton, LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g). Schlichter Bogard & Denton has been appointed as class counsel in over 30 other ERISA class actions regarding excessive fees in large defined contribution plans. Courts in these cases have consistently and repeatedly recognized the firm's unparalleled success in the area of defined contribution excessive fee litigation.

125.   Judge Michael Ponsor of the United States District Court for the District of Massachusetts found that Schlichter, Bogard & Denton had achieved an "outstanding result for the class," and "demonstrated extraordinary resourcefulness, skill, efficiency and determination." *Gordan v. Mass Mutual Life Ins., Co.*, No. 14-30184, Doc. 144 at 5 (D. Mass. Nov. 3, 2016). Chief Judge Michael J. Reagan of the Southern District of Illinois recognized that the firm had shown "exceptional commitment and perseverance in representing employees and retirees seeking to improve their retirement plans," and "demonstrated its well-earned reputation as a

- 45 -

pioneer and the leader in the field" of 401(k) plan excessive fee litigation. *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 WL 43984750, at *1 (S.D. Ill. July 17, 2015). Judge Harold Baker of the Central District of Illinois acknowledged the significant impact of the firm's work, finding that as of 2013, the nationwide "fee reduction attributed to Schlichter, Bogard & Denton's fee litigation and the Department of Labor's fee disclosure regulations approach *$2.8 billion in annual savings* for American workers and retirees." *Nolte v. Cigna Corp.*, No. 07-2046, 2013 WL 12242015, at *2 (C.D. Ill. Oct. 15, 2013) (emphasis added).

126.    Other courts have made similar findings. *See, e.g., Marshall v. Northrop Grumman Corp.*, No. 16-6794 AB (JCX), 2020 WL 5668935, at *4 (C.D. Cal. Sept. 18, 2020) ("The Court finds that Schlichter, Bogard & Denton is exceptionally skilled having achieved unparalleled success in actually pioneering complex ERISA 401(k) excessive fee litigation[.]"); *Kelly v. Johns Hopkins Univ.*, No. 16-2835, 2020 WL 434473, at *2 (D. Md. Jan. 28, 2020) (Schlichter, Bogard & Denton "pioneered this ground-breaking and novel area of litigation" that has "dramatically brought down fees in defined contribution plans"); *Bell v. Pension Comm. of ATH Holding Co.,* No. 15-2062, 2019 WL 4193376, at *2 (S.D. Ind. Sept. 4, 2019*)* (the firm are "experts in ERISA litigation"); *Spano v. Boeing Co.*, No. 06-743, Doc. 587, at 5–6 (S.D. Ill. Mar. 31, 2016) ("The law firm Schlichter, Bogard & Denton has significantly improved 401(k) plans across the country by bringing cases such as this one[.]") (internal quotations omitted); *Beesley v. Int'l Paper Co.*, No. 06-703, 2014 WL 375432, at *2 (S.D. Ill. Jan. 31, 2014) ("Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to demonstrate extraordinary skill and determination."); *George v. Kraft Foods Global, Inc.*, No. 08-3799, 2012 WL 13089487, at *2 (N.D. Ill. June 26, 2012) ("It is clear to the Court that the firm of Schlichter, Bogard & Denton is preeminent in the field" "and is the only firm which has invested such massive resources in this area."); *Will v. General Dynamics*

- 46 -

*Corp.*, No. 06-698, 2010 WL 4818174, at *3 (S.D. Ill. Nov. 22, 2010) ("Schlichter, Bogard & Denton's work throughout this litigation illustrates an exceptional example of a private attorney general risking large sums of money and investing many thousands of hours for the benefit of employees and retirees.").

127.   Schlichter Bogard & Denton handled the first full trial of an ERISA excessive fee case, resulting in a $36.9 million judgment for the plaintiffs that was affirmed in part by the Eighth Circuit. *Tussey v. ABB, Inc.*, 746 F.3d 327 (8th Cir. 2014). In awarding attorney's fees after trial, the district court concluded that "Plaintiffs' attorneys are clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 WL 5386033, at *3 (W.D. Mo. Nov. 2, 2012). Following remand, the district court again awarded Plaintiffs' attorney's fees, emphasizing the significant contribution Plaintiffs' attorneys have made to ERISA litigation, including educating the Department of Labor and federal courts about the importance of monitoring fees in retirement plans:

> Of special importance is the significant, national contribution made by the Plaintiffs whose litigation clarified ERISA standards in the context of investment fees. The litigation educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees and separating a fiduciary's corporate interest from its fiduciary obligations.

*Tussey v. ABB, Inc.,* No. 06-4305, 2015 WL 8485265, at *2 (W.D. Mo. Dec. 9, 2015).

128.   Schlichter Bogard & Denton was also class counsel in and handled *Tibble v. Edison International*, 135 S. Ct. 1823 (2015), the first and only Supreme Court case to address the issue of excessive fees in a defined contribution plan—in which the Court held in a unanimous 9–0 decision that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Id.* at 1829. Schlichter Bogard & Denton successfully petitioned for a writ of certiorari and

obtained amicus support from the United States Solicitor General and AARP, among others. Given the Court's broad recognition of an ongoing fiduciary duty, the *Tibble* decision will affect all ERISA defined contribution plans.

## COUNT I: BREACH OF FIDUCIARY DUTIES (29 U.S.C. §1104(A)(1)) RELATED TO THE FLEXPATH FUNDS

129. Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

130. This Count alleges breach of fiduciary duties against all Defendants.

131. Defendants were required to act "solely in the interest" of participants and to manage the assets of the Plan for the "exclusive purpose of providing benefits to participants and their beneficiaries, and defraying reasonable expenses of administering the Plan", and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims". 29 U.S.C. §1104(a)(1)(A)–(B). Defendants were directly responsible for selecting prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent designated investment alternatives, and taking all necessary steps to ensure that the Plan's assets were invested prudently. As the Supreme Court confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble,* 135 S. Ct. at 1829.

132. Defendants breached their duties of loyalty and prudence under 29 U.S.C. §1104(a)(1)(A) and (B) by selecting and retaining the flexPATH funds in the Plan. Instead of acting solely in the interest of Plan participants, Defendants provided the flexPATH funds as Plan investments because of the benefits they provided to the NFP Defendants, which came at the expense of participants' retirement savings. While the NFP Defendants received millions of dollars in Plan assets for their investment management business and advisory fees, participants

- 48 -

sustained massive losses in retirement savings due to high fees and poor performance. Moreover, Defendants failed to engage in a reasoned decision-making process to determine that using the flexPATH funds was in the best interests of Plan participants or prudent and failed to determine whether participants would be better served by other prudent and better performing alternatives available to the Plan after considering all relevant factors. Defendants' decision to add or recommend the retention of the proprietary flexPATH funds caused the Plan and participants to incur significant losses.

133. In particular, the Wood Defendants failed to discharge their fiduciary duties by allowing flexPATH to include its untested and inferior proprietary target date funds in the Plan, and also by selecting and retaining the other flexPATH funds (International Stock, Core Bond, and Large Cap Value funds) that were inferior to prudent alternatives available to the Plan.

134. flexPATH violated its fiduciaries duties by selecting and retaining the flexPATH target date funds in the Plan, which were managed under an untested investment strategy and were inferior to prudent alternatives available to the Plan.

135. Following the engagement of flexPATH, NFP also violated its fiduciary duties by advising the Wood Defendants on the retention of the flexPATH target date funds, and separately, by advising the Wood Defendants to select and retain the other flexPATH funds because of the benefits they provided to itself and flexPATH.

136. Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

137. Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

138. Each Defendant knowingly participated in the breach of the other

- 49 -

Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT II: BREACH OF FIDUCIARY DUTIES (29 U.S.C. §1104(A)(1)) RELATED TO THE USE OF HIGHER-COST VERSIONS OF PLAN INVESTMENTS

139.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

140.   This Count alleges breach of fiduciary duties against the Wood Defendants and NFP.

141.   These Defendants breached their duties of loyalty and prudence under 29 U.S.C. §1104(a)(1)(A) and (B) by selecting and retaining as Plan investment options higher-cost shares of mutual funds and collective investment trusts that charged unreasonable fees relative to other investment options that were available to the Plan at all relevant times, including separately managed accounts, collective investment trusts, lower-cost share classes for the Plan's mutual fund and collective investment trust investments with the identical investment manager and investments.

142.   Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

143.   Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate. Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of

- 50 -

the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT III: PROHIBITED TRANSACTIONS (29 U.S.C. §1106) RELATED TO THE FLEXPATH FUNDS

144.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

145.   This Count is asserted against all Defendants.

146.   Section 1106(b) prohibits transactions between a plan and a fiduciary. 29 U.S.C. §1106(b). flexPATH was a Plan fiduciary and caused the Plan to use the flexPATH target date funds, thereby benefiting itself and NFP. NFP was a Plan fiduciary and advised the Wood Defendants on the retention of the flexPATH target date funds and the use of the other flexPATH funds (International Stock, Core Bond, and Large Cap Value funds). flexPATH and NFP therefore dealt with the assets of the Plan in their own interest or for its own account, in violation of 29 U.S.C. §1106(b)(1); acted in a transaction involving the Plan on behalf of a party whose interests were adverse to the interests of the Plan, its participants and beneficiaries, in violation of 29 U.S.C. §1106(b)(2); and received consideration for their own personal account from parties dealing with the Plan in connection with transactions involving the assets of the Plan, in violation of 29 U.S.C. §1106(b)(3).

147.   Section 1106(a) prohibits transactions between a plan and a party in interest. 29 U.S.C. §1106(a). NFP and flexPATH are parties in interest because they were Plan fiduciaries, and entities who provided services to the Plan. 29 U.S.C. §1002(14)(A) and (B). The Wood Defendants and the NFP Defendants caused the Plan to use the flexPATH funds. Defendants therefore caused the Plan to engage in a transaction that they knew or should have known constituted an exchange of property between the Plan and a party in interest in violation of 29 U.S.C. §1106(a)(1)(A); engage in a transaction they knew or should have known

- 51 -

constituted the furnishing of services between the Plan and a party in interest in violation of 29 U.S.C. §1106(a)(1)(C); and engage in a transaction they knew or should have known constituted a transfer of Plan assets to a party in interest in violation of 29 U.S.C. §1106(a)(1)(D).

148.  As a direct result of these prohibited transactions, Defendants caused the Plan to suffer losses.

149.  Even if flexPATH did not act as a fiduciary over the selection and retention of certain flexPATH funds (*i.e.,* International Stock, Core Bond, and Large Cap Value funds), flexPATH is still liable as a non-fiduciary "party in interest", who knowingly participated in a prohibited transaction. Under 29 U.S.C. §1132(a)(3), a court may award "other appropriate equitable relief" to redress "any act or practice" that violates ERISA. A nonfiduciary transferee of ill-gotten proceeds is subject to equitable relief if it had actual or constructive knowledge of the circumstances that rendered the transaction or payment unlawful.

150.  flexPATH had such actual or constructive knowledge that the Plan's investment in the flexPATH funds was unlawful. flexPATH knew or should have known that NFP, whose CEO and President own up to 75% of flexPATH and its executive officers operate and control flexPATH, was engaged in unlawful self-dealing by causing the Plan to invest in the non-QDIA flexPATH funds to enrich themselves.

151.  flexPATH has not dissipated the entirety of the proceeds on nontraceable items and the proceeds can be traced to particular funds or property in flexPATH's possession.

152.  Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties and prohibited transactions alleged in this Count and to restore to the Plan all profits through their use of Plan assets and is subject to other equitable or remedial relief as appropriate, including removal as a Plan fiduciary.

- 52 -

## COUNT IV: FAILURE TO MONITOR FIDUCIARIES

153.  Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

154.  This Count is asserted against the Wood Defendants.

155.  Wood Group U.S. Holdings, Inc., and previously Wood Group Management Services, Inc., oversaw the overall governance of the Plan and had the authority to delegate any of their fiduciary responsibilities. Wood Group U.S. Holdings, Inc. appointed the Fiduciary Committee with authority over the selection, monitoring and removal of Plan investments and service providers, including NFP as the Plan's fiduciary investment advisor.

156.  A monitoring fiduciary must ensure that the person to whom it delegates fiduciary duties is performing its fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when the delegate fails to discharge its duties. To the extent any of the fiduciary responsibilities of the Wood Defendants were delegated to another fiduciary, their monitoring duties included an obligation to ensure that any delegated tasks were being performed in accordance with ERISA's fiduciary standards.

157.  The Wood Defendants breached their fiduciary monitoring duties by, among other things:

a.  failing to monitor their appointees and delegees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and omissions with respect to the Plan;

b.  failing to monitor their appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the imprudent investment options in violation of ERISA;

c.  failing to ensure that the monitored fiduciaries considered the ready

- 53 -

availability of comparable and better performing investment options that charged significantly lower fees and expenses than the Plan's investments; and

    d.  failing to remove appointees and delegees whose performance was inadequate in that they continued to allow unreasonable fees to be charged to Plan participants or imprudent investment options to be selected and retained in the Plan, all to the detriment of Plan participants' retirement savings.

158.   As a direct result of these breaches of fiduciary duty to monitor, the Plan suffered substantial losses. Had the Wood Defendants and the other delegating fiduciaries discharged their fiduciary monitoring duties prudently as described above, the Plan would not have suffered these losses.

## COUNT V: BREACH OF FIDUCIARY DUTIES (29 U.S.C. §1104(A)(1)) RELATED TO THE SELECTION OF FLEXPATH

159.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

160.   This Count is asserted against the Wood Defendants.

161.   When selecting service providers, the Wood Defendants are held to the same stringent fiduciary obligations when administering the Plan. These include the requirement to act "solely in the interest" of participants and to manage the assets of the Plan for the "exclusive purpose of providing benefits to participants and their beneficiaries, and defraying reasonable expenses of administering the Plan", and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims". 29 U.S.C. §1104(a)(1)(A)–(B).

162.   The Wood Defendants breached their duties of loyalty and prudence under 29 U.S.C. §1104(a)(1)(A) and (B) by selecting flexPATH to serve as the

- 54 -

Plan's discretionary investment manager with authority over the Plan's QDIA because flexPATH had no meaningful experience as an investment manager for a defined contribution plan's target date fund option and the Wood Defendants failed to a make a reasoned decision that the selection of flexPATH was in the best interest of Plan participants or prudent, and failed to determine whether participants would be better served by a prudent discretionary investment manager available to the Plan after considering all relevant factors. This is particularly demonstrated by flexPATH's untested experience as an investment manager over a defined contribution plan's QDIA and inferior track record managing target date fund options offered to defined contribution plans. The Wood Defendants independently made the decision to hire flexPATH even though they lacked the experience and sophistication to hire a Plan service provider, as shown by their engagement of NFP to serve as the Plan's fiduciary investment advisor.

163.   By causing the Plan to hire flexPATH as the Plan's discretionary investment manager over the selection of the Plan's QDIA, and authorizing flexPATH to select its proprietary investments, the Wood Defendants caused the Plan to invest in the flexPATH target date funds, thereby causing the Plan and participants to incur significant losses.

164.   Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

165.   Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

166.   Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under

- 55 -

the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## JURY TRIAL DEMANDED

167.  Under Fed. R. Civ. P. 38 and the Constitution of the United States, Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- find and declare that Defendants have breached their fiduciary duties as described above;
- find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty and prohibited transaction, and to otherwise restore the Plan to the position they would have occupied but for the breaches of fiduciary duty;
- order the disgorgement of all amounts paid by the Plan to NFP and flexPATH;
- determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;
- order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under §1109(a);
- remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;
- surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;
- certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Schlichter, Bogard & Denton LLP as

- 56 -

AMENDED COMPLAINT
Case No. 8:21-CV-00301-JVS-KES

Class Counsel;

- award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;
- order the payment of interest to the extent it is allowed by law; and
- grant other equitable or remedial relief as the Court deems appropriate.

May 24, 2021                                Respectfully submitted,

                                            By: /s/ Troy A. Doles
                                            SCHLICHTER BOGARD & DENTON LLP
                                            Jerome J. Schlichter (SBN 054513)
                                            Troy A. Doles (admitted *pro hac vice*)
                                            Heather Lea (admitted *pro hac vice*)
                                            Sean E. Soyars (admitted *pro hac vice*)
                                            Kurt C. Struckhoff (admitted *pro hac vice*)
                                            100 South Fourth Street, Suite 1200
                                            St. Louis, Missouri 63102
                                            Telephone: (314) 621-6115
                                            Facsimile: (314) 621-5934
                                            jschlichter@uselaws.com
                                            tdoles@uselaws.com
                                            hlea@uselaws.com
                                            ssoyars@uselaws.com
                                            kstruckhoff@uselaws.com

                                            *Counsel for Plaintiffs*

                                            William H. Edmonson (SBN 243445)
                                            *will@whelawfirm.com*
                                            LAW OFFICE OF WILL EDMONDSON
                                            8335 Sunset Boulevard, Suite 350
                                            West Hollywood, CA 90069
                                            Telephone: (424) 248-9581

                                            *Local Counsel for Plaintiffs*

- 57 -