1  Jerome J. Schlichter (SBN 054513)
   jschlichter@uselaws.com
2  Troy A. Doles (admitted *pro hac vice*)
   tdoles@uselaws.com
3  Heather Lea (admitted *pro hac vice*)
   hlea@uselaws.com
4  Sean E. Soyars (admitted *pro hac vice*)
   ssoyars@uselaws.com
5  Kurt C. Struckhoff (admitted *pro hac vice*)
   kstruckhoff@uselaws.com
6  SCHLICHTER BOGARD & DENTON LLP
   100 South Fourth Street, Suite 1200
7  St. Louis, MO 63102
   (314) 621-6115

8  *Lead Counsel for Plaintiffs*

9  William H. Edmonson (SBN 243445)
   will@whelawfirm.com
10 LAW OFFICE OF WILL EDMONSON
   8335 Sunset Boulevard, Suite 350
11 West Hollywood, CA 90069
   (424) 248-9581

12
   *Local Counsel for Plaintiffs*
13

14      **IN THE UNITED STATES DISTRICT COURT**
        **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
15

16 ROBERT LAUDERDALE, *et al.*,          Case No. 8:21-cv-301-JVS-KES
17
                          *Plaintiffs*,  Hon. James V. Selna
18
    v.
19                                       PLAINTIFFS' MEM. OF POINTS AND
                                         AUTHORITIES IN OPPOSITION TO
20 NFP RETIREMENT, INC., *et al.*,       NFP RETIREMENT INC.'S MOTION
                                         TO DISMISS [DOC. 75]
21                        *Defendants*.
22
                                         Date: Monday, August 9, 2021
23                                       Time: 1:30 p.m.
                                         Department: Santa Ana, Courtroom 10C
24
25                                       Action Filed: February 16, 2021
                                         Trial Date: October 4, 2022
26
27
28

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................... 1

BACKGROUND ......................................................................................... 1

   I.    The Wood 401(k) Plan .................................................................. 1

   II.   ERISA's strict fiduciary standards and liability apply to NFP ........... 3

         A.   NFP is an "investment advice" fiduciary .................................. 3

         B.   ERISA's fiduciary duties are the highest known to the law ....... 4

         C.   NFP cannot turn a blind eye to flexPATH's breach .................. 5

         D.   ERISA prohibits self-dealing and injurious transactions .......... 5

         E.   ERISA authorizes broad remedies for fiduciary misconduct .................................................................................. 6

   III.   Soon after NPF became the Plan's investment adviser, its corporate partner installed new and untested investments in the Plan ...................................................................................................... 6

ARGUMENT ............................................................................................... 8

   I.    A complaint need only raise a reasonable inference of misconduct ..................................................................................... 8

   II.   Count I states claims against NFP related to the flexPATH funds ..... 11

         A.   NFP's fiduciary status is not limited to investment advice ...... 11

         B.   Plaintiffs' allegations raise a plausible inference that NFP breached its fiduciary duties ................................................. 14

         C.   NFP identifies no basis for dismissal ...................................... 20

   III. Count II plausibly alleges NFP's liability for higher-cost investments ................................................................................. 22

   IV. Count III plausibly alleges NFP's liability for prohibited transactions ................................................................................. 24

CONCLUSION ......................................................................................... 25

# TABLE OF AUTHORITIES

**CASES**

*Allen v. GreatBanc Tr. Co.,*
  835 F.3d 670 (7th Cir. 2016) ................................................................. 8

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ...................................................................... 8, 9

*Baird v. BlackRock Inst'l Tr. Co., N.A.,*
  403 F. Supp. 3d 765 (N.D. Cal. 2019) ............................................. 19

*Bell Atl. Corp v. Twombly,*
  550 U.S. 544 (2007) ...................................................................... 8, 9

*Blatt v. Marshall & Lassman,*
  812 F.2d 810 (2d Cir. 1987) ........................................................... 12

*Braden v. Wal-Mart Stores, Inc.,*
  588 F.3d 585 (8th Cir. 2009) ....................... 8, 9, 11, 14, 18, 19, 21

*Brotherston v. Putnam Investments, LLC,*
  907 F.3d 17 (1st Cir. 2018) ............................................................ 22

*Bussian v. RJR Nabisco, Inc.,*
  223 F.3d 286 (5th Cir. 2000) .......................................................... 16

*Concha v. London,*
  62 F.3d 1493 (9th Cir. 1995) ............................................................ 8

*Davis v. Washington Univ. in St. Louis,*
  960 F.3d 478 (8th Cir. 2020) .......................................................... 23

*DiFelice v. U.S. Airways, Inc.,*
  497 F.3d 410 (4th Cir.2007) ........................................................... 15

*Donovan v. Bierwirth,*
  680 F.2d 263 (2d Cir. 1982) ................................................. 1, 15, 16

*Fifth Third Bancorp v. Dudenhoeffer,*
  573 U.S. 409 (2014) ......................................................................... 4

*George v. Kraft Foods Global, Inc.,*
  641 F.3d 786 (7th Cir. 2011) .......................................................... 15

*Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.,*
  530 U.S. 238 (2000) ......................................................................... 5

*Howard v. Shay,*
  100 F.3d 1484 (9th Cir. 1996) ............................... 4, 8, 15, 16, 17, 18

*Howell v. Motorola, Inc.*,
    633 F.3d 552 (7th Cir. 2011) ................................................................ 15

*In re Century Alum. Co. Sec. Litig.*,
    729 F.3d 1104 (9th Cir. 2013) .............................................................. 9

*John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*,
    510 U.S. 86 (1993) ............................................................................... 3

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ............................................................... 20

*Krueger v. Ameriprise Fin., Inc.*,
    No. 11-2781, 2012 WL 5873825 (D. Minn. Nov. 20, 2012) ............... 19

*Leigh v. Engle*,
    727 F.2d 113 (7th Cir. 1984) ................................................... 16, 17, 18

Lockheed Corp. v. Spink,
    517 U.S. 882 (1996) ............................................................................. 4

*Lowen v. Tower Asset Mgmt.*,
    829 F.2d 1209 (2d Cir. 1987) ............................................................... 25

*Mass. Mut. Life Ins. Co. v. Russell*,
    473 U.S. 134 (1985) ............................................................................. 6

*McGinnes v. FirstGroup Am., Inc.*,
    No. 18-326, 2021 WL 1056789 (S.D. Ohio Mar. 18, 2021) ............... 19

*Meiners v. Wells Fargo & Co.*,
    898 F.3d 820 (8th Cir. 2018) ............................................................... 21

*Mertens v. Hewitt Assocs.*,
    508 U.S. 248 (1993) ............................................................................. 12

*Miller v. Astellas US LLC*,
    No. 20-3882, 2021 WL 1387948 (N.D. Ill. Apr. 13, 2021) ....... 18, 19, 20, 21, 22

*Moreno v. Deutsche Bank Americas Holding Corp.*,
    No. 15-9936, 2016 WL 5957307 (S.D.N.Y. Oct. 13, 2016) ............... 22

*Munro v. Univ. of S. California*,
    896 F.3d 1088 (9th Cir. 2018) .............................................................. 6

*Park v. Thompson*,
    851 F.3d 910 (9th Cir. 2017) ............................................................... 8

*Patelco Credit Union v. Sahni*,
    262 F.3d 897 (9th Cir. 2001) ............................................................... 5

*Pegram v. Herdrich*,
    530 U.S. 211 (2000) ..................................................................... 13, 15

- iii -

*Pilkington PLC v. Perelman*,
   72 F.3d 1396 (9th Cir. 1995) ................................................................................. 1

*Pinnell v. Teva Pharm. USA, Inc.*,
   No. 19-5738, 2020 WL 1531870 (E.D. Pa. Mar. 31, 2020) ............................ 22

*Pipefitters Local 636 Ins. Fund v. Blue Cross & Blue Shield of Mich.*,
   722 F.3d 861 (6th Cir. 2013) ............................................................................ 15

*Pledger v. Reliance Tr. Co.*,
   240 F. Supp. 3d 1314 (N.D. Ga. 2017) ............................................. 13, 19, 25

*Rankin v. Rots*,
   278 F. Supp. 2d 853 (E.D. Mich. 2003) ............................................................ 13

*Reetz v. Lowe's Companies, Inc.*,
   No. 18-75, 2019 WL 4233616 (W.D. N.C. Sept. 6, 2019) .............................. 19

*Reich v. Compton*,
   57 F.3d 270 (3d Cir. 1995) ................................................................................... 5

*Renfro v. Unisys Corp.*,
   671 F.3d 314 (3d Cir. 2011) .............................................................................. 24

*Rozo v. Principal Life Ins. Co.*,
   949 F.3d 1071 (8th Cir. 2020) ........................................................................... 12

*Santomenno v. Transamerica Life Ins. Co.*,
   883 F.3d 833 (9th Cir. 2018) .......................................................................... 3, 20

*Sheppard v. David Evans & Assoc.*,
   694 F.3d 1045 (9th Cir. 2012) ............................................................................. 8

*Sonoma Cty. Ass'n of Retired Emples. v. Sonoma Cty.*,
   708 F.3d 1109 (9th Cir. 2013) ........................................................................ 8, 20

*Starr v. Baca*,
   652 F.3d 1202 (9th Cir. 2011) .................................................................. 8, 9, 10

*Sweda v. Univ. of Pa.*,
   923 F.3d 320 (3d Cir. 2019), *cert. denied*, 140 S. Ct. 2565 (2020) 8, 9, 11, 14, 15,
   17, 20, 21, 22, 24

*Tatum v. RJR Pension Inv. Comm.*,
   761 F.3d 346 (4th Cir. 2014) ............................................................................. 15

*Terraza v. Safeway Inc.*,
   241 F. Supp. 3d 1057 (N.D. Cal. 2017) ............................................ 9, 15, 19, 23, 24

*Thole v. U.S. Bank N.A.*,
   140 S. Ct. 1615 (2020) .......................................................................................... 2

*Tibble v. Edison Int'l (Tibble I)*,
   729 F.3d 1110 (9th Cir. 2013), *vacated on other grounds*, 575 U.S.
   523 (2015) .................................................................................................... 15, 18

- iv -

*Tibble v. Edison Int'l (Tibble II)*,
  575 U.S. 523 (2015) ................................................................2, 4, 5

*Tibble v. Edison Int'l (Tibble III)*,
  843 F.3d 1187 (9th Cir. 2016)............................2, 4, 5, 15, 18, 22, 24

*Tibble v. Edison Int'l (Tibble IV)*,
  No. 07-5359-SVW, 2017 WL 3523737 (C.D. Cal. Aug. 16, 2017) .................23

*Tracey v. Mass. Inst. of Tech.*,
  No. 16-11620, 2017 WL 4478239 (D. Mass. Oct. 4, 2017)............................23

*Turner v. Davis Selected Advisers, LP*,
  626 F. App'x 713 (9th Cir. 2015)........................................................22

*Turner v. Schneider Elec. Holdings, Inc.*,
  No. 20-11006, --- F. Supp. 3d ---, 2021 WL 1178308 (D. Mass.
  Mar. 26, 2021) ...............................................................18, 19, 20

*Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*,
  No. 15-1614-JLS, 2016 WL 4507117 (C.D. Cal. Aug. 5, 2016) .....................19

*White v Chevron Corp.*,
  752 F. App'x. 453 (9th Cir. 2018)........................................................9

*Woods v. S. Co.*,
  396 F.Supp.2d 1351 (N.D. Ga. 2005) ................................................13

*Yeseta v. Baima*,
  837 F.2d 380 (9th Cir. 1988) ...........................................................12

**STATUTES**

15 U.S.C. §77k...............................................................................10

29 U.S.C. §1001(a) ...........................................................................3

29 U.S.C. §1002(14) ..........................................................................5

29 U.S.C. §1002(21)(A) ...............................................................3, 12, 21

29 U.S.C. §1002(21)(A)(i) ..................................................................12

29 U.S.C. §1002(21)(A)(ii) ...................................................................4

29 U.S.C. §1002(34)...........................................................................2

29 U.S.C. §1002(38) ..........................................................................6

29 U.S.C. §1102(a) ...........................................................................3

29 U.S.C. §1102(a)(1) ........................................................................3

29 U.S.C. §1104(a) ...........................................................................4

29 U.S.C. §1104(a)(1) ............................................................... 15

29 U.S.C. §1104(a)(1)(A) ............................................................ 4

29 U.S.C. §1104(a)(1)(B) ............................................................ 4

29 U.S.C. §1104(c)(5) .................................................................. 6

29 U.S.C. §1105 ........................................................................... 4

29 U.S.C. §1105(a) ................................................................. 5, 14

29 U.S.C. §1105(a)(3) ................................................................ 14

29 U.S.C. §1106 ...................................................................... 4, 5

29 U.S.C. §1106(a) .................................................................... 25

29 U.S.C. §1106(b) ...................................................................... 5

29 U.S.C. §1109(a) ............................................................ 4, 6, 11

29 U.S.C. §1132(a)(2) .................................................................. 6

**RULES**

9th Cir. R. 36-3(a) ...................................................................... 9

**REGULATIONS**

29 C.F.R. §2550.404c-5(e)(4) ...................................................... 6

**OTHER AUTHORITIES**

Restatement (Third) of Trusts ...................................................... 22

**INTRODUCTION**

The fiduciary standard imposed by ERISA requires investment decisions to be made prudently and with "*an eye single to the interests of the participants.*" *Pilkington PLC v. Perelman*, 72 F.3d 1396, 1402 (9th Cir. 1995) (emphasis original, quoting *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982)).

The complaint's detailed factual allegations compellingly demonstrate that NFP Retirement, Inc. ("NFP") and its co-fiduciaries fell short of that standard. Far from the thorough and impartial investigation that ERISA demands, the facts show that NFP—whose top executives also own and manage corporate partner and co-defendant flexPATH Strategies, LLC ("flexPATH")—at a minimum enabled flexPATH's pre-determined scheme to benefit the companies' shared corporate interests by transferring over half a billion dollars of Wood Group employees' retirement assets to flexPATH's fledgling target-date funds and recommended other flexPATH products. This allowed NFP and flexPATH to enrich themselves at the expense of the Wood 401(k) Plan and its participants, in violation of ERISA's fiduciary obligations and prohibited transactions rules. The result was disastrous for the Plan and its participants, causing millions of dollars in lost retirement savings.

Although NFP disputes that it profited from the arrangement and seeks to downplay its role by shifting blame to co-fiduciaries, the well-pleaded facts raise an inescapable inference that NFP failed to act prudently and with the unyielding loyalty to participants that ERISA demands. The motion should be denied.

**BACKGROUND**

**I.    The Wood 401(k) Plan**

Plaintiffs, seven former employees of Wood Group USA, Inc. or its affiliates ("Wood"), bring this action on behalf of themselves and the Wood 401(k) Plan ("Plan"), and seek to represent a class of all Plan participants since February 16, 2015 (over 18,000 individuals). Am. Compl. ("AC") ¶¶1, 10–17, 121 (Doc. 70). Defendants are the Plan's fiduciaries, as discussed further below. AC ¶¶18–27.

The Plan is a "defined contribution" plan. AC ¶7; *see* 29 U.S.C. §1002(34). Participants' benefits in such plans are "limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l (Tibble III)*, 843 F.3d 1187, 1191 (9th Cir. 2016) (en banc) (quoting *Tibble v. Edison Int'l (Tibble II)*, 575 U.S. 523, 525 (2015)).

Although participants decide how to invest their accounts among a menu of options, determining which options are on the menu is within the fiduciaries' exclusive control. AC ¶¶9, 37. Thus, "the plan fiduciaries' particular investment decisions" in a defined contribution plan can dramatically affect participants' retirement benefits. *Thole v. U.S. Bank N.A*, 140 S. Ct. 1615, 1618 (2020); *Tibble III*, 843 F.3d at 1191 (excessive fees can "significantly reduce the value" of participants' accounts) (quoting *Tibble II*, 575 U.S. at 525); AC ¶35. Over time, even seemingly small differences in fees or performance can add up to a major reduction in retirement benefits. *Tibble III*, 843 F.3d at 1198 (noting that higher fees indisputably cause a participant's account to "shrink[]" and illustrating impact of various fee differentials). As the United States Department of Labor has illustrated, a 1% difference in fees (the same is necessarily true of performance) reduces the average worker's account balance by 28%, which adds up to $500,000 over a 40-year career. AC ¶38. Thus, the practical effect of a fiduciary's decision to select and retain imprudent or excessive-cost investments is to potentially delay or preclude altogether participants' readiness for a secure retirement. *Id.* ¶38.

The potential adverse effects of retaining imprudent options are particularly pronounced in the context of a defined contribution plan's target-date fund option. Such funds are designed as a "one-stop" option for participants who do not want to actively reallocate their accounts among various equity and fixed income options to achieve a diversified portfolio. *Id.* ¶61. Target-date funds are marketed as a suite with each fund in the suite having a specified date that corresponds to an investor's

- 2 -

target retirement date (*e.g.*, investors in the "2030" fund intend to retire near 2030). *Id.* ¶61. A critical component of a target-date fund is its "glide path"—a formula by which the underlying portfolio is modified over time to become more conservative as its target date approaches (*e.g.*, a "2030" fund currently has a more conservative portfolio than a "2040" fund). *Id.* ¶¶61–62. Because a target-date option is designed to be a single diversified portfolio, participants who opt to invest in a target-date fund typically allocate their entire account balance to the fund. *Id.* ¶61. Target-date funds are also typically the "default" option for participants who do not make an investment selection. *Id.* ¶¶27, 44 & n.5, 46. An imprudent target-date option can therefore have a devastating impact on participants' retirement savings. *Id.* ¶75.

## II.   ERISA's strict fiduciary standards and liability apply to NFP

### A.   NFP is an "investment advice" fiduciary

ERISA fiduciaries are entrusted with protecting "the continued well-being and security of millions of employees and their dependents [which] are directly affected" by employee benefit plans. *John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 96 n.5 (1993) (quoting 29 U.S.C. §1001(a)).

Fiduciary status under ERISA can attach in two ways. First, "[a]n employer that forms an ERISA plan is a statutory fiduciary." *Santomenno v. Transamerica Life Ins. Co.*, 883 F.3d 833, 837 (9th Cir. 2018) (citing 29 U.S.C. §1102(a)). Such "named fiduciaries" are identified in the written plan document and have the overall "authority to control and manage the operation and administration of the plan." 29 U.S.C. §1102(a)(1). Here, certain of the Wood Defendants are the Plan's named fiduciaries. AC ¶¶19–20; Doc. 72-9 at 143 (Inv. Mgr. Agreement, p.1).

Second, "a party not named in the plan" becomes a fiduciary if it engages in certain specified conduct such as exercising discretion over plan assets. *Santomenno*, 883 F.3d at 837; *see* 29 U.S.C. §1002(21)(A). Such entities are often referred to as *de facto* or "functional" fiduciaries. *Santomenno*, 883 F.3d at 837.

NFP is undisputedly a fiduciary based on its contract with Wood (AC ¶¶26, 43),

- 3 -

because NFP "renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so." 29 U.S.C. §1002(21)(A)(ii). Functional fiduciaries like NFP are subject to the same standards and liability as named fiduciaries. *Santomenno*, 883 F.3d at 837 ("Whether named or functional, an ERISA fiduciary has a 'duty of care with respect to management of existing [ ] funds, along with liability for a breach of that duty.'") (quoting *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996)); *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 418–19 (2014) ("[T]he same standard of prudence applies to all ERISA fiduciaries[.]"). Four such provisions are of particular relevance: (1) the "Prudent Man Standard of Care," 29 U.S.C. §1104(a); (2) co-fiduciary liability, §1105; (3) prohibited transactions, §1106; and (4) remedies, §1109(a).

**B.     ERISA's fiduciary duties are the highest known to the law**

ERISA's fiduciary duties are derived from the common law of trusts and "are the highest known to the law." *Tibble III*, 843 F.3d at 1197 (quoting *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996)). The duty of loyalty requires a plan fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan[.]" 29 U.S.C. §1104(a)(1)(A). To satisfy the duty of prudence, "[a]n ERISA fiduciary must discharge his responsibility 'with the care, skill, prudence, and diligence' that a prudent person 'acting in a like capacity and familiar with such matters' would use." *Tibble III*, 843 F.3d at 1197 (quoting *Tibble II*, 575 U.S. at 528); 29 U.S.C. §1104(a)(1)(B).

To determine the "contours" of a fiduciary's duty, courts look to the law of trusts. *Tibble II*, 575 U.S. at 528–29; *Tibble III*, 843 F.3d at 1197. Under trust law, the duty of prudence does not end upon the initial selection of an investment. *Tibble II*, 575 U.S. at 529; *Tibble III*, 843 F.3d at 1197. Rather, prudence entails "a

- 4 -

continuing duty to monitor trust investments and remove imprudent ones." *Tibble II*, 575 U.S. at 529; *Tibble III*, 843 F.3d at 1197. Thus, "[a] plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Tibble II*, 575 U.S. at 530.

### C. NFP cannot turn a blind eye to flexPATH's breach

In addition to discharging its own duties with loyalty and prudence, a fiduciary is also obligated to take appropriate action when it learns of another fiduciary's breach. *See* 29 U.S.C. §1105(a). Thus, even if a fiduciary has complied with §1104(a) in its own delineated area of responsibility, it can be held liable for enabling, participating in, or failing to remedy a co-fiduciary's breach. *Id.*

### D. ERISA prohibits self-dealing and injurious transactions

To supplement the general fiduciary duties of §1104(a), Congress enacted §1106, which categorically bars "certain transactions deemed 'likely to injure'" a plan. *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241−42 (2000) (citation omitted); 29 U.S.C. §1106. Section 1106(a) prohibits transactions between a plan and a "party in interest," which Congress defined to encompass "those entities that a fiduciary might be inclined to favor at the expense of the plan beneficiaries," including employers, other fiduciaries, and service providers. *Harris*, 530 U.S. at 242 (citing 29 U.S.C. §1002(14)).

Section 1106(b) forbids transactions between a plan and a fiduciary. 29 U.S.C. §1106(b). Its purpose is to "prevent[] a fiduciary from being put in a position where he has dual loyalties and, therefore, he cannot act exclusively for the benefit of a plan's participants and beneficiaries." *Reich v. Compton*, 57 F.3d 270, 287 (3d Cir. 1995) (quotation omitted). There is no "reasonable compensation" defense to a violation of §1106(b). *Patelco Credit Union v. Sahni*, 262 F.3d 897, 911 (9th Cir. 2001).

### E. ERISA authorizes broad remedies for fiduciary misconduct

A breaching fiduciary is liable for "any losses to the plan resulting" from the breach or violation, must restore any profits "made through use of assets of the plan," and is "subject to such other equitable or remedial relief as the court may deem appropriate." 29 U.S.C. §1109(a). Any plan participant may bring an action in a representative capacity to pursue these remedies on behalf of a plan. 29 U.S.C. §1132(a)(2); *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 n.9 (1985); *Munro v. Univ. of S. California*, 896 F.3d 1088, 1092–94 (9th Cir. 2018).

## III. Soon after NPF became the Plan's investment adviser, its corporate partner installed new and untested investments in the Plan

Wood Group Management Services, Inc. (Wood Management) hired NFP in July 2015 as the Plan's investment consultant tasked with advising the Wood fiduciaries on the selection, monitoring and retention of Plan investments and service providers. AC ¶¶26, 43. Eight months later, in March 2016, Wood Management hired flexPATH as the Plan's discretionary investment manager under 29 U.S.C. §1002(38). *Id.* ¶27. In that role, flexPATH obtained the authority to select the Plan's qualified default investment alternative (QDIA). AC ¶27; 29 U.S.C. §1104(c)(5); 29 C.F.R. §2550.404c-5(e)(4); *see also* AC ¶44 n.5 & ¶75 n.8 (defining QDIA). Wood Management expressly authorized flexPATH to use its own affiliated investment products. AC ¶44.

Although nominally distinct entities, NFP and flexPATH are closely related. Both companies are operated and controlled by the *same* senior executives in the *same* office. *Id.* ¶¶44, 53. NFP's CEO and President own up to 75% of flexPATH, and NFP and flexPATH receive additional compensation when their clients invest in their proprietary funds. *Id.* ¶¶53–56.

Just three months after being hired, in June 2016, flexPATH selected its own target date funds for the Plan (flexPATH TDFs). *Id.* ¶46. At the time, flexPATH had very limited investment experience. *Id.* ¶52. It had only managed assets for

approximately one year and had only launched the flexPATH TDFs roughly six months before they were placed in the Plan. *Id.* The flexPATH TDFs were managed under a novel and untested investment strategy that had *never* been used in any plan. *Id.* ¶¶63–64, 68–69. Placing these funds in the Plan resulted in the transfer of over $500 million of the Plan's assets to the unproven flexPATH TDFs. *Id.* ¶58. The decision enabled flexPATH to use over a half-billion dollars in Plan assets as seed money, substantially increasing NFP's and flexPATH's assets under management and materially benefiting their retirement plan business by enhancing the funds' marketability. *Id.* Before flexPATH put its TDFs in the Plan, they had attracted very little capital from other retirement plans—less than $78 million in the moderate option. *Id.* ¶59. As of year-end 2016, most of the assets invested in the moderate flexPATH TDFs were attributable to the Plan. *Id.*

In December 2018, Wood replaced the flexPATH TDFs with Vanguard's target date funds. *Id.* ¶¶47, 79. Near the same time, Wood selected three other flexPATH-advised funds to be added to the Plan on NFP's recommendation. *Id.* ¶¶48–50, 81, 96, 105. These investments were inferior because they charged higher fees than otherwise identical investments available to the Plan and the International Stock and Core Bond funds had historically underperformed their benchmarks or comparable alternatives. *Id.* ¶¶89–92, 100–02, 108. In addition to the three higher-cost flexPATH funds, several other Plan investments charged fees that were significantly higher than identical lower-cost institutional versions of the same investments that were available to the Plan based on its size. *Id.* ¶¶115–17.

Based on these facts, Plaintiffs assert that NFP breached its fiduciary and co-fiduciary duties and engaged in prohibited transactions related to the flexPATH funds (Count I, *id.* ¶¶129–38, Count III, *id.* ¶¶144–52), and breached fiduciary and co-fiduciary duties related to the Plan's higher-cost investment options (Count II, *id.* ¶¶139–43). NFP now seeks dismissal of all claims against it.

**ARGUMENT**

**I.    A complaint need only raise a reasonable inference of misconduct**

Rule 8(a)(2) does not require "detailed factual allegations," but only "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Sonoma Cty. Ass'n of Retired Emples. v. Sonoma Cty.*, 708 F.3d 1109, 1115 (9th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The alleged facts are sufficient if they raise a "'reasonable expectation that discovery will reveal [further] evidence' to support the allegations." *Starr v. Baca*, 652 F.3d 1202, 1217 (9th Cir. 2011) (quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 556 (2007)).

The plausibility inquiry is always "context-specific." *Sheppard v. David Evans & Assoc.*, 694 F.3d 1045, 1051 (9th Cir. 2012). In the context of an ERISA claim for breach of fiduciary duty, courts focus on the fiduciary's conduct—*i.e.,* whether it engaged in a sufficiently thorough and impartial investigation. *See Howard*, 100 F.3d at 1489. Yet prior to discovery, the details of how a fiduciary made decisions "will frequently be in the exclusive possession of the breaching fiduciary." *Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995).

That is the case here. Plaintiffs sent Wood a pre-suit statutory information request for materials disclosing the fiduciary process—including the content of NFP's advice—but Wood refused. AC ¶¶28, 57. Courts must "relax pleading requirements where the relevant facts are known only to the defendant." *Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) (quoting *Concha*, 62 F.3d at 1503).

In light of this systemic informational asymmetry regarding a fiduciary's conduct, courts have uniformly held that ERISA plan participants need not "describe directly the ways in which [defendants] breached their fiduciary duties" to state a plausible claim for relief. *Braden v. Wal-Mart Stores, Inc*., 588 F.3d 585, 598 (8th Cir. 2009); *Sweda v. Univ. of Pa.*, 923 F.3d 320, 332 (3d Cir. 2019), *cert. denied*, 140 S. Ct. 2565 (2020); *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016). It is enough if the circumstantial allegations raise a reasonable inference

- 8 -

that the fiduciary process was "flawed" and "tainted by failure of effort, competence, or loyalty." *Braden*, 588 F.3d at 596; *Sweda*, 923 F.3d at 332. A more stringent pleading standard would mean "the remedial scheme of the statute will fail, and the crucial rights secured by ERISA will suffer." *Braden*, 588 F.3d at 598.

Because plausibility "is not akin to a 'probability requirement,'" *Iqbal*, 556 U.S. at 678, a complaint need not anticipate and rebut every alternative explanation that defendant's counsel might conjure up. *Sweda*, 923 F.3d at 326 (a plaintiff is not required to "rule out every lawful explanation for the conduct he challenges"); *Terraza v. Safeway Inc*., 241 F. Supp. 3d 1057, 1077 (N.D. Cal. 2017). The obligation to rebut a defendant's alternative explanation arises only when it "is so convincing that plaintiff's explanation is implausible*.*" *Starr*, 652 F.3d at 1216.

NFP contends that Plaintiffs always must rebut other "*possible* explanations," when the alternative, if true, would preclude liability. Mem. 5 (Doc. 75-2) (citing *White v Chevron Corp.*, 752 F. App'x. 453, 454 (9th Cir. 2018)) (emphasis added). *White*, however, is an unpublished memorandum disposition with no precedential value. 9th Cir. R. 36-3(a). Nor is it persuasive. In *every* case, it could be said that there are two possible explanations, only one of which can be true and only one of which results in liability: the defendant either (1) acted lawfully, or (2) acted unlawfully. If the plaintiff were always required to disprove even a remote *possibility* that the defendant acted lawfully, that would elevate the plausibility requirement to a "certainty" requirement. Precedent clearly rejects even a "probability requirement." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 556.

The *precedential* source of NFP's quote further explains why NFP's portrayal is misleading. *See White*, 752 F. App'x. at 454 (citing *In re Century Alum. Co. Sec. Litig*., 729 F.3d 1104, 1108 (9th Cir. 2013)). After issuing the original opinion including the language quoted by NFP, the *Century Aluminum* court amended its opinion to clarify that the quote was limited to situations in which the plaintiff had advanced a "merely *possible* rather than plausible" explanation, but not competing

- 9 -

"*plausible* explanations." 729 F.3d at 1105, 1108 ("If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, *both of which are plausible*, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6).") (quoting *Starr*, 652 F.3d at 1216). The *Century Aluminum* plaintiffs failed to cross the plausibility threshold because they failed to rebut an obvious alternative explanation. *Id*. To prevail on their claim under §11 of the Securities Act of 1933 (15 U.S.C. §77k), the plaintiffs had to prove that their shares, purchased in the aftermarket, were traceable to a secondary offering in which an alleged misrepresentation was made. *Id*. at 1106–07. Because tracing aftermarket shares is "often impossible" for various reasons, it was a matter of experience and common sense that "aftermarket purchasers usually will *not* be able to trace their shares back to a particular offering." *Id.* at 1107–08. And at the time of the secondary offering, "more than *49 million shares* of Century Aluminum common stock were already in the market." *Id.* at 1110 (emphasis added). Without some explanation of how the plaintiffs could hope to prove that the origin of their shares was outside of the pool of 49 million previously issued shares, the plaintiffs had no "plausible chance of success," and allowing the claim to proceed would have been futile. *Id*. at 1107–08.

Thus, while a plaintiff may sometimes be required to rebut an obvious, apparently insurmountable obstacle to recovery to state a plausible claim, the mere existence of a competing alternative explanation from the defendant—even a plausible one—does not defeat a plaintiff's plausible explanation. *See Starr*, 652 F.3d at 1216. In contrast to *Century Aluminum*, there is no obvious lawful explanation for why a 401(k) plan would invest in a fiduciary's own brand-new funds from which the fiduciaries will derive significant corporate benefits, particularly when those funds are far more expensive than objectively superior options with established performance histories. While there *could* be "lawful reasons" for the decision—such as the "potential for higher return, lower financial

- 10 -

risk, more services offered, or greater management flexibility"—such "speculation is far from the sort of concrete, obvious alternative explanation [plaintiff] would need to rebut in his complaint." *Braden*, 588 F.3d at 596–97; *Sweda*, 923 F.3d at 333 (defendant's argument that it had prudent reasons for investment decisions was "misplaced" at the pleading stage). Plaintiffs' theory—that the untested flexPATH funds were in the Plan not based on merit but to further NFP's/flexPATH's shared corporate interests—is not only plausible, but likely. NFP's purported explanations merely present disputes for the factfinder.

## II.    Count I states claims against NFP related to the flexPATH funds

A claim for breach of fiduciary duty has three elements: (1) a plan fiduciary, (2) breached an ERISA-imposed duty, (3) causing a loss to the plan. *Sweda*, 923 F.3d at 328; *Braden*, 588 F.3d at 594–95; *see* 29 U.S.C. §1109(a). NFP concedes that it is a fiduciary to the extent it provides investment advice but asserts that its contract precludes liability related to the selection or retention of flexPATH funds. That argument fails for the reasons stated in Part A. NFP's further contention that Plaintiffs' allegations fail to show a breach of fiduciary duty related to the flexPATH funds is meritless for the reasons stated in Parts B–C.

### A.    NFP's fiduciary status is not limited to investment advice

NFP contends that the language of its contract with Wood precludes liability for any "decision to include or retain an investment from the Plan's lineup." Mem. 5–6. That argument is incorrect for three reasons.

*First*, NFP mistakenly assumes that the claimed basis for its liability under Count I is limited to the conduct described in paragraph 135 and is necessarily "distinct" from the basis for flexPATH's liability. *Id.* at 1, 5–6. While NFP's flawed advice is *one* basis for liability (AC ¶135), Count I also alleges that *all* Defendants were involved in the decisions to "provide[] the flexPATH funds as Plan investments because of the benefits they provided to the NFP Defendants [NFP and flexPATH]," to wit, "millions of dollars in Plan assets for their

investment management business and advisory fees," and that the decisions were not the product of a prudent or loyal decision-making process. *Id.* ¶132.

*Second*, contract language is not dispositive. ERISA defines "'fiduciary' not in terms of formal trusteeship, but in functional terms, *see* 29 U.S.C. §1002(21)(A), thus expanding the universe of persons subject to fiduciary duties—and to damages—under §409(a)." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993). Thus, a person who *in fact* "exercises any authority or control" over plan assets is a fiduciary, and it is no defense to say that the conduct exceeded his authority. *Yeseta v. Baima*, 837 F.2d 380, 386 (9th Cir. 1988); *see* 29 U.S.C. §1002(21)(A)(i).

The term "control" in §1002(21)(A) means "[t]o exercise power or *influence* over." *Rozo v. Principal Life Ins. Co.*, 949 F.3d 1071, 1074 (8th Cir. 2020) (quoting Black's Law Dictionary (11th ed. 2019)) (emphasis added); *see also Blatt v. Marshall & Lassman*, 812 F.2d 810, 812 (2d Cir. 1987) ("An entity need not have absolute discretion with respect to a benefit plan in order to be considered a fiduciary."). Thus, if NFP so much as influenced a decision to include or retain any of the flexPATH funds, it thereby acted as a fiduciary. 29 U.S.C. §1002(21)(A)(i).

Although the precise details of how NFP and flexPATH decided to select and retain the flexPATH TDFs are hidden from Plaintiffs (AC ¶¶28, 57), the close corporate relationship between NFP and flexPATH supports an inference that NFP (at a minimum) influenced flexPATH's decisions. Both companies are operated out of the *same* office by the *same* corporate officers. *Id.* ¶44. NFP's CEO and President own up to 75% of flexPATH. *Id.* ¶53. NFP's top executives—including its CEO, President, Chief Operations Officer, and Chief Compliance Officer—hold the *same* positions with flexPATH. *Id.* ¶53. NFP's Chief Investment Officer is also co-employed by flexPATH. *Id.* ¶55. Thus, the same individuals who run NFP also had ultimate authority over flexPATH's decisions to put and retain the flexPATH TDFs in the Plan. Because no "meaningful distinction can be drawn between a 'corporation' and the directors through whom it must act," *Woods v. S. Co.*, 396

- 12 -

F.Supp.2d 1351, 1373 (N.D. Ga. 2005), the actions of flexPATH executives in approving those decisions were also the actions of NFP.

Even if some meaningful distinction existed between the companies and their shared senior executives who manage both companies from the same office, untangling the overlap would require a developed record. Each of the joint NFP/flexPATH officers wears a multitude of "hats." *See Pegram v. Herdrich*, 530 U.S. 211, 225 (2000) (corporate officer-fiduciaries must "wear only one [hat] at a time, and wear the fiduciary hat when making fiduciary decisions."). Determining, for example, whether the companies' shared CEO was wearing only his flexPATH "hat" and had completely removed his NFP "hat" when approving flexPATH's decisions to put and retain flexPATH TDFs in the Plan will necessarily require a fact-intensive inquiry unsuitable to resolution on the pleadings.

In a similar case involving related companies with shared executives, the court held that it would be "inappropriate" to definitively resolve "the fiduciary status of allegedly-interrelated corporations at the motion to dismiss stage." *Pledger v. Reliance Tr. Co.*, 240 F. Supp. 3d 1314, 1325 (N.D. Ga. 2017). As many courts have held, "[t]he absence of exacting factual averments" regarding "the outer contours of [defendants'] fiduciary capacities" is not a basis for dismissal. *Id*. at 1324 (quoting *Woods*, 396 F. Supp. 2d at 1365, and collecting cases). Because "the manner in which each defendant, which are in the universe of possible decision makers, operated is … something of a black box" before discovery, "expect[ing] a plaintiff to be able to turn on the light and point to the particular individuals who exercised decision making authority is simply too much to require at this stage of the case." *Rankin v. Rots*, 278 F. Supp. 2d 853, 879 (E.D. Mich. 2003).

*Third*, even assuming that NFP somehow was not *directly* involved in selecting and retaining the flexPATH TDFs even though NFP's senior executives also run flexPATH, NFP is nevertheless subject to co-fiduciary liability for flexPATH's breach in selecting and retaining the flexPATH TDFs. AC ¶138; 29 U.S.C.

- 13 -

§1105(a). In light of their shared executives, NFP necessarily knew of flexPATH's conflict of interest and that a $500 million infusion of Plan assets would enhance the flexPATH TDFs' marketability and materially benefit the companies' retirement plan business. AC ¶¶54, 58. NFP also necessarily knew that Wood authorized flexPATH to select its affiliated options and that flexPATH did so without an independent investigation of whether a novel strategy executed by an inexperienced manager was prudent and in the interest of Plan participants. *Id.* ¶¶44, 73. Thus, if Plaintiffs prove that flexPATH breached its duties, NFP necessarily had knowledge of the breach, yet failed to make "reasonable efforts under the circumstances to remedy the breach." 29 U.S.C. §1105(a)(3).

Thus, NFP's liability under Count I is not limited to investment advice. As to NFP's dispute about the *scope* of its advice and whether its responsibilities extended to "providing advice to Wood regarding the ongoing retention of the flexPATH TDFs" (Mem. 8), NFP fails to identify any specific provision of the IAA excluding the flexPATH TDFs. NFP claims that ongoing "monitoring" of the flexPATH TDFs was flexPATH's duty (*id.*), but the cited IMA provision says nothing about NFP's advice responsibilities. Accordingly, NFP cites nothing that is inconsistent with Plaintiffs' allegation that NFP's advice to Wood covered all Plan investments. AC ¶45. Resolving NFP's factual disputes about what it did or did not do requires a developed record.

**B.     Plaintiffs' allegations raise a plausible inference that NFP breached its fiduciary duties**

In assessing the plausibility of a claimed breach of fiduciary duty, "the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden*, 588 F.3d at 594; *Sweda*, 923 F.3d at 331. Claims regarding the reasonableness of fiduciary conduct involve "inherently factual questions." *Sweda*, 923 F.3d at 329. "[R]arely will such a determination be appropriate on a motion for summary judgment, let alone a motion

- 14 -

to dismiss." *Terraza*, 241 F. Supp. 3d at 1078 (citation, quotation marks omitted).

A fiduciary's "process must bear the marks of loyalty, skill, and diligence expected of *an expert* in the field." *Sweda*, 923 F.3d at 329 (emphasis added). A fiduciary's "most fundamental duty" is the duty of loyalty, "to administer the trust solely in the interest of the beneficiaries," while "exclud[ing] all selfish interest[.]" *Pegram*, 530 U.S. at 224 (quotations and citations omitted). The "fiduciary must act for the exclusive benefit of plan *beneficiaries*," not the fiduciary's own benefit. *Howard*, 100 F.3d at 1488 (citing 29 U.S.C. §1104(a)(1)) (emphasis added). Those with corporate ties must "avoid placing themselves in a position where their acts as officers or directors of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan." *Bierwirth*, 680 F.2d at 271. "Self-dealing, conflicts of interest, or even divided loyalties are inconsistent with fiduciary responsibilities." *Howell v. Motorola, Inc.*, 633 F.3d 552, 566 (7th Cir. 2011). An ERISA fiduciary who "use[s] plan assets for its own purposes" breaches its duty of loyalty. *Pipefitters Local 636 Ins. Fund v. Blue Cross & Blue Shield of Mich.*, 722 F.3d 861, 869 (6th Cir. 2013).

The duty of prudence considers whether the fiduciary "employed the appropriate methods to investigate the merits of the investment." *Howard*, 100 F.3d at 1488. Thus, "the court focuses not only on the merits of the transaction, but also on the thoroughness of the investigation into the merits of the transaction." *Tibble III*, 843 F.3d at 1197 (quoting *Howard*, 100 F.3d at 1488). A thorough investigation requires "a reasoned decision-making process." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356 (4th Cir. 2014) (quoting *DiFelice v. U.S. Airways, Inc.,* 497 F.3d 410, 420 (4th Cir.2007)); *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 796 (7th Cir. 2011). A fiduciary "is duty-bound 'to make such investments and only such investments as a prudent [person] would make of his own property." *Tibble v. Edison Int'l (Tibble I)*, 729 F.3d 1110, 1134 (9th Cir. 2013), *vacated on other grounds*, 575 U.S. 523 (2015) (citations omitted).

- 15 -

The presence of a conflict-of-interest triggers heightened investigative requirements. "When it is 'possible to question the fiduciaries' loyalty, they are obliged at a minimum to engage in an intensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries.'" *Howard*, 100 F.3d at 1488–89 (quoting *Leigh v. Engle*, 727 F.2d 113, 125–26 (7th Cir. 1984)); *Leigh*, 727 F.3d at 125 ("[S]ince their judgment on this score could scarcely be unbiased, *at the least they were bound to take every feasible precaution to see that they had carefully considered the other side ...*") (quoting *Bierwirth,* 680 F.2d at 276) (emphasis added); *Bussian v. RJR Nabisco, Inc*., 223 F.3d 286, 299 (5th Cir. 2000). Indeed, a fiduciary may neglect a thorough investigation precisely *because* its self-interested decision is already preordained.

Such was the case here. The fund selection practices used by similarly situated fiduciaries include evaluating the manager's experience, whether a fund has a sufficient and consistent live performance history (not hypothetical or back-tested), and the quality and cost of alternative options in the market. AC ¶¶70–71. In contrast to prudent fiduciary practice, Wood and flexPATH agreed not to require flexPATH to consider any alternative investments available to the Plan to objectively determine which options would best serve the interests of Plan participants. *Id.* ¶44. The parties instead agreed in advance that flexPATH could use its own funds. *Id.* The flexPATH TDFs were then placed in the Plan within three months. *Id.* ¶¶46, 68. At the time, flexPATH had only one year of investment management experience—and little or no experience successfully managing a target date fund—and the flexPATH TDFs utilized an unproven and novel investment strategy that had never been used in a 401(k) plan. *Id.* ¶¶62–64, 68–69. Because the flexPATH TDFs had existed for only one full quarter, it was impossible to "score" them under the criteria set forth in the Plan's Investment Policy Statement ("IPS"). *Id.* ¶¶68–69, 74. Alternative TDFs with strong and established performance and much lower costs were readily available in the market. *Id.* ¶¶76–80, 134. Even the

- 16 -

underlying funds in which the flexPATH TDFs invested were available for a fraction of the cost—a fact that NFP concedes in its regulatory filings. *Id.* ¶¶66–67. Putting the flexPATH TDFs in the Plan benefited NFP and flexPATH by increasing their assets under management by over a half-billion dollars and generating advisory fees. *Id.* ¶¶50–51, 58–59, 132.

The benefits that NFP and flexPATH generated for themselves came at the direct expense of participants' retirement savings. The Plan was essentially a guinea pig for flexPATH's novel and untested strategy. The experiment was a colossal failure, resulting in the flexPATH TDFs being removed from the Plan after two-and-a-half years, as of year-end 2018. *Id.* ¶¶47, 79. By then, the Plan had lost roughly $18 million relative to the Vanguard target-date funds that replaced the flexPATH TDFs. *Id.* ¶80. NFP and flexPATH were undeterred, however, and three more new flexPATH options were installed on the Plan menu around the same time. *Id.* ¶¶81, 96, 105. Those options also had existed for only a year or less and charged higher fees than better performing alternatives from established managers, resulting in further Plan losses. *Id.* ¶¶89–92, 100–02, 108.

These facts raise a reasonable inference that NFP and flexPATH failed to act "for the exclusive benefit of plan beneficiaries" rather than their own benefit, *Howard*, 100 F.3d at 1488, and otherwise failed to perform their duties "with the level of care, skill, prudence, and diligence to which Plan participants are statutorily entitled," *Sweda*, 923 F.3d at 332. Despite the conflict between participants' interests in maximizing their retirement assets and NFP's/flexPATH's interests in maximizing corporate revenues and growing their investment business, it is apparent that an "intensive and scrupulous independent investigation" to determine whether the flexPATH funds were truly "in the best interests of the plan beneficiaries" did not occur. *See Howard*, 100 F.3d at 1488–89; *Leigh*, 727 F.3d at 127. Indeed, the result that flexPATH would select its own TDFs was evidently predetermined, as shown by the parties' explicit agreement. AC ¶44. Agreeing not

- 17 -

to investigate alternatives while pursuing options that would further NFP's and flexPATH's corporate interests is "highly probative" of disloyalty. *Leigh*, 727 F.2d at 127. NFP failed to take steps that may have neutralized the conflict, such as seeking advice from "a non-conflicted fiduciary" as to whether the switch to flexPATH funds was in participants' interest. *Cf. Howard*, 100 F.3d at 1489.[1]

The novel and untested nature of flexPATH's strategy and its inexperience managing investments also show that the "thoroughness of the investigation into the merits" was lacking. *Tibble III*, 843 F.3d at 1197. A prudent fiduciary under like circumstances would have required a much longer performance record before putting participants' retirement assets at risk. AC ¶¶70–71. It is reasonable to infer that a prudent fiduciary with no financial stake in the transaction would have had no reason to hire an inexperienced manager without a meaningful track record instead of using the many options in the market with outstanding performance and low fees managed by established firms. *Id.* ¶¶71, 76–80; *cf. Tibble I*, 729 F.3d at 1134 (fiduciary must invest as a prudent person would invest "his own property").

In short, selecting newly created funds from which the fiduciary will earn substantial profits, and using plan assets as seed money for the funds, instead of superior alternatives with an established performance history raises an inference (at the least) that the process by which flexPATH funds were selected and retained was "tainted by failure of effort, competence, or loyalty," *Braden*, 588 F.3d at 596, if not by an outright desire to profit at the participants' expense.

Courts have routinely concluded that allegations that fiduciaries favored their new proprietary funds over more established options state a plausible claim for relief. *Miller v. Astellas US LLC*, No. 20-3882, 2021 WL 1387948, at *5–6 (N.D. Ill. Apr. 13, 2021); *Turner v. Schneider Elec. Holdings, Inc.*, No. 20-11006, --- F. Supp. 3d ---, 2021 WL 1178308, at *3 (D. Mass. Mar. 26, 2021); *McGinnes v.*

---

[1] The fact that Wood hired NFP as the Plan's investment consultant shows that Wood lacked the necessary expertise. *See* AC ¶26.

*FirstGroup Am., Inc.*, No. 18-326, 2021 WL 1056789, at *8–10 (S.D. Ohio Mar. 18, 2021); *Reetz v. Lowe's Companies, Inc.*, No. 18-75, 2019 WL 4233616, at *5–6 (W.D. N.C. Sept. 6, 2019); *Baird v. BlackRock Inst'l Tr. Co., N.A.*, 403 F. Supp. 3d 765, 780–81 (N.D. Cal. 2019); *Pledger*, 240 F. Supp. 3d at 1325–27; *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, No. 15-1614-JLS, 2016 WL 4507117, at *7 (C.D. Cal. Aug. 5, 2016); *Krueger v. Ameriprise Fin., Inc.*, No. 11-2781, 2012 WL 5873825, at *11 (D. Minn. Nov. 20, 2012); *see also Braden*, 588 F.3d at 589–90, 595–96 (employer "failed adequately to evaluate" plan's investment options and used funds that benefited the trustee); *Terraza*, 241 F. Supp. 3d at 1076 (similar).

The facts in *Turner* and *Miller* are materially indistinguishable from those here. In each case, the employer hired an outside investment manager (Aon) and authorized Aon to put its newly created proprietary target-date collective trusts in the Plan without considering alternatives, which Aon promptly did. *Turner*, 2021 WL 1178308, at *1; *Miller*, 2021 WL 1387948, at *1–2. The courts concluded that Aon's decision to select its own funds with insufficient performance records for its "own financial gain rather than to benefit Plan participants" raised an inference of disloyalty and imprudence. *Turner*, 2021 WL 1178308, at *3–4; *Miller*, 2021 WL 1387948, at *5–6. The courts rejected many of the same arguments that defendants make here. *Turner*, 2021 WL 1178308, at *3–4; *Miller*, 2021 WL 1387948, at *5–6. Although Aon relied on its contract to argue that it received no *additional* fees for choosing its own funds, that did not negate the inference of disloyalty because of the indirect benefit to Aon "from the use of Plan assets to promote its new investment products and to increase its investment management business." *Turner*, 2021 WL 1178308, at *4; *Miller*, 2021 WL 1387948, at *6.

The same reasoning applies here. Plaintiffs' "multitude of allegations" that investing in the flexPATH trusts was imprudent "resulting in financial gain to [NFP/flexPATH] and financial loss to Plan participants" raise "a plausible inference" of disloyalty and imprudence. *Turner*, 2021 WL 1178308, at *4.

### C.     NFP identifies no basis for dismissal

NFP makes many of the same arguments that failed in *Turner* and *Miller*, which this Court should reject for similar reasons.

First, NFP faults Plaintiffs for not identifying any specific flaws in NFP's investment advice or "the process NFP allegedly used to monitor or select" investments. Mem. 6–7, 8. NFP contends that without such allegations, the Court should presume "that reasonable procedures were used." *Id*. 7, 8–9. But the mere fact that NFP stated in a contract that it had the aspirational "goal" of using a prudent process does not establish that it did so. *Id*. 6. NFP's argument is akin to asking the Court to assume that NFP acted with "care, skill, prudence, and diligence" simply because ERISA required it, despite Plaintiffs' numerous allegations to the contrary. While the Court can consider the *existence* of NFP's goal, the contract cannot be construed to contradict the complaint's allegations that the process was deeply flawed. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1014–15 (9th Cir. 2018); *Sweda*, 923 F.3d at 333 ("[W]e are not permitted to accept Penn's account of the facts or draw inferences in Penn's favor at this stage of litigation."). And while Wood thwarted Plaintiffs' ability to provide additional details about NFP's advice (AC ¶¶28, 57), Rule 8(a)(2) does not require that level of detail in any event. *Sonoma Cty*, 708 F.3d at 1115.

NFP next argues that it received "nothing extra" beyond "receiving negotiated compensation for services listed in the IAA." Mem. 7–8. But that ignores the alleged facts, including the material benefit to NFP—and its executives who partially own flexPATH—from the use of a half-billion dollars in Plan assets as seed money and to grow its retirement business (AC ¶¶58–59), as well as the potential "compensation" to NFP from its affiliates' products (*Id.* ¶¶55–56). *See Turner*, 2021 WL 1178308, at *4; *Miller*, 2021 WL 1387948, at *6 (both rejecting the same argument). While a service provider does not act as a fiduciary by the mere act of "negotiating its prospective fees" at arm's-length, *Santomenno*, 883

- 20 -

F.3d at 838, fund selection and investment advice—and the benefits that flowed to NFP and flexPATH from having flexPATH funds in the Plan—is fiduciary conduct. *See* 29 U.S.C. §1002(21)(A)(i)–(ii). NFP's other cases are also inapposite—fund selections and advice to benefit the fiduciary and its affiliate instead of participants is a "specific disloyal action." Mem. 7–8.

Next, NFP seeks to argue the substantive merits of the flexPATH options. *Id*. 9–10. In so doing, NFP "parse[s]" each allegation "piece by piece" to argue that each isolated aspect of the funds—manager inexperience, high costs, underperformance—does not, *standing alone*, rise to the level of a breach. *Cf. Braden*, 588 F.3d at 594. But a complaint must be read as a "whole." *Braden*, 588 F.3d at 594; *Sweda*, 923 F.3d at 331 (using a "holistic approach"). Plaintiffs do not allege that the flexPATH options should be deemed imprudent merely because they were not the cheapest possible or best performing option on the market, as in the cases cited by NFP. *See, e.g.*, *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 n.4 (8th Cir. 2018) (allegation of a "failure to invest in Vanguard, *without more*," did not state a claim) (emphasis added). Rather, it is the "*totality* of the specific allegations in this case" that plausibly shows a breach of fiduciary duty: NFP/flexPATH chose their untested, high-cost proprietary funds that almost no other retirement plans used instead of better-performing, award-winning options available from experienced managers at a fraction of the cost, while benefiting themselves by using over $500 million in Plan assets to grow their retirement business and failing to obtain an independent evaluation of whether using the flexPATH funds was prudent and in the interest of participants. *Braden*, 588 F.3d at 596 & n.7 (emphasis added); *Miller*, 2021 WL 1387948, at *5 (finding a similar "combination of allegations," "taken together," plausibly alleged a breach).

NFP contends that it is irrelevant that the flexPATH TDFs had only one full quarter of live performance because the IPS did not actually require a five-year history. *Id*. 9. Putting aside the fact that the IPS' "Scorecard" devised by NFP

- 21 -

requires at least three years of performance to generate a score (AC ¶74), NFP ignores Plaintiffs' allegations that using untested funds is imprudent for reasons beyond the IPS. Plaintiffs allege specific facts as to why a prudent fiduciary would require five years of live (not hypothetical) performance before exposing participants' retirement savings to the risk of an untested strategy, particularly given the many established options in the market. *Id.* ¶¶70–71, 76; *see Sweda*, 923 F.3d at 332 (allegations regarding "practices of similarly situated fiduciaries" plausibly showed what a prudent fiduciary would have done).

While NFP also baldly asserts that certain features of the flexPATH funds render Vanguard an "apples-to-oranges" comparison (Mem. 9–10), such "factual disputes regarding the aptness" of comparisons to alternative funds are not properly resolved on a motion to dismiss. *Miller*, 2021 WL 1387948, at *5; *Pinnell v. Teva Pharm. USA, Inc.*, No. 19-5738, 2020 WL 1531870, at *5 (E.D. Pa. Mar. 31, 2020); *Moreno v. Deutsche Bank Americas Holding Corp.*, No. 15-9936, 2016 WL 5957307, at *6 (S.D.N.Y. Oct. 13, 2016). Moreover, it is proper to compare actively managed funds to "index mutual funds or market indexes" to determine an ERISA plan's losses. *Brotherston v. Putnam Investments, LLC*, 907 F.3d 17, 31, 34 (1st Cir. 2018) (citing Restatement (Third) of Trusts, §100 cmt. b(1)). NFP's unpublished authority is not even an ERISA case. *Turner v. Davis Selected Advisers, LP*, 626 F. App'x 713, 715 (9th Cir. 2015) (Investment Company Act).

**III. Count II plausibly alleges NFP's liability for higher-cost investments**

The trust law principles that inform ERISA provide that "cost-conscious management is fundamental to" prudent investing and "[w]asting beneficiaries' money" is imprudent. *Tibble III*, 843 F.3d at 1197–98 (analyzing trust law sources). Thus, fiduciaries of large plans are obligated to eliminate unnecessary expenses: "a trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected." *Id.* at 1198.

- 22 -

When a fiduciary fails to obtain identical lower-cost shares of plan funds, it is reasonable to infer that the fiduciary was "asleep at the wheel." *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 483 (8th Cir. 2020); *Terraza*, 241 F. Supp. 3d at 1077 (because price was "the *only* difference" between share classes, court could "reasonably infer that the Defendants acted imprudently by selecting the more expensive option"); *Tracey v. Mass. Inst. of Tech.*, No. 16-11620, 2017 WL 4478239, at *2 (D. Mass. Oct. 4, 2017) ("If defendants did, in fact, include higher fee options when identical lower fee options were available, they failed to act with the 'care, skill and prudence' required by ERISA.").

*Tibble* further shows that this is a claim upon which relief may be—and has been—granted. *Tibble v. Edison Int'l (Tibble IV)*, No. 07-5359-SVW, 2017 WL 3523737, *5–6, 10–12 (C.D. Cal. Aug. 16, 2017) (plaintiffs prevailed in two trials on claim that fiduciaries failed to obtain lower-cost institutional shares).

NFP's advice responsibilities included advising Wood on share classes of Plan investments. AC ¶115. For three of the Plan's mutual funds, Defendants provided a higher-cost share class instead of available lower-cost shares of the *same* funds that were available to the Plan based on its size. *Id.* ¶116. The share classes differed only in terms of expense ratio—they were otherwise identical in every way, investing in the same portfolio managed by the same adviser. *Id*. Defendants also failed to obtain lower-cost shares for the Plan's $1 billion investment in the Vanguard target-date trusts. *Id.* ¶117. The flexPATH funds' underlying investments were also available at a much lower cost. *Id.* ¶¶67, 90, 110, 108, 117. As a result, the Plan suffered losses. *Id.* ¶118.

Because a prudent fiduciary would have investigated the available share classes and used the lower-cost versions to avoid incurring unnecessary fees (*Id.* ¶112), it is reasonable to infer that NFP failed to diligently monitor the available share classes, resulting in flawed investment advice to Wood and a failure "to act with the 'care, skill and prudence' required by ERISA." *Tracey*, 2017 WL 4478239, at *2.

- 23 -

NFP merely ignores or disputes the truth of Plaintiffs' allegations. Mem. 10–12. Although NFP asserts that Plaintiffs fail to allege that "the Plan investments were even comparable to the alleged comparators" (*id.* 10), Plaintiffs in fact allege that the comparators were "identical" except for their lower cost. AC ¶¶112, 116, 141 ("the only difference between the share classes is fees"); *see also Tibble III*, 843 F.3d at 1198 (different share classes are "substantially identical"). NFP similarly ignores, or disputes the truth of, Plaintiffs' allegation that the lower-cost shares "were readily available to the Plan" "at all relevant times" based on its enormous size. AC ¶¶113, 115–17, 141. And NFP's bald assertion (Mem. 11–12) that the Plan would have had to pay additional fees merely disputes the alleged facts.

Whether the expense ratios of the Plan funds were within a particular "range of fees" misses the point. *See* Mem. 10. The point of *Tibble* is that regardless of the absolute fee, it is imprudent to pay a higher rate when the "substantially identical" product is available at a lower cost. *Tibble III*, 843 F.3d at 1197–98. It was no defense in *Tibble* that the fees of the challenged funds were within the range of "0.03% to 2%." *See id.* at 1198 n.4. And it is no defense here.

The cases cited by NFP, which involved challenges to a plan's "mix and range" of options, "held that the *range* of expense ratios offered was reasonable, not that a fiduciary's decision to include an investment option that has an expense ratio within that range is always reasonable as a matter of law." *Terraza*, 241 F. Supp. 3d at 1079. The Third Circuit rejected NFP's very argument in *Sweda*, noting that *Renfro v. Unisys Corp.*, 671 F.3d 314 (3d Cir. 2011), did not set a fee range that "insulates plan fiduciaries from liability for breach of fiduciary duty." *Sweda*, 923 F.3d at 330.

**IV. Count III plausibly alleges NFP's liability for prohibited transactions**

NFP largely relies on flexPATH's arguments, and Plaintiffs incorporate their responses thereto. NFP's own arguments provide no basis for dismissal.

A. NFP's contention that it did not "cause" the Plan to invest in the flexPATH funds does not warrant dismissal for the reasons stated *supra*, Part II.A. The senior

- 24 -

executives responsible for flexPATH's decision to invest Plan assets in the flexPATH TDFs are also senior executives of NFP, managing both companies from the same office. Determining the degree of NFP's influence on flexPATH's fund selections requires factual development.

B. NFP incorrectly claims that it did not receive "Plan assets" or engage in "self-dealing." Mem. 12–13. Over $500 million in Plan assets was transferred to the flexPATH TDFs, from which NFP derived material benefits. AC ¶58. The statute also expressly applies to "indirect" transfers, 29 U.S.C. §1106(a), such as the "compensation" to NFP from its affiliates' products. AC ¶¶55–56. To the extent NFP is arguing that it cannot be liable because the payments technically went to flexPATH, partly owned and managed by NFP executives, that argument fails. NFP cannot hide behind "the corporate form" or "shell-game-like maneuvers" to evade ERISA "while channeling profits from self-dealing to a separate legal entity under their control." *Lowen v. Tower Asset Mgmt.*, 829 F.2d 1209, 1220–21 (2d Cir. 1987); *Pledger*, 240 F. Supp. 3d at 1335. And in any event, an exchange of Plan assets is not an element of a §1106(a)(1)(C) violation. AC ¶147.

C. NFP asserts that the purpose and intent of §1106(a) is to prevent transactions with "insiders" that are "potentially harmful" to the plan. Mem. 12–13. Even accepting NFP's position, a plan fiduciary using its authority to invest $500 million in the fiduciary's proprietary investments, causing plan losses, fits that definition.

## CONCLUSION

For these reasons, the Court should deny NFP's motion to dismiss (Doc. 75).

July 12, 2021                                Respectfully submitted,

                                            By: /s/ Sean E. Soyars
                                            Sean E. Soyars (admitted *pro hac vice*)
                                            SCHLICHTER, BOGARD & DENTON LLP
                                            *Lead Counsel for Plaintiffs*