1   Jerome J. Schlichter (SBN 054513)
    jschlichter@uselaws.com
2   Troy A. Doles (admitted *pro hac vice*)
    tdoles@uselaws.com
3   Heather Lea (admitted *pro hac vice*)
    hlea@uselaws.com
4   Kurt C. Struckhoff (admitted *pro hac vice*)
    kstruckhoff@uselaws.com
5   Sean E. Soyars (admitted *pro hac vice*)
    ssoyars@uselaws.com
6   SCHLICHTER BOGARD & DENTON LLP
    100 South Fourth Street, Suite 1200
7   St. Louis, MO 63102
    Telephone: (314) 621-6115
8   Facsimile: (314) 621-5934

9   *Counsel for Plaintiffs*

10  William H. Edmonson (SBN 243445)
    will@whelawfirm.com
11  LAW OFFICE OF WILL EDMONSON
    8335 Sunset Boulevard, Suite 350
12  West Hollywood, CA 90069
    Telephone: (424) 248-9581
13
    *Local Counsel for Plaintiffs*
14

15           **IN THE UNITED STATES DISTRICT COURT**
           **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
16                    **(Southern Division)**

17  ROBERT LAUDERDALE, JOSHUA
    CARRELL, TING SHEN WANG,
18  LEONARD DICKHAUT, ROBERT CROW,
19  AUBIN NTELA, and RODNEY AARON          Case No. 21-cv-00301-JVS-KES
    RIGGINS, individually and as representatives
20  of a class of participants and beneficiaries on   SECOND AMENDED
    behalf of the Wood 401(k) Plan (fka the   COMPLAINT—CLASS
21  Wood Group 401(k) Plan),                  ACTION
22
                                              JURY TRIAL DEMANDED
23                    *Plaintiffs*,

24
    v.
25

26  NFP RETIREMENT, INC., FLEXPATH
    STRATEGIES, LLC, WOOD GROUP U.S.
27  HOLDINGS, INC, WOOD GROUP
28  MANAGEMENT SERVICES, INC. (NKA

WOOD GROUP USA, INC.), and THE
COMMITTEE OF THE WOOD 401(K)
PLAN,

*Defendants.*

1.      Plaintiffs Robert Lauderdale, Joshua Carrell, Ting Shen Wang, Leonard Dickhaut, Robert Crow, Aubin Ntela and Rodney Aaron Riggins, individually and as representatives of a class of participants and beneficiaries of the Wood 401(k) Plan (fka the Wood Group 401(k) Plan) (the Plan), bring this action under 29 U.S.C. §1132(a)(2) and (a)(3) on behalf of the Plan against Defendants NFP Retirement, Inc. (NFP), flexPATH Strategies, LLC (flexPATH), Wood Group U.S. Holdings, Inc., Wood Group Management Services, Inc. (nka Wood Group USA, Inc.), and the Committee of the Wood 401(k) Plan for breach of fiduciary duties and prohibited transactions under ERISA.[1]

2.      As Plan fiduciaries, Defendants are obligated to act for the exclusive benefit of Plan participants and beneficiaries and to ensure that Plan expenses are reasonable and Plan investments are prudent. These duties are the "highest known to the law" and must be discharged with "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982). Instead of acting in the exclusive best interest of participants, Defendants caused the Plan to invest in flexPATH's proprietary collective investment trusts, which benefitted the NFP Defendants at the expense of Plan participants' retirement savings. The Wood Defendants and NFP also failed to use the Plan's bargaining power to obtain reasonable investment management fees, which caused unreasonable expenses to be charged to the Plan.

3.      To remedy these breaches of duty, Plaintiffs, individually and as

---

[1] The Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461. Unless otherwise indicated, NFP Retirement, Inc. and flexPATH are referred to as the NFP Defendants, and Wood Group U.S. Holdings, Inc., Wood Group Management Services, Inc., and the Committee of the Wood 401(k) Plan are referred to as the Wood Defendants.

- 2 -

representatives of a class of participants and beneficiaries of the Plan, bring this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (a)(3) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and to restore to the Plan profits made through Defendants' use of Plan assets. In addition, Plaintiffs seek equitable or remedial relief for the Plan as the Court may deem appropriate.

## JURISDICTION AND VENUE

4.    **Subject-matter jurisdiction.** This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2).

5.    **Venue.** This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district where the Plan is or was administered, where at least one of the alleged breaches took place, or where at least one defendant resides or may be found.

6.    **Standing.** An action under §1132(a)(2) allows recovery only for a plan and does not provide a remedy for individual injuries distinct from plan injuries. *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256 (2008). The plan is the victim of any fiduciary breach and the recipient of any recovery. *Id*. at 254. Section 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to bring a civil action to seek relief on behalf of a plan. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and remains exposed to harm and continued future losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs. To the extent the Plaintiffs must also show an individual injury, each Plaintiff has suffered such an injury, in at least the following ways:

      a.    The Named Plaintiffs suffered harm to their individual accounts as a result of Defendants' fiduciary breaches. During the proposed class period, the Named Plaintiffs invested in the flexPATH collective

investment trusts provided in the Plan. For instance, all of the Named Plaintiffs except for Plaintiff Ntela and Riggins invested in a flexPATH Index target date fund. Plaintiff Riggins invested in the International Stock, Core Bond and Large Cap Value funds, which were managed by flexPATH. Plaintiff Lauderdale also invested in the Core Bond Fund, and Plaintiff Ntela invested in the International Stock Fund. By providing flexPATH's proprietary collective investment trusts, Defendants caused millions of dollars in performance losses to all participants who invested in these funds.

b.  The Named Plaintiffs suffered harm to their individual accounts as a result of the Wood Defendants selecting and retaining higher-cost versions of the Plan's investments. For instance, Plaintiffs Lauderdale, Carrell, Wang, Dickhaut, Crow and Ntela invested in the Vanguard Target Retirement Trust target date funds when lower-cost shares were available to the Plan. Had the Wood Defendants provided the lowest-cost shares or versions of the Plan's investments, every participant's account would have had fewer investment management fees deducted and would have been of higher value in light of those fees and the investment return on those fees.

**PARTIES**

**The Wood 401(k) Plan (fka the Wood Group 401(k) Plan)**

7.   The Wood 401(k) Plan (fka the Wood Group 401(k) Plan) is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34). The Plan is intended to be a multiple employer defined contribution plan in accordance with 26 U.S.C. §413(c). A multiple employer plan is an employee pension benefit plan adopted by two or more employers established and maintained for the purpose of providing benefits to employees of the adopting employers. There were 24 adopting employers in 2014, and 15 in 2019.

- 4 -

8.     The Plan was established on January 1, 1999 and is maintained under a written document in accordance with 29 U.S.C. §1102(a)(1), last amended and restated effective January 1, 2020.

9.     Under the Plan, participants are responsible for investing their individual accounts and will receive in retirement only the current value of that account, which will depend on the amount contributed to the account by the employee and employer and on the performance of investment options net of fees and expenses. Plan fiduciaries control what investment options are provided in the Plan and the Plan's fees and expenses.

10.    As of December 31, 2013, the Plan had $261.7 million in assets and 4,997 participants with account balances. Effective December 31, 2015, the Wood Group Mustang 401(k) Plan, the Wood Group PSN, Inc. 401(k) Plan, and the Elkhorn Holdings, Inc. Profit Sharing Plan merged into the Plan, which increased the Plan's size to $836.6 million in assets and 10,881 participants with account balances. The Plan continued to dramatically grow in size over the years. By December 31, 2019, the Plan had $2.4 billion in assets and 18,013 participants with account balances.

**Plaintiffs**

11.    Robert Lauderdale was formerly employed by Wood Group Mustang, Inc. (nka Wood Group USA, Inc.). He resides in Brandon, Florida. He is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

12.    Joshua Carrell was formerly employed by Wood Group, PSN (fka Elkhorn Holdings, Inc.), an adopting employer of the Plan. He resides in Windsor, Colorado. He participated in the Plan until approximately September 2019. However, he is still a "participant" under 29 U.S.C. §1002(7) for purposes of bringing this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) because he is eligible to receive his share of the amounts by which his account would have been

- 5 -

greater had Defendants not breached their fiduciary duties.

13.     Ting Shen Wang was formerly employed by Wood Group Mustang, Inc. (nka Wood Group USA, Inc.), an adopting employer of the Plan. He resides in Chicago, Illinois. He is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

14.     Leonard Dickhaut was formerly employed by Wood Group Mustang, Inc. (nka Wood Group USA, Inc.), an adopting employer of the Plan. He resides in Ocean Springs, Mississippi. He is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

15.     Robert Crow was formerly employed by Wood Group Mustang, Inc. (nka Wood Group USA, Inc.), an adopting employer of the Plan. He resides in Houston, Texas. He is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

16.     Aubin Ntela was formerly employed by Amec Foster Wheeler, an adopting employer of the Plan. He resides in Houston, Texas. He is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

17.     Rodney Aaron Riggins was formerly employed by Wood Group Mustang, Inc. (nka Wood Group USA, Inc.), an adopting employer of the Plan. He resides in Seneca, South Carolina. He is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

**Defendants**

18.     Wood Group U.S. Holdings, Inc. is a domestic corporation incorporated in Nevada. The company is a wholly owned subsidiary of John Wood

Group PLC, a multinational company that provides project, engineering and technical services to energy and industrial markets with headquarters in Aberdeen, Scotland. Wood Group U.S. Holdings, Inc. is located in Houston, Texas.

19.     Wood Group U.S. Holdings, Inc. is the Plan sponsor under 29 U.S.C. §1102(a)(1) and Plan administrator under 29 U.S.C. §1002(16). It has served in this capacity since June 1, 2016. As alleged herein, Wood Group U.S. Holdings, Inc. exercises discretionary authority or discretionary control respecting the management of the Plan, exercises authority or control respecting the management or disposition of Plan assets, and/or has discretionary authority or discretionary responsibility in the administration of the Plan and is a fiduciary under 29 U.S.C. §1002(21)(A)(i) and (iii).

20.     Until June 1, 2016, Wood Group Management Services, Inc. was the Plan sponsor under 29 U.S.C. §1102(a)(1) and Plan administrator under 29 U.S.C. §1002(16). Effective June 1, 2016, the Board of Directors of Wood Group Management Services, Inc. transferred sponsorship of the Plan to Wood Group U.S. Holdings, Inc. The Board of Directors of Wood Group U.S. Holdings, Inc. adopted the resolution.

21.     Effective July 1, 2016, Wood Group Management Services, Inc. merged with Wood Group Mustang, Inc. and later changed its name to Wood Group USA, Inc. on May 29, 2017. Wood Group USA, Inc. is a domestic corporation with a principal place of business in Houston, Texas. It is a wholly owned subsidiary of Wood Group U.S. Holdings, Inc.

22.     As alleged herein, Wood Group Management Services, Inc. (nka Wood Group USA, Inc.) exercised discretionary authority or discretionary control respecting the management of the Plan, exercised authority or control respecting the management or disposition of Plan assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and was a fiduciary under 29 U.S.C. §1002(21)(A)(i) and (iii).

23.     Wood Group U.S. Holdings, Inc. appointed a "Committee" to carry out its fiduciary duties with respect to the Plan. The Committee will be referred to herein as the "Fiduciary Committee". This Fiduciary Committee has been referred to internally by the Wood Defendants as the Retirement Plan Committee or the Retirement Benefits Committee. The Fiduciary Committee and its individual members are responsible for the selection, monitoring and removal of Plan investments and service providers, including the investment consultant. The Fiduciary Committee establishes and maintains the Plan's investment policy or guidelines and monitors the fees charged by service providers and the Plan's investment options. As alleged herein, the Fiduciary Committee and its individual members exercise discretionary authority or discretionary control respecting the management of the Plan, exercise authority or control respecting the management or disposition of Plan assets, and/or have discretionary authority or discretionary responsibility in the administration of the Plan and are fiduciaries under 29 U.S.C. §1002(21)(A)(i) and (iii).

24.     Because the Wood Group individuals and entities described above acted as alleged herein as agents of Wood Group U.S. Holdings, Inc., these defendants are collectively referred to hereafter as the "Wood Defendants" unless otherwise indicated.

25.     NFP Retirement, Inc. (dba 401k Advisors, Inc.) is a registered investment adviser under the Investment Advisers Act of 1940 with its principal place of business in Aliso Viejo, California. Effective July 16, 2015, Wood Group Management Services, Inc. appointed NFP as the Plan's investment consultant or fiduciary investment advisor as defined by 29 U.S.C. §1002(21)(A)(ii). NFP provides investment advice to the Wood Defendants related to the selection, monitoring and replacement of Plan investments, the selection of service providers, the development and ongoing evaluation of the Plan's Investment Policy Statement (IPS), and the assessment of the reasonableness of Plan expenses.

26.     flexPATH Strategies, LLC is a registered investment adviser under the Investment Advisers Act of 1940 with its principal place of business in Aliso Viejo, California. On or about March 21, 2016, Wood Group Management Services, Inc. appointed flexPATH as the Plan's discretionary investment manager under 29 U.S.C. §1002(38) and delegated to flexPATH the authority to select the Plan's Qualified Default Investment Alternative (QDIA), which has been the Plan's target date fund investment option. flexPATH also was the subadvisor of the Plan's flexPATH Index target date funds, and currently serves in that capacity for the Plan's International Stock Fund, the Core Bond Fund and the Large Cap Value Fund, which are investment options in the Plan.

27.     On November 19, 2020, in accordance with 29 U.S.C. §1024(b), Plaintiffs requested from the Plan administrator documents related to the operation and administration of the Plan. On January 11, 2021, the Plan administrator responded to that request for information but refused to provide documents related to the process employed by the Wood Defendants in making decisions on behalf of the Plan, including minutes of meetings of the Plan's fiduciaries and materials presented during those meetings. The Plan administrator also refused to produce service provider agreements, including those with NFP.

28.     Subsequently, in August and September 2021, Defendants produced certain agreed-upon documents related to the operation and administration of the Plan, including minutes of the Fiduciary Committee and materials presented to the Wood Defendants and the Fiduciary Committee for the period of December 17, 2014 through November 1, 2018 related to the selection, monitoring and removal of Plan investments and service providers. These documents reflect the decision-making process of the Wood Defendants and the investment advice rendered to the Wood Defendants by NFP.

## ERISA'S FIDUCIARY STANDARDS

29.     ERISA imposes strict fiduciary duties of loyalty and prudence upon

- 9 -

the Defendants as fiduciaries of the Plan. 29 U.S.C. §1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> > (A)    for the exclusive purpose of
> >
> > > (i) providing benefits to participants and their beneficiaries; and
> > > (ii) defraying reasonable expenses of administering the plan;
> >
> > [and]
> >
> > (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

30.    Under ERISA, fiduciaries that exercise any authority or control over plan assets, including, but not limited to, the selection of plan investments and service providers, must act prudently and for the *exclusive* benefit of participants in the plan, monitor the funds in the plan and remove imprudent or excessively expensive funds. Fiduciaries cannot act for the benefit of third parties, including service providers to the plan, affiliated businesses or brokerage firms and those who provide investment products. Fiduciaries must ensure that the amount of fees paid to service providers is no more than reasonable. DOL Adv. Op. 97-15A; DOL Adv. Op. 97-16A; *see also* 29 U.S.C. §1103(c)(1) (plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan").

31.    An ERISA "trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). Prudence requires a review at "regular intervals." *Id.* When making investment decisions, an ERISA fiduciary "is duty-bound 'to make such investments and only such investments as a prudent [person] would make of his own property[.]'" *In re*

- 10 -

*Unisys*, 74 F.3d 420, 434 (3d Cir. 1996) (quoting RESTATEMENT (SECOND) OF TRUSTS §227 (1959)). "[T]he duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *Id*. at 435.

32.    A defined contribution plan fiduciary cannot "insulate itself from liability by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009). Instead, fiduciaries must "initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants." *DiFelice v. U.S. Airways, Inc*., 497 F.3d 410, 423 (4th Cir. 2007) (emphasis original); *see also* 29 C.F.R. §2550.404a-1; DOL Adv. Op. 98-04A; DOL Adv. Op. 88-16A. Fiduciaries have "a continuing duty to monitor investments and remove imprudent ones" within a reasonable time. *Tibble*, 135 S. Ct. at 1828–29.

33.    ERISA also imposes explicit co-fiduciary liability on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]
>
> (2)    if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary

- 11 -

1    to commit a breach; or

2    (3)    if he has knowledge of a breach by such other fiduciary, unless

3           he makes reasonable efforts under the circumstances to remedy

4           the breach.

5                           **BACKGROUND FACTS**

6           34.    "Defined contribution plans dominate the retirement plan scene

7    today." *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008). In the

8    private sector, such plans have largely replaced the defined benefit pension plans

9    that were America's retirement system when ERISA was enacted in 1974. The

10   consulting firm Towers Watson studied Fortune 100 companies from 1985 to 2012

11   and found that the type of retirement plan offered by the companies has essentially

12   flipped over the last three decades.[2] The survey found that whereas in 1985, 89 of

13   the Fortune 100 companies offered a traditional defined benefit plan, in 2012, only

14   11 of the Fortune 100 companies offered defined benefit plans to newly hired

15   employees. Defined contribution plans have become America's retirement system.

16          35.    A fundamental difference between traditional pension plans and

17   defined contribution plans is that, in the former, the employer's assets are at risk.

18   Because the employer is responsible for funding the pension plan to satisfy its

19   commitments to employees, it bears all investment risks. In a defined contribution

20   plan, the employees and retirees bear all investment risks.

21          36.    Each participant in a defined contribution plan has an individual

22   account and directs plan contributions into one or more investment alternatives in a

23   lineup chosen by the plan's fiduciaries. "[P]articipants' retirement benefits are

24   limited to the value of their own individual investment accounts, which is

25   determined by the market performance of employee and employer contributions,

26   less expenses." *Tibble*, 135 S. Ct. at 1826. Plan expenses can "significantly reduce

27
     _____
28   [2] Towers Watson, *Retirement Plan Types of Fortune 100 Companies in 2012*,
     TOWERS WATSON RESEARCH INSIDER, Oct. 2012.

- 12 -

the value of an account in a defined-contribution plan." *Id.* The fees assessed to participants are generally attributable to two types of services: plan administration and investment management.

37.     The plan's fiduciaries have control over these expenses. The fiduciaries are responsible for hiring administrative service providers and negotiating and approving their compensation. The fiduciaries also have exclusive control over the menu of investment alternatives to which participants may direct the assets in their accounts. The investment alternatives each have their own fees, usually expressed as a percentage of assets under management, or "expense ratio." For example, if a fund deducts 1.0% of fund assets each year in fees, the fund's expense ratio would be 1.0%, or 100 basis points (bps). (One basis point is equal to 1/100th of one percent.) The fees deducted from a fund's assets reduce the value of the shares and hence reduce the returns that participants receive on their investments.

38.     These fiduciary decisions have the potential to dramatically affect the amount of money that participants are able to save for retirement. According to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of 28% in savings at retirement.[3] Over a 40-year career, this difference in fees can reduce a participant's retirement savings by almost $500,000.[4]

39.     Academic and financial industry literature demonstrate that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee*

---

[3] U.S. Dept. of Labor, *A Look at 401(k) Plan Fees,* at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.

[4] Michael Bird, *Pandemic Highlights Reasons for Reviewing Plan Fees,* PLANSPONSOR, May 15, 2020, https://www.plansponsor.com/pandemic-highlights-reasons-reviewing-plan-fees/.

*Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 873 (2008); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. PA. L. REV. 1961, 1993 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed mutual funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

40.     Accordingly, fiduciaries of defined contribution plans must engage in a rigorous process to control costs and ensure that participants pay no more than a reasonable level of fees. This is particularly true for large defined contribution plans which have the bargaining power to obtain the highest level of service and the very lowest fees. The fees available to these plans are orders of magnitude lower than the much higher retail fees available to small investors.

41.     The entities that provide services to defined contribution plans have an incentive to maximize their fees by putting their own higher-cost funds in plans and collecting the highest amount possible for plan-related services. For each additional dollar in fees paid to a service provider, participants' retirement savings are directly reduced by the same amount, and participants lose the potential for those lost assets to grow over the remainder of their careers through investment returns. The level of diligence used by plan fiduciaries to control, negotiate, reduce the plan's fees, and safeguard plan assets directly affects participants' retirement security.

- 14 -

42.     Fiduciaries must be cognizant of a service provider's self-interest in maximizing fees and cannot simply accede to the provider's desires and recommendations to include the provider's proprietary funds and services that will maximize the provider's fees without negotiating or considering alternatives. In order to act in the exclusive interest of participants and not in the service provider's interest, fiduciaries must conduct their own independent investigation into the merits of a particular investment or service by considering alternatives.

## DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

**I.**    **Through conflicted fiduciary decisions, Defendants used flexPATH's proprietary collective investment trusts in the Plan that benefitted Plan fiduciaries to the detriment of Plan participants.**

    **A.**    **NFP and flexPATH acted under profound conflicts of interest in causing the Plan to use their proprietary investments in the Plan.**

43.     In July 2015, the Wood Defendants hired NFP as the Plan's investment consultant or fiduciary investment advisor. Under the Investment Advisory Agreement (IAA) between NFP and Wood Management Services, Inc., NFP was charged with advising the Wood Defendants on the selection, monitoring, and retention of Plan investments and to provide assistance on the selection of service providers, among other duties. No amendment was executed by the parties thereto to modify the agreement or the scope of NFP's fiduciary obligations.

44.     At the outset of its relationship with the Wood Defendants, NFP consistently recommended the use of its affiliated flexPATH target date funds managed (or to be managed) by its affiliate, flexPATH. As described in detail *infra,* NFP and flexPATH are closely related companies, which are operated and controlled by the *same* senior executives in the *same* office, and co-employees of both NFP and flexPATH recommended or actively participated in recommending the flexPATH target date funds to the Wood Defendants. flexPATH offered two versions of its target date funds: Index+ (actively managed) and Index (passively

- 15 -

managed). The flexPATH "Index+" target date funds were launched on June 1,
2015, and for the flexPATH Index target date funds that were later included in the
Plan, these funds were launched in December 2015 or January 2016 depending on
the particular target date fund at issue.[5]

45.    In September and November 2015, immediately after the Wood
Defendants hired NFP, NFP presented fund recommendations to the Fiduciary
Committee, wherein it presented the flexPATH target date funds as a solution to fill
the Plan's target date fund option and also serve as the Plan's Qualified Default
Investment Alternative (QDIA) as defined by 29 U.S.C. §1104(c)(5).[6] In December
2015, NFP again presented its "Fund Lineup Recommendations" to the Wood
Defendants and recommended the approach of using the flexPATH target date
funds for the Plan. Ultimately, on February 25, 2016, NFP recommended that the
Wood Defendants add the flexPATH Index target date funds to the Plan. On the
advice and recommendation of NFP, the Fiduciary Committee adopted that
recommendation and voted unanimously to add these funds to the Plan.

46.    In March 2016, after the Wood Defendants' decision to add the
flexPATH Index target date funds to the Plan, the Wood Defendants hired NFP's
affiliate (flexPATH) as the Plan's discretionary investment manager with authority
over the selection, monitoring, and replacement of the Plan's QDIA. For the Plan's
QDIA, the Wood Defendants expressly authorized flexPATH to use affiliated
investment options, including its flexPATH proprietary funds for the Plan. Despite
this delegation, and apart from their imprudent decision to add the flexPATH Index

_____

[5] For instance, the flexPATH Index Aggressive and Conservative target date
funds were launched in December 2015, while the flexPATH Index Moderative
target date funds were launch in January 2016.
[6] Section 1104(c)(5) provides that "a participant or beneficiary in an individual
account plan meeting the notice requirements" "shall be treated as exercising
control over the assets in the account" with respect to contributions or earnings
invested by the plan in the QDIA when the participant or beneficiary does not make
an investment election. 29 U.S.C. §1104(c)(5)(A). A QDIA is limited to specific
categories of investments, including life-cycle or target date funds, balanced funds,
and professionally managed accounts. 29 CFR §2550.404c-5(e)(4).

target date funds to the Plan, the Wood Defendants had the fiduciary responsibility to monitor flexPATH and ensure it carried out its fiduciary obligations loyally and prudently and had the duty to prevent any fiduciary breach by flexPATH in the selection or removal of the Plan's QDIA. As described in detail *infra*, the Wood Defendants failed to prudently discharge their fiduciary responsibility in monitoring flexPATH.

47.     Upon hiring flexPATH, Wood Management Services, Inc. represented in its Investment Manager Agreement (IMA) with flexPATH that neither flexPATH nor any affiliate of flexPATH provided investment advice nor recommended, advised, or exercised discretion over Wood Management Services, Inc.'s decision to *engage* flexPATH as the Plan's discretionary investment manager for the QDIA options in the Plan. NFP also previously represented to the Court that it had "*no role* in the decision to invest in the flexPATH funds", and "played no role at all in the decision to do so." Doc. 60-1 at 22, 33; *see also id.* at 16 ("NFP did not perform *any* investment advice services or service provider due diligence in connection with Wood's decision to retain flexPATH as an investment manager."), 17 ("NFP had no role in evaluating whether to engage flexPATH."), 22 ("In fact, NFP did not recommend, advise, or otherwise act as a fiduciary in connection with Wood's decision to engage flexPATH (and thus adding flexPATH funds to the Fund lineup) in 2016."); *see also* Doc. 75-2 at 10 ("NFP did not provide any services in connection with Wood's decision to retain flexPATH as an investment manager or the selection of flexPATH TDFs.").

48.     Those representations have been proven false from subsequently produced documents reflecting the Wood Defendants' decision-making process. These documents demonstrate that NFP repeatedly recommended the use of the flexPATH target date funds for the Plan. No representation regarding NFP's purported lack of influence over the decision to hire flexPATH, however, was made in the IMA with respect to the monitoring and investment advice related to the

- 17 -

ongoing retention of the Plan's QDIA, or the selection, monitoring, or retention of non-QDIA investment options, including, but not limited to, the flexPATH-advised funds within the large cap, international and fixed income asset categories. Accordingly, and despite the conflicted advice NFP rendered to the Wood Defendants regarding the selection and retention of the flexPATH target date funds, NFP had the ongoing responsibility to monitor and provide advice to the Wood Defendants on all investments in the Plan.

49.     By June 2016—only months after flexPATH was hired—flexPATH exercised its delegated fiduciary authority over the selection or retention of the Plan's QDIA and, and consistent with the Wood Defendants' prior vote of approval of the flexPATH Index target date funds, selected its proprietary flexPATH Index target date funds for the Plan. The flexPATH Index Moderate target date fund was designated as the Plan's QDIA to receive participant contributions for those who do not make an investment election.

50.     In 2018, and contrary to NFP's fund recommendations to the Wood Defendants to *retain* the flexPATH Index target date funds, the Wood Defendants removed those funds from the Plan, and thus, terminated flexPATH as the discretionary investment manager over the Plan's QDIA. At or around the time of the replacement of the flexPATH Index target date funds, NFP advised the Wood Defendants on the selection of other flexPATH-advised investments to be added to the Plan called the International Stock, Core Bond and Large Cap Value funds. (The flexPATH proprietary investments are collectively referred to herein as the flexPATH funds unless otherwise indicated.)

51.     Apart from the false representation that NFP did not advise the Wood Defendants or play any role with respect to the selection of the flexPATH Index target date funds or *engagement* of flexPATH as the discretionary investment manager over the Plan's QDIA, NFP was charged with advising the Wood Defendants with respect to the selection, monitoring, and retention of all other Plan

- 18 -

investments. That included flexPATH's International Stock, Core Bond and Large
Cap Value funds. As indicated *supra,* neither the IMA with flexPATH nor the IAA
with NFP contain any provision that limited the scope of NFP's fiduciary
investment services regarding advice for non-QDIA investments.

### B. The flexPATH collective investment trusts and conflicted relationship between NFP and flexPATH.

52.     The flexPATH funds are collective investment trusts maintained by
Wilmington Trust, N.A. (Wilmington Trust), a bank that serves as the trustee for
the funds. Collective investment trusts are investment vehicles maintained by a
bank that consist of pooled assets of "retirement, pension, profit sharing, stock
bonus or other trusts exempt from Federal income tax". 29 C.F.R. §9.18(a)(2). A
collective investment trust is similar to a mutual fund or other pooled investment
vehicle because it also invests in a variety of securities to create a diversified
investment portfolio.

53.     Apart from serving as the Plan's discretionary investment manager
over the Plan's QDIA, flexPATH is the subadvisor of the flexPATH funds. As the
subadvisor, flexPATH provides investment advisory services and has authority over
investing fund assets and developing the investment strategies for the funds. The
financial statement for the target date fund series describes the fees charged to
investors as:

"All asset-based fees are based upon the net assets as determined at the end
of each preceding business day as set forth in the table below:

| flexPATH Index I Series | Fee Class I1 |
| --- | --- |
| Trustee Fee | 0.030% |
| Service Provider Fee | 0.000% |
| Investment Consultant Fee | 0.060% |
| Management Services Fee | 0.100% |

flexPATH Strategies, LLC is compensated for its investment advisory and consultant services provided to each fund."

54.     Separately, flexPATH contracted for a quarterly asset-based fee for discretionary investment management services for the Plan's target date option through the IMA. Although the IMA noted that flexPATH did not charge the Client or the Plan "additional fees if flexPATH CITs are selected in performing the Management Services," fund disclosures indicate that Plan participants paid net total operating expenses for the flexPATH Index target date funds that included additional fees, as noted in the chart above.[7] Further, because the IMA only pertained to flexPATH's services as the discretionary investment manager over the Plan's QDIA, the referenced provision in the IMA does not apply to any revenue or benefits received by flexPATH or NFP from the other flexPATH funds that were not the QDIA (*e.g.*, International Stock, Core Bond and Large Cap Value funds).

55.     flexPATH had limited experience managing assets when the flexPATH Index target date funds were first added to the Plan, which was known by the Wood Defendants prior to appointing flexPATH as the discretionary investment manager to act on behalf of the Plan. flexPATH was not registered as an investment adviser with the SEC until February 2015 and did not begin managing assets until June 2015. Shortly thereafter, in December 2015 and January 2016, flexPATH launched the flexPATH Index target date funds, which were included in the Plan within six months of their inception. In fact, NFP presented these funds to the Fiduciary Committee *before* they were even launched.

56.     The flexPATH funds are proprietary investment products of flexPATH and affiliated with NFP. NFP specifically markets and promotes the use of the

_____

[7] The fees reported to Plan participants do not indicate a reduction in the net operating expenses on the funds to account for any rebate of the management services fee charged on the flexPATH Index target date funds. flexPATH's own documents also report approximately the same net operating expenses charged on the flexPATH Index target date funds as reported to Plan participants, further indicating that flexPATH was paid from fund assets.

flexPATH funds. The ownership structure of NFP and flexPATH illustrates the close affiliation between the two companies. National Financial Partners Corporation (NFP Corporation) owns NFP. NFP Corporation, along with NFP's Chief Executive Officer (CEO) (Vincent Giovinazzo) and President (Nicholas Della Vedova), own flexPATH. In particular, NFP's CEO has a 25%–50% ownership interest in flexPATH, and NFP's President has a 10%–25% ownership interest. flexPATH and NFP are operated by the *same* corporate officers and headquartered in the *same* office. The CEO, President, Chief Operations Officer, and Chief Compliance Officer for NFP also hold those positions for flexPATH. As reported on the companies' Forms ADV filed with the SEC, these individuals are control persons with authority to direct the management of each company (flexPATH and NFP). The Wood Defendants were aware of this relationship since the time they engaged NFP in 2015.

57.     NFP's and flexPATH's senior executives were directly involved in NFP's recommendation of the flexPATH target date funds for the Plan. NFP/flexPATH President (Nicholas Della Vedova) and NFP Senior Investment Advisor and flexPATH Investment Committee member (Daniel Kallus) attended the February 25, 2016 Fiduciary Committee meeting as representatives of "NFP" wherein NFP presented its final fund recommendations to include the flexPATH Index target date funds in the Plan. These recommendations were unanimously approved by the Fiduciary Committee. Leading up to that decision, NFP/flexPATH Chief Investment Officer (Jeffrey Elvander) and Mr. Kallus likewise attended Fiduciary Committee meetings as representatives of "NFP" wherein NFP's fund recommendations on the Plan's target date fund selection were presented to the Fiduciary Committee. Mr. Della Vedova also was identified as the registered representative of the Plan in the Participation Agreement with Wilmington Trust authorizing the Plan's investment in the flexPATH target date funds.

58.     Based on these facts, the NFP Defendants acted under profound

- 21 -

conflicts of interest as Plan fiduciaries by using the Plan to grow their collective investment trust business. flexPATH and NFP had an incentive to include their proprietary funds in the Plan. Relevant disclosures indicate flexPATH receives additional compensation, such as in the form of bonuses and other incentives for the individual NFP or flexPATH investment advisors, when clients invest in affiliated products or services.

59.     NFP's Form ADV Brochure Part 2A for NFP dated March 2020 confirms this inherent conflict of interest in recommending the use of affiliated products or services— NFP or "its associated persons may receive compensation" for "services and/or products" affiliated with NFP Corporation or its affiliates. Moreover, NFP employs Investment Advisor Representatives (IARs), who are individuals within the firm that provide investment advice to clients. The IARs are commonly co-employed by flexPATH. These individuals therefore may also receive compensation as an IAR of flexPATH. In fact, certain NFP IARs derive their entire compensation from flexPATH. Apart from the IARs, NFP's President, Chief Executive Officer and Chief Investment Officer are co-employed by flexPATH.[8] Every IAR listed in the flexPATH ADV is co-employed by NFP.

60.     The IMA further acknowledges this revenue sharing arrangement between NFP and flexPATH when NFP's clients invest in flexPATH's proprietary target date funds. The IMA states: "Any compensation received by an affiliate of flexPATH in connection with the utilization of flexPATH CITs (if utilized) as part of the Plan will be paid out of amounts received by flexPATH for the performance of the Management Services without additional cost to the Client or the Plan."

61.     Plan participants were not informed that flexPATH was the entity that was delegated authority to select the flexPATH Index target date funds, that NFP was the entity that recommended the flexPATH funds for the Plan, or that

---

[8] In 2015, NFP Securities, Inc. also received finder's or placement fees from the Plan.

- 22 -

flexPATH and NFP had profound conflict of interests when causing the Plan to use of their own funds. Plan participants also were not informed of the internal decision-making process that Defendants employed prior to including the flexPATH funds, which included the approval of the flexPATH Index target date funds for the Plan. The Wood Defendants did not even inform the Department of Labor in the Financial Statements to the Plan's Forms 5500 that flexPATH was a party-in-interest or that the Plan's investment in the flexPATH funds were party-in-interest transactions under ERISA. *See* 29 U.S.C. §1002(14) (a party in interest includes any plan fiduciary or person providing services to the plan).

62.     The decision to add the flexPATH Index target date funds to the Plan benefitted NFP and flexPATH by providing an immediate and substantial transfer of approximately $565 million of the Plan's assets into these brand-new, untested target date funds. The Plan's investment of over $500 million in seed money substantially increased NFP's and flexPATH's assets under management in these investment vehicles, which materially benefitted their retirement business by enhancing the marketability of these new funds.

63.     The material benefit NFP and flexPATH derived from the Plan is illustrated by the Plan's investment in the flexPATH Index Moderate funds, which was one of the three risk profile models used for the Plan's flexPATH target date funds and the Plan's QDIA for which flexPATH had discretion over its selection. *See infra* Section I.C.1. As of January 1, 2016, NFP and flexPATH attracted only $77.7 million in qualified plan assets. However, by December 31, 2016, the Plan added $552.8 million in assets to these investments. In total, by year-end 2016, the Plan's assets represented the majority of the assets invested in the flexPATH Index Moderate funds.

64.     The material benefit NFP and flexPATH derived from the Plan was not limited to the flexPATH Index target date funds. As described in further detail *infra*, the International Stock, Core Bond and Large Cap Value funds did not exist

- 23 -

until 2017 or 2018. As a result of NFP's conflicted advice, the Plan immediately transferred approximately $159 million in these newly established funds less than one year after their inception. Like the flexPATH Index target date funds, the Plan's substantial transfer of seed money to these affiliated investments materially benefitted NFP and flexPATH.

### C. A prudent and loyal fiduciary would not have invested in flexPATH's proprietary funds that served to only benefit the Plan's fiduciaries.

#### 1. The flexPath Index target date funds.

65.     Target date funds are designed to provide a single diversified investment vehicle for participants. In general, they can be attractive to participants who do not want to actively manage their retirement savings to maintain a diversified portfolio. Target date funds rebalance their portfolios to become more conservative as the participant gets closer to retirement. The "target date" refers to the participant's target retirement date. For instance, target date "2030" funds are designed for individuals who intend to retire in 2030.

66.     The flexPATH Index target date funds utilized a novel and untested target date fund management style by combining index or passive management strategies with multiple glidepaths. A glidepath refers to how the fund's target asset allocations among a mix of investments, such as stocks, bonds and cash equivalents, are expected to change over time. As the participant's target date approaches, the asset allocations transition to a mix of more conservative investments.

67.     The flexPATH Index target date funds were "off-the-shelf" target date funds or funds designed for and offered to defined contribution plans generally. They were not "custom" or "customized" target date funds, which are funds designed by an investment adviser or consultant for a single plan sponsor taking into account that plan's unique demographics and participant base. Because custom

- 24 -

target date funds are constructed for a specific defined contribution plan, they are only available to that plan's participant population. In contrast, the flexPATH target date funds are marketed and sold to unrelated defined contribution plan sponsors, including NFP Corporation's own employees' plan.

68.     When the flexPATH target date funds were launched, their management style had never been used in any target date fund solution offered in the marketplace. Each "target date" fund had three glidepaths varying by investment style and risk tolerance. For instance, for the 2030 target retirement date, flexPATH provided three separate target date funds: flexPATH Index Aggressive 2035 Fund, flexPATH Index Moderate 2035 Fund, and flexPATH Index Conservative 2035 Fund. Because three separate target date funds are offered for a single target retirement date, the number of target date funds offered for a plan triples. This adds further complexity to the fund lineup from which participants select options to invest for retirement.

69.     flexPATH did not actually invest the flexPATH target date funds' underlying assets. Rather, flexPATH utilized a "fund of funds" structure for the target date funds, whereby it allocated fund assets among various underlying funds managed by an unaffiliated investment manager.

70.     The Financial Statements for the Wilmington Trust Collective Investment Trust Funds Subadvised by flexPATH reported the underlying assets of the flexPATH Index target date funds. For the flexPATH Index Aggressive target date funds, the funds invested in one or two BlackRock LifePath Index target date funds, *e.g.*, the flexPATH Index Aggressive 2025 Fund invests in the BlackRock LifePath Index 2030 and 2035 funds (F shares). The flexPATH Index Moderate target date funds invested in the BlackRock LifePath Index target date fund corresponding to the target retirement date, *e.g.,* the flexPATH Index Moderate 2025 Fund invests in the BlackRock LifePath Index 2025 Fund (F shares). And the flexPATH Index Conservative target date funds invested in the BlackRock LifePath

- 25 -

Index Conservative target date fund corresponding to the target retirement date,
*e.g.,* the flexPATH Index Conservative Index 2025 Fund invests in the BlackRock
LifePath Index Conservative 2025 Fund (F shares).

71.     Because flexPATH invested the underlying assets of the flexPATH
Index target date funds in BlackRock target date funds, additional fees were
charged than would otherwise be charged to investors had they invested directly in
BlackRock's funds. In its Form ADV Brochure Part 2A, NFP concedes that it does
not make any representation that affiliated products are "offered at the lowest cost
and the client may be able to obtain the same products or services at a lower cost
from other provides." The additional fees are revealed by comparing the fees
charged by the underlying BlackRock funds. The BlackRock LifePath Index target
date funds charge 8 bps. In contrast, flexPATH charged Plan participants 26 bps.
This resulted is an additional 18 bps—225% more—to invest in flexPATH's
version of the target date funds.

72.     Within months of the Wood Defendants hiring NFP as the Plan's
fiduciary investment advisor and flexPATH as the discretionary investment
manager over the Plan's target date funds, flexPATH exercised its authority under
the IMA and selected itself as the Plan's target date fund provider even though it
had no established track record as an investment manager and its target date fund
management style had never been used in any target date fund offered to a 401(k)
plan. flexPATH did not first start managing assets for investors until June 2015 by
launching its first version of target date funds called the "flexPATH Index+" target
date funds.[9] Shortly thereafter, flexPATH launched the version of the target date
funds included in the Plan, the flexPATH Index target date funds. These target date
funds did not even exist until December 2015 (for the Aggressive and Conservative
funds) and January 2016 (for the Moderate funds). However, they were placed in

---

[9] flexPATH's independent exercise of discretion in selecting the flexPATH target
date funds also is confirmed in NFP-prepared presentations presented to the Wood
Defendants.

the Plan on June 21, 2016.

73.     At the time the Wood Defendants voted to add the flexPATH Index target date funds to the Plan in February 2016, those funds had been in existence for barely one or two months. As a result, there was not even one quarter of actual performance history for the Wood Defendants, NFP and flexPATH to consider when evaluating how the flexPATH Index target date funds performed under actual market conditions. That deficient performance history was not presented to the Wood Defendants by NFP prior to approving these funds for the Plan.

74.     Therefore, at most, the flexPATH Index target date funds had only *two* months of performance history at the time of the Wood Defendants' decision to include them in the Plan and only *one* full quarter of actual performance history when they were added to the Plan, which was known by the Wood Defendants before the funds were placed in the Plan. Despite the inferior track record of both the investment manager and the flexPATH Index target date funds, and the conflicted decision made by flexPATH, the Wood Defendants authorized the use of these untested investments and made no reasonable efforts to remedy or otherwise prevent flexPATH's target date funds from being added to the Plan.

75.     The imprudent and disloyal actions of Defendants are also shown through the deficient and unreliable investment performance data NFP presented to the Wood Defendants to support NFP's target date fund recommendations. NFP presented to the Wood Defendants *hypothetical* investment returns of the flexPATH "Index+" target date funds dating back to September 30, 2010. These returns do not reflect the actual investment returns of the flexPATH Index+ target date funds because those funds did not exist until June 1, 2015.

76.     Hypothetical performance results mean performance results that are not actually achieved by any portfolio of an investment adviser, and which includes model performance, back-tested performance, or target or projected performance returns. They may represent a hypothetical illustration calculated by the retroactive

application of the asset allocation methodology used in constructing the fund(s) to prior periods. They do not represent actual investment returns and do not reflect actual market or economic conditions. A prudent and loyal fiduciary would not rely on back-tested or hypothetical performance data when recommending or selecting an investment for a defined contribution plan because that data can be easily manipulated and does not reflect how the investment manager would perform under actual market conditions.

77. The flexPATH hypothetical performance results are inherently unreliable because they do not reflect the hypothetical returns of the *actual* version of the flexPATH target date funds later included in the Plan—the flexPATH Index target date funds. The hypothetical investment returns of the flexPATH Index+ target date funds could not reasonably approximate a hypothetical illustration of investment returns for the flexPATH Index target date funds because the funds employed a fundamentally different investment strategy and invested in different underlying managers. For instance, the "Index" target date funds are passively managed investing 100% in passive or index investments, whereas the "Index+" target date funds are actively managed by investing 30% of fund assets in actively managed funds and 70% of fund assets in passively managed funds.

78. NFP and flexPATH inevitably could not perform a hypothetical illustration for the flexPATH Index target date funds launched in December 2015 or January 2016 because they did not exist at the time NFP performed those calculations for the period ending September 30, 2015. Therefore, NFP and flexPATH could not apply a retroactive application of an asset allocation methodology actually employed for yet-to-be launched funds. From the materials presented to the Fiduciary Committee, neither NFP nor flexPATH ever provided any hypothetical results for the flexPATH Index target date funds compared to available investment alternatives. In fact, the actual performance results of the flexPATH Index target date funds—albeit over an extremely limited period—were

- 28 -

never presented to or considered by the Wood Defendants prior to adding them to the Plan.

79.     Even if the hypothetical investment returns of the actively managed flexPATH Index+ target date funds were reliable or prudent for evaluating the passively managed flexPATH Index funds for inclusion in the Plan—which they were not for the reasons stated—that data would not objectively support the Wood Defendants' and flexPATH's decision to include them in the Plan, or NFP's recommendation to add them. When the *hypothetical* returns of the actively managed flexPATH Index+ target date funds were compared to the *actual* investment returns of NFP's hand-selected actively managed target date fund alternative, the flexPATH Index+ funds significantly underperformed that alternative over the trailing one, three, and five years as of September 30, 2015. For instance, over the trailing three-year period, the flexPATH Index+ funds underperformed the alternative by up to 272 basis points, and over the five-year period, by up to 156 basis points.

80.     Prior to the decision to include the flexPATH Index target date funds in the Plan, the Wood Defendants also never evaluated the fees or performance of the flexPATH Index target date funds—hypothetical or otherwise—to a passively managed target date fund solution managed by an experienced investment manager that was available to the Plan. They did not do so even though the Wood Defendants were aware that NFP had the capability to perform that due diligence and present that information to them for consideration.

81.     When making investment decisions, prudent fiduciaries of defined contribution plans consider the performance history, portfolio manager experience, and manager tenure of available investment alternatives. A consistent performance history and investment strategy, among other factors, demonstrate the ability of the investment manager to generate consistently superior long-term investment results. At a minimum, prudent fiduciaries require an actual five-year performance history

- 29 -

for an investment option prior to its inclusion in a 401(k) plan.

82.     A prudent and loyal fiduciary would not have recommended or
selected the flexPATH Index target date funds without a five-year performance
history to assess the investment manager's ability to provide superior long-term
investment returns relative to prudent alternatives available to the Plan. That is
especially so when the Plan's investment manager with discretion over the selection
of the QDIA (flexPATH) had less than one year of actual experience managing
assets and the decision to add the funds benefitted itself and its affiliated investment
advisor (NFP) charged with advising the Plan's named fiduciaries.

83.     From the minutes of meetings of the Fiduciary Committee and
materials presented during those meetings, the Wood Defendants conducted no
independent investigation into the merits of using flexPATH to serve as the
discretionary investment manager with discretion over the selection of the Plan's
target date fund solution. The Wood Defendants never considered any other
provider to serve as the discretionary investment manager for the Plan's QDIA,
much less engage in a competitive bidding process prior to making the decision to
hire an inexperienced discretionary investment manager (flexPATH). To evaluate
the performance of flexPATH, the Wood Defendants were only presented with a
single quarter of performance data for a flexPATH target date fund series different
than the one selected for the Plan. The Fiduciary Committee minutes similarly do
not reflect any deliberation or reasoned decision-making process prior to hiring
flexPATH that the decision was in the best interest of Plan participants or prudent
in light of alternative investment managers available to the Plan.

84.     Given the lack of any meaningful performance history to evaluate
flexPATH relative to prudent alternatives available to the Plan, the Wood
Defendants could not conduct an independent investigation into the merits of hiring
flexPATH as the Plan's discretionary investment manager. The facts as noted *supra*
demonstrate that the Wood Defendants failed to conduct a prudent investigation of

- 30 -

flexPATH's qualifications to determine whether flexPATH was sufficiently capable of managing the Plan's assets through an untested investment strategy. The inadequate track record of flexPATH and its untested target date fund strategy would have been apparent to a prudent and loyal fiduciary. Therefore, by failing to satisfy their own fiduciary obligations as the appointing fiduciary prior to engaging flexPATH as the Plan's discretionary investment manager or allowing the flexPATH funds to be added to the Plan, the Wood Defendants enabled flexPATH to commit a breach by including its own imprudent investments in the Plan.

85.     The Wood Defendants independently breached their fiduciary duty by approving the use of the flexPATH Index target date funds without conducting an independent investigation to determine whether adding the funds to the Plan was in the best interest of Plan participants or prudent. They also failed to prudently determine whether participants would be better served by other prudent and better performing passively managed alternatives available to the Plan after considering all relevant factors.

86.     Likewise, NFP breached its duty by providing conflicted and self-interested investment advice to the Wood Defendants by recommending the use of its affiliated target date funds. Despite its conflict between participants' interest in maximizing their retirement assets and NFP/flexPATH's interest in maximizing their corporate revenues and growth of their investment businesses, and based on the record of the Wood Defendants' fiduciary decision-making process, NFP did not engage in an intensive and scrupulous independent investigation to determine if the flexPATH Index target date funds were truly in the best interest of Plan participants or prudent after considering all relevant factors.

87.     This is evident based on NFP's failure to conduct an objective evaluation of other passively managed target date fund alternatives to the flexPATH Index target date funds and present that information for the Wood Defendants' consideration. At a minimum, an objective evaluation would consist of comparing

- 31 -

the manager experience, track record, fees, and historical performance of the flexPATH Index target date funds to available target date fund solutions. The decision to include the flexPATH Index target date funds only served to benefit the NFP Defendants.

88.     In using flexPATH and flexPATH's target date funds, the foregoing facts demonstrate that the Wood Defendants, NFP and flexPATH failed to "balance the relevant factors and make a reasoned decision as to the preferred course of action—under circumstances in which a prudent fiduciary would have done so," which is a breach of fiduciary duty. *See George v. Kraft Foods Global, Inc*., 641 F.3d 786, 788 (7th Cir. 2011). There was no loyal or prudent reason to cause the flexPATH Index target date funds to be placed in the Plan, which were managed by an inexperienced investment manager under a novel and untested target date fund investment strategy.

89.     The decision to use flexPATH's target date funds also was contrary to the fund selection criteria set forth in the Wood Defendants' Investment Policy Statement (IPS) for the Plan that was operative at the time the decision was made to include the flexPATH Index target date funds in the Plan. The IPS governed the selection, monitoring and removal of Plan investment options. The IPS documented the investment process by which the Plan's fiduciaries determined what was prudent when overseeing the Plan's investments. In selecting investment options for the Plan, the IPS required that certain factors "will" be considered, such as an investment option's investment objectives, performance relative to its index and peer group, risk characteristics, investment style, fees, manager tenure, style consistency and degree of correlation with other Plan investment options.

90.     At the time the Wood Defendants voted to add the flexPATH Index target date funds, they did not consider the actual performance history of the flexPATH Index target date funds relative to their benchmark index or peer group. Even if they had evaluated the performance history of those flexPATH target date

funds, those funds had at most two months of performance history at the time of
their decision. Given the funds' limited performance history, coupled with
flexPATH's limited tenure managing that target date fund solution, the Wood
Defendants could not prudently consider the investment option's performance or
manager tenure in accordance with the IPS.

91.     The decision to include the flexPATH Index target date funds also was
inconsistent with the Scorecard System Methodology set forth in the IPS that was
later adopted on August 5, 2016. When evaluating Plan investments, the IPS
initially contemplates that Plan investments have an average historical performance
history of three or five years for target date fund strategies to evaluate (or score)
those funds under the Scorecard System Methodology developed by NFP. (For
asset allocation funds, the IPS specifies a five-year time period.) Therefore, when
the flexPATH Index target date funds were added to the Plan, the Wood Defendants
and NFP were unable to score those funds under the system developed to evaluate
target date fund strategies.

92.     The Wood Defendants, NFP and flexPATH did not prudently monitor
the performance of the flexPATH Index target date funds after their inclusion in the
Plan. NFP did not present to the Wood Defendants any style specific benchmark to
evaluate the investment returns of the flexPATH Index target date funds until April
27, 2017. When the performance of the flexPATH Index target date funds was
actually compared to their style specific benchmark effective March 31, 2017, *all* of
the flexPATH Index target date funds underperformed their benchmark over the
rolling one-year period. The same is true for each quarter from June 31, 2017
through June 30, 2018. And unlike other funds in the Plan's investment lineup, NFP
did not "score" or rate the flexPATH Index target date funds under the
methodology it developed to monitor investment options. Despite the consistent
underperformance, Defendants took no action to promptly remove those funds from
the Plan.

93.     The significance of a plan's target date fund option underscores the importance of a prudent and loyal selection process and continuous oversight of that option. Participants may solely rely on their single target date fund selection over their investment horizon to meet their retirement goals. In addition, the flexPATH Index Moderate target date fund was the Plan's QDIA.[10] No prudent fiduciary would subject Plan participants to an unproven fund that they heavily rely on to invest for retirement.

94.     At the time the flexPATH Index target date funds were added to the Plan, there was no shortage of prudent target date funds managed by experienced and reputable investment managers available to the Plan. The market for target date funds provided to defined contribution plans has been highly developed since target date funds were first offered to the marketplace in March 1994.[11] Vanguard's target date funds, called the Vanguard Target Retirement Funds, are one such example of a prudent target date solution to the flexPATH Index target date funds that has been available in the market for 17 years.

95.     Vanguard has extensive experience in the investment management industry. Founded on May 1, 1975, Vanguard has offered investment products to investors for over 45 years.[12] Vanguard has offered target date funds since 2003,[13] and lower-cost collective investment trust versions (I shares) since 2007.[14] Each

---

[10] As indicted *supra,* if a participant has not made or does not make an investment election, any contributions she receives or makes to the Plan are invested in the QDIA. 29 CFR §2550.404c-5(a)(1).

[11] Jeffrey Ptak, *Success Story: Target-Date Investors*, MORNINGSTAR (Feb. 19, 2018), https://www.morningstar.com/articles/850872/success-story-target-date-fund-investors.

[12] Vanguard Chester Funds, Form N-1A, Jan. 27, 2017, https://www.sec.gov/Archives/edgar/data/752177/000093247117000194/chester485b.htm.

[13] Vanguard Chester Funds, Form N-CSR, Mar. 31, 2006, https://www.sec.gov/Archives/edgar/data/752177/000093247106000887/chesterfundsfinal.htm.

[14] Vanguard Chester Funds, Form N-CSR, Mar. 31, 2006, https://www.sec.gov/Archives/edgar/data/752177/000093247106000887/chesterfundsfinal.htm; Vanguard Target Retirement 2020 Trust I Fact Sheet, https://institutional.vanguard.com/iippdf/pdfs/FS1464.pdf.

- 34 -

year from 2012–2017, Vanguard received the highest Morningstar Analyst Rating for Target-Date Series mutual funds.[15] Vanguard also has been the top target date fund provider (by assets under management) since 2014.[16] Since before 2016, Vanguard's target date mutual funds have been strong performing target date funds,[17] and the Vanguard collective investment trust versions have experienced even better performance because they charge lower fees than their mutual fund equivalents.

96.    The Vanguard Target Retirement collective trust target date funds also charge low investment management expenses. Since 2016, the Vanguard Target Retirement Trust Plus shares charge 6–7 bps, and the lower-cost Trust Select shares charge 5 bps. The Trust Plus shares have been available since August 2011, while the Trust Select shares have been available since June 2015. Relative to the Trust Select Shares at the time of selection, the flexPATH Index target date funds (I1 shares) charged 420% higher expenses—26 bps compared to 5 bps. The Plan later transitioned to M shares for the flexPATH Index target date funds at or around February 2018. These shares were still more than twice the cost of the Vanguard collective trusts—12 bps compared to 5 bps.

97.    The Wood Defendants recognized the prudence of using Vanguard as the Plan's target date fund manager, which further demonstrates that the Wood Defendants concede the Vanguard target date funds were a prudent alternative to the flexPATH Index target date funds. It was also previously used by one of the 401(k) plans that merged with the Plan effective December 31, 2015. As of

---

[15] John Croke, *Vanguard Earns Morningstar Gold,* June 21, 2019, https://institutional.vanguard.com/VGApp/iip/site/institutional/researchcommentary/article/InvComVanguardMorningstarGold. Morningstar, Inc. is a leading provider of investment research and investment services, and is relied on by industry professionals.

[16] Morningstar, 2019 Target Date Fund Landscape, at 9, 11 https://institutional.vanguard.com/iam/pdf/TDFLNDSCP.pdf.

[17] *E.g.,* Morningstar, 2019 Target Date Fund Landscape at 33; Vanguard Chester Funds, Form N-1A, Jan. 27, 2017, https://www.sec.gov/Archives/edgar/data/752177/000093247117000194/chester485b.htm.

December 31, 2018, the Wood Defendants made the decision to replace the flexPATH Index target date funds with the Vanguard Target Retirement Trust Plus target date funds. The Wood Defendants only came to this conclusion after Defendants subjected Plan participants to an untested target date fund solution that put at risk hundreds of millions of dollars of participants' retirement savings. This decision caused Plan participants to lose substantial retirement savings.

98.     A prudent alternative to the flexPATH Index target date funds was the Vanguard Target Retirement Trust target date funds. From June 30, 2016 through September 30, 2018, the Plan's flexPATH target date funds substantially underperformed the Vanguard Target Retirement Trust Select target date funds. Had the Wood Defendants used the Vanguard alternative rather than the flexPATH Index target date funds, Plan participants would not have lost in excess of $17.6 million of their retirement savings.[18]

## 2.  The other flexPATH-managed funds.

99.     Following the removal of the flexPATH Index target date funds, NFP recommended that the Wood Defendants add three flexPATH-advised funds to the Plan: the International Stock Fund, the Core Bond Fund, and the Large Cap Value Fund. NFP refers to these funds internally as the "NFP Collective Trusts", which are exclusively offered to NFP's clients. The Wood Defendants approved those recommendations and added these three flexPATH-advised funds to the Plan in late 2018. However, the minutes of the meetings of the Fiduciary Committee do not reflect any decision—much less deliberations or a reasoned decision-making process—to support the decision to add the flexPATH funds. In fact, Fiduciary Committee members were routinely absent from committee meetings during 2018

---

[18] Plan losses have been brought forward through September 30, 2020 to account for lost investment opportunity.

1   that preceded the decision to add the flexPATH funds to the Plan.

2                    **a. International Stock Fund (I1).**

3          100.   In late 2018, the Wood Defendants added the International Stock Fund

4   (I1) to the Plan on the advice and recommendation of NFP. The International Stock

5   Fund replaced the Dodge & Cox International Fund (DODFX) in the Plan and the

6   Hartford Schroders International Multi-Cap Value Fund (SIDNX) from a

7   predecessor plan, which resulted in over $23 million mapped to that fund.

8   "Mapping" refers to the process where the fund assets are sold, and the proceeds are

9   transferred to the new investment option where they are reinvested. As indicated

10  *supra,* the International Stock Fund is an affiliated investment of NFP, as

11  flexPATH serves as the subadvisor for this fund.

12         101.   Using an active investment management strategy, the International

13  Stock Fund seeks to achieve long-term capital growth by investing primarily in

14  non-U.S. equity securities. Morningstar classifies the Fund in the foreign large cap

15  value asset category and used the Morgan Stanley Capital International All Country

16  World Index Excluding U.S. (MSCI ACWI Ex-US Index) as its style-specific

17  benchmark. The MSCI benchmark index captures large and mid-cap securities

18  across 22 developed markets countries (excluding the United States) and 27

19  emerging markets countries.

20         102.   In an active investment strategy, the investment manager uses her

21  judgment in buying and selling individual securities (*e.g.*, stocks, bonds, etc.) in an

22  attempt to generate investment returns that surpass a benchmark index, net of fees,

23  which are higher in actively managed than passively managed funds. In a passive

24  investment strategy, the investment manager attempts to match the performance of

25  a given benchmark index by holding a representative sample of securities in that

26  index. Because no stock selection or research is necessary for the manager to track

27  the index and trading is limited, passively managed investments charge

28  significantly lower fees for investment management services.

- 37 -

103.   In light of the effect of fees on expected returns, fiduciaries must carefully consider whether the added cost of actively managed funds is realistically justified by an expectation of higher returns. RESTATEMENT (THIRD) OF TRUSTS ch. 17, intro. note; *id*. § 90 cmt. h(2). Nobel Prize winners in economics have concluded that virtually no investment manager consistently beats the market over time after fees are taken into account. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs." William F. Sharpe, *The Arithmetic of Active Management,* 47 FIN. ANALYSTS J. 7, 8 (Jan./Feb. 1991);[19] Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 J. FIN. 1915, 1915 (2010) ("After costs . . . in terms of net returns to investors, active investment must be a negative sum game.").

104.   To the extent managers show any sustainable ability to beat the market, the outperformance is nearly always dwarfed by fund expenses. Fama & French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, at 1931– 34; *see also* Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. FIN. 1655, 1690 (2000) ("on a net-return level, the funds underperform broad market indexes by one percent per year").

105.   If an individual high-cost mutual fund exhibits market-beating performance over a short period of time, studies demonstrate that outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. FIN. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. FIN. 57, 57, 59 (1997) (measuring thirty-one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost

[19] https://www.tandfonline.com/doi/10.2469/faj.v47.n1.7.

all of the predictability in mutual fund returns"). But the *worst-performing* mutual funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57.

106.   Accordingly, a prudent fiduciary would not select as a plan investment option a more-expensive actively managed fund without determining that the fund is reasonably expected to outperform a cheaper index fund.

107.   The International Stock Fund did not exist until December 29, 2017 when flexPATH launched the fund. Wilmington Trust is the trustee and flexPATH is the subadvisor of the fund. Rather than actually investing the underlying assets of the International Stock Fund, flexPATH invests the assets in an investment vehicle selected by flexPATH, which is managed by an unaffiliated investment manager. From the fund's inception to March 27, 2020, the Templeton Foreign CIT was the underlying fund, and since that time, the PIMCO RAE International collective trust has been the underlying fund.

108.   The International Stock Fund had less than one year of performance history at the time the Wood Defendants selected it for the Plan. Further, at the time of selection, flexPATH had only managed assets in general for barely three years and the Fund's investment strategy in particular for less than one year. Indeed, when NFP first presented the International Stock Fund to the Fiduciary Committee, flexPATH had not even launched the Fund. Because the International Stock Fund did not exist until December 2017, the Wood Defendants could not consider actual performance results over any meaningful period prior to adding the Fund to the Plan, or to evaluate the success or lack thereof of flexPATH's management of the Fund. In fact, the minutes of meeting of the Fiduciary Committee and materials presented during those meetings indicate that the Fiduciary Committee did not consider the actual performance history of the International Stock Fund over its limited history, and NFP did not present that information for consideration.

109.   These documents also show that neither the Wood Defendants nor

- 39 -

NFP performed an evaluation or investigation of available investment alternatives to the International Stock Fund to replace the Plan's existing investment options. Nor do these materials indicate that the Wood Defendants made a decision—much less a reasoned decision after weighing all relevant factors—that the selection of the International Stock Fund was in the best interest of Plan participants or prudent.

110. The performance history of the underlying fund (Templeton Foreign Fund) would not support the Wood Defendants' decision and NFP's recommendation to add NFP's/flexPATH's version of the Fund to the Plan. It also was not presented to Plan participants. Even though the Templeton Foreign Fund had a longer performance history (through its mutual fund equivalent in R or R6 shares), it underperformed its benchmark index over one-, five- and ten-year periods as of December 31, 2017.[20] From 2014 through 2017, the Templeton Foreign Fund also ranked in the 80th percentile or worse of its peer group for three of those four years. This performance data and peer rankings, as reported by the investment manager (Templeton) and Morningstar, was available to the Wood Defendants and NFP prior to and during the time period that purported fiduciary discussions occurred about adding the International Stock Fund to the Plan.

111. The International Stock Fund charges 40 bps. The Wood Defendants, NFP and flexPATH caused the Plan to invest in a higher-cost version of the underlying fund managed by Templeton Global Advisors. This caused Plan participants to pay higher expenses than would be charged if the Plan invested directly in the lowest-share class of the underlying fund. This caused participants to suffer from lower returns on their investment due to higher expenses. For instance, during the time period that the Templeton Foreign CIT was the fund's underlying investment, Wilmington Trust offered the Templeton Foreign CIT (Class 0TS),

---

[20] Templeton Funds, Form N-1A, Dec. 27, 2018, https://www.sec.gov/Archives/edgar/data/225930/000137949118006477/filing1906.htm. The Templeton Foreign Fund identified the MSCI ACWI Ex-US Index as the benchmark index, which is the same benchmark identified by Morningstar.

which charged 33 bps—close to 20% less—for the same investment managed by the same investment manager. The Fiduciary Committee minutes and materials do not reflect any investigation or consideration by the Wood Defendants or NFP of the lower-cost version of the International Stock Fund. The Plan's investment in this higher-cost version by flexPATH for the same investment only benefitted NFP and flexPATH to the detriment of Plan participants.[21]

112.   The International Stock Fund was inferior to other comparable funds in the market. The Vanguard Total World Stock Index Fund (Instl) (VTWIX) is a passively managed foreign index fund that provides shareholders broad exposure to stock markets around the world, including developed and emerging markets. The Vanguard index fund charged substantially lower expenses than the International Stock Fund. In 2018, the flexPATH fund charged 40 bps compared to 10 bps charged by Vanguard, which is 300% more. The Vanguard index fund also was superior to the International Stock Fund in terms of performance. As of December 31, 2017, the Vanguard alternative outperformed the Templeton Foreign Fund (as measured by its mutual fund equivalent) over the trailing one-, three- and five-year periods.[22]

113.   Another lower-cost alternative to the International Stock Fund is the Vanguard Total International Stock Index Fund (VTPSX). The Vanguard Total International Stock is a passively managed foreign index fund that provides shareholders exposure to developed and emerging markets, excluding the United States. The Vanguard index fund is benchmarked to the MSCI ACWI ex US and other comparative indexes. In 2018, flexPATH charged 40 bps for the International

---

[21] The harm to Plan participants is further shown when the International Stock Fund is compared to the Templeton Foreign CIT's mutual fund equivalent. In 2019, the International Stock Fund underperformed than the Templeton Foreign Fund (R6) (FTFGX), which charged higher expenses. In 2019, the Templeton mutual fund outperformed the International Stock Fund by 28 bps (13.05% vs. 12.77%).
[22] Vanguard International Equity Index Funds, Form N-1A, Feb. 23, 2018, https://www.sec.gov/Archives/edgar/data/857489/000093247118005160/merged.htm; Templeton Funds, Form N-1A, Dec. 27, 2018; Morningstar.

Stock Fund, which was 471% higher than the 7 bps charged by Vanguard. The
Vanguard index fund also was superior to the International Stock Fund in terms of
performance. As of December 31, 2017, the Vanguard alternative outperformed the
Templeton Fund (as measured by its mutual fund equivalent) over the trailing one-,
three-, and five-year periods.[23]

114.   Since 2018 when the International Stock Fund was added to the Plan,
it has underperformed its benchmark index, comparable Plan investments and
passively managed equivalents.[24] For 2019 and year-to-date (as of Sept. 30, 2020),
the International Stock Fund underperformed its benchmark index by 879 bps to
1,118 bps and underperformed the Vanguard Total World Stock Index Fund by
1,401 bps to 1,779 bps. Relative to the Vanguard Total International Stock Index,
the International Stock Fund underperformed by 879 bps to 1,179 bps. Despite this
significant underperformance, the Wood Defendants retained the Fund in the Plan.
The significance of this underperformance would have been apparent to a prudent
and loyal fiduciary, who would have caused it to be immediately removed from the
Plan. For the reasons previously stated, the International Stock Fund would not
have been added to the Plan by a prudent fiduciary.

115.   Because of the International Stock Fund's inferior performance history
at the time of selection and flexPATH's insufficient experience either managing
assets in general or the Fund's investment strategy in particular, and based on the
above-referenced facts of the fiduciary decision-making process, the Wood
Defendants and NFP failed to make a reasoned decision that adding and continuing
to retain this actively managed fund in the Plan was in the best interest of Plan
participants or prudent, and additionally failed to determine whether participants
would be better served by other prudent and better performing alternatives available

---

[23] Vanguard Star Funds, Form N-1A, Feb. 22, 2018,
https://www.sec.gov/Archives/edgar/data/736054/000093247118005104/star485b0
22018.htm; Templeton Funds, Form N-1A, Dec. 27, 2018; Morningstar.
[24] As of September 30, 2020.

to the Plan after considering all relevant factors. The decision to include and retain the International Stock in the Plan only served to benefit NFP and flexPATH.

116.   By using and continuing to retain the International Stock Fund as a Plan investment, the Wood Defendants and NFP caused Plan participants to suffer performance losses. A prudent alternative to the International Stock Fund was the Vanguard Total World Stock Index Fund (VTWIX). Had the Wood Defendants used the Vanguard alternative instead of the International Stock Fund, Plan participants would not have lost in excess of $5.1 million of their retirement savings.[25]

### b. Core Bond Fund (I1).

117.   In late 2018, the Wood Defendants added the Core Bond Fund (I1) to the Plan on the advice and recommendation of NFP. The Core Bond Fund replaced the PIMCO Total Return Fund (PTTRX) in the Plan and the Baird Aggregate Bond Fund (BAGIX) from a predecessor plan, which resulted in over $98 million mapped to that fund. As indicated *supra,* the Core Bond Fund is an affiliated investment of NFP because flexPATH serves as the fund's subadvisor.

118.   Using an active investment management strategy, the Core Bond Fund seeks to achieve a total return from current income and capital appreciation by investing in a diversified portfolio of fixed-income securities. Morningstar classified the Fund in the intermediate-term bond asset category and identifies the Barclays U.S. Universal Bond Index as its benchmark. The Barclays U.S. Universal Bond Index measures the performance of investment grade or high-yield U.S. dollar-denominated, fixed-rate taxable bonds, including Treasuries, government-related and corporate securities, and mortgage-backed securities.

119.   The Core Bond Fund did not exist until January 2, 2018 when flexPATH launched the fund. Wilmington Trust is the trustee and flexPATH is the

---

[25] Plan losses have been brought forward through September 30, 2020 to account for lost investment opportunity.

subadvisor of the fund. Rather than actually investing the underlying assets of the
Core Bond Fund, flexPATH invests the assets in an investment vehicle selected by
flexPATH, which is managed by an unaffiliated investment manager called the
Lord Abbett Total Return Trust II. The underlying investment strategy seeks to
outperform its benchmark by *100–150 bps gross of fees* over a full market cycle.
The performance of the Core Bond Fund is based on the performance of the Core
Plus Total Return Composite restated to reflect fees and expenses of the applicable
share class.

120.   The Core Bond Fund had far less than one year of performance history
at the time the Wood Defendants selected it for the Plan. At the time of selection,
flexPATH had only managed assets in general for barely three years, and the
Fund's investment strategy in particular for only months. Indeed, when NFP
presented the Core Bond Fund to the Fiduciary Committee, flexPATH had yet to
launch the Fund. Because the Core Bond Fund did not exist until January 2018, the
Wood Defendants could not consider the Fund's actual performance results over
any meaningful period prior to adding it to the Plan. In fact, the minutes of
meetings of the Fiduciary Committee and materials presented during those
meetings indicate that the Fiduciary Committee did not consider the actual
performance history of the Core Bond Fund over its limited history, and NFP did
not present that information for consideration.

121.   These documents also show that neither the Wood Defendants nor
NFP performed an evaluation or investigation of available investment alternatives
to the Core Bond Fund to replace the Plan's existing investment options. Nor do
these materials indicate that the Wood Defendants made a decision—much less a
reasoned decision after weighing all relevant factors—that the selection of the Core
Bond Fund was in the best interest of Plan participants or prudent.

122.   The Core Bond Fund charges 23 bps. The Wood Defendants, NFP and
flexPATH caused the Plan to invest in a higher-cost version of the underlying fund

- 44 -

managed by Lord Abbett & Co., LLC. This causes Plan participants to pay higher

expenses than would be charged if the Plan invested directly in the lowest-share

class of the underlying fund, thereby causing participants to suffer from lower

investment returns. For example, Wilmington Trust offered the Lord Abbett Total

Return Trust II (Class 0TS), which charged 16 bps—over 30% less—for the same

investment managed by the same investment manager. The minutes of meetings of

the Fiduciary Committee and materials presented during those meetings do not

reflect any investigation or consideration by the Wood Defendants or NFP of the

lower-cost version of the Core Bond Fund. The Plan's investment in the higher-cost

version by flexPATH for the same investment only benefitted NFP and flexPATH

to the detriment of Plan participants.

123.   The Core Bond Fund replaced the PIMCO Total Return Fund

(PTTRX) in the Plan, which was a comparable intermediate-term bond fund

benchmarked to the Barclays U.S. Aggregate Bond Index. The Barclays U.S.

Aggregate Bond Index is the most popular benchmark for the U.S. investment-

grade market. The index measures the investment grade, U.S. dollar denominated,

fixed-rate taxable bond market. As of December 31, 2017, the PIMCO Total Return

Fund outperformed its benchmark index over all reporting periods.[26] It also

outperformed the Lord Abbett Total Return mutual fund over the trailing one- and

three-year periods. Apart from the mutual-fund version of the PIMCO Total Return

Fund provided in the Plan, PIMCO also offered a lower-cost separate account

version of this fund as early as 2008.

124.   This performance data as reported by the investment manager was

available to the Wood Defendants and NFP prior to and during the time period that

purported discussions occurred about adding the Core Bond Fund to the Plan. The

historical performance of the PIMCO fund would not have caused a prudent

---

[26] PIMCO Funds, Form N-1A, July 30, 2018,
https://www.sec.gov/Archives/edgar/data/810893/000119312518228168/d550613d
485bpos.htm#chapter_2-sect1_11_5425.

fiduciary to remove that option from the Plan in favor of an investment vehicle offered by an inexperienced investment manager, particularly when that decision directly benefited the Plan's fiduciary investment advisor.

125.   According to the minutes of meetings of the Fiduciary Committee and materials presented by NFP during those meetings, neither the Wood Defendants nor NFP expressed any intention to remove the PIMCO fund from the Plan because the Fiduciary Committee lost confidence in the investment manager's ability to achieve performance, because of concerns regarding the fund's investment style, allocation and/or risk objectives, or because of the fund's inability to maintain acceptable qualitative standards. From June 30, 2017 through June 30, 2018, the PIMCO fund consistently outperformed its benchmark over the rolling one-, three-, five-, and ten-year periods. Immediately prior to the PIMCO fund's removal, NFP specifically scored the fund 9 out of 10 (or "good").

126.   The loss of confidence by the Committee and the manager's ability to meet those factors specified above, *e.g.,* ability to achieve performance, are monitoring criteria set forth in the IPS governing when an investment manager may be removed. The IPS specifies that "considerable judgment" should be exercised prior to any fund removal. The PIMCO fund also was not on the "watch list" prior to its removal, despite placement on the watch list was a procedure established by the Wood Defendants and NFP to identify managers that may need to be replaced.

127.   When an investment manager was placed on watch, and consideration was given to replace that manager, NFP evaluated multiple candidates relative to the watch-listed fund and analyzed the watch-listed fund's historical performance and other quantitative criteria relative to investment alternatives available to the Plan. This process was specifically conducted by NFP for the Plan's small cap growth fund option at the time that NFP initially identified the Core Bond Fund to the Fiduciary Committee. No such fiduciary evaluation was performed prior to the removal of the PIMCO fund.

- 46 -

128.   The Core Bond Fund was also inferior to comparable funds in the market. The Vanguard Intermediate-Term Bond Index Fund (Instl Plus) (VBIUX) is a passively managed intermediate-term bond fund. Morningstar classified the Vanguard index fund in the intermediate-term bond asset category and uses the Barclays U.S. Aggregate Bond Index as its benchmark. The Vanguard index fund charged substantially lower fees relative to the Core Bond Fund. In 2018, the flexPATH fund charged 23 bps compared to 4 bps charged by Vanguard, which is 475% more.

129.   Because the Core Bond Fund had an inferior performance history at the time of selection and flexPATH had insufficient experience managing assets in general or the Fund's investment strategy in particular, and based on the above-referenced facts of the fiduciary decision-making process, the Wood Defendants and NFP failed to make a reasoned decision that adding and retaining the actively managed Core Bond Fund to the Plan was in the best interest of Plan participants or prudent, and failed to determine whether participants would be better served by other prudent and better performing alternatives available to the Plan after considering all relevant factors. The decision to include and retain the Core Bond in the Plan only served to benefit NFP and flexPATH to the detriment of Plan participants.

130.   During the period the Core Bond Fund was included in the Plan, it has underperformed its benchmark index, comparable Plan investments, and passively managed equivalents.[27] In particular, by underperforming its benchmark index, the fund has consistently failed to meet its underlying investment strategy by outperforming its benchmark by 100–150 bps gross of fees. Despite this, the Wood Defendants retained the Fund as a Plan investment based on the investment advice of NFP.

131.   A prudent and loyal fiduciary would not have selected or

_____

[27] As of September 30, 2020.

- 47 -

recommended the Core Bond Fund to the Plan based on the Fund's inferior

performance history and the limited track record of flexPATH. At a minimum, a

fiduciary would have taken prompt action to remove the Fund based on its

continued underperformance and failure to meet its investment objective.

132.   By including and continuing to retain the Core Bond Fund in the Plan,

the Wood Defendants and NFP caused Plan participants to suffer performance

losses. A prudent alternative to the Core Bond Fund was the Vanguard

Intermediate-Term Bond Index Fund (VBIUX). Had the Wood Defendants used the

Vanguard alternative instead of the Core Bond Fund, Plan participants would not

have lost in excess of $3 million of their retirement savings.[28] Relative to the

PIMCO Total Return Fund (PTTRX), which the Core Bond Fund replaced, Plan

participants lost in excess of $1 million.

### c. Large Cap Value (I1).

133.   In late 2018, the Wood Defendants added the Large Cap Value Fund

(I1) to the Plan on the advice and recommendation of NFP. The Large Cap Value

Fund replaced the MFS Value Fund (MEIKX) in the Plan and the T. Rowe Price

Institutional Large Cap Value Fund (TILCX) from a predecessor plan, which

resulted in over $92 million mapped to that fund. As indicated *supra,* the Large Cap

Value Fund is an affiliated investment of NFP that is subadvised by flexPATH.

134.   Using an active investment management strategy, the Large Cap Value

Fund seeks to outperform the market over the long-term by employing a value-

oriented approach to identify potential opportunities by investing in large

capitalization securities and identifies the Russell 1000 Value Index as its

benchmark. The Russell 1000 Value Index measures the performance of the large-

cap value segment of domestic equity securities. The index includes companies

within the Russell 1000 Index with lower price-to-book ratios and lower expected

---

[28] Plan losses have been brought forward through September 30, 2020 to account
for lost investment opportunity.

growth values.

135.   The Large Cap Value Fund did not exist until December 3, 2018 when flexPATH launched the fund. Wilmington Trust is the trustee and flexPATH is the subadvisor of the fund. Rather than actually investing the underlying assets of the Large Cap Value Fund, flexPATH invests the assets in an investment vehicle selected by flexPATH, which is managed by an unaffiliated investment manager called the Putnam Large Cap Value Trust. The performance of the Large Cap Value Fund is based on the performance of the Putnam's mutual fund equivalent, the Putnam Equity Income Fund (R6) (PEQSX) (nka the Putnam Large Cap Value Fund).

136.   According to the minutes of meetings of the Fiduciary Committee and materials presented by NFP during those meetings, neither the Wood Defendants nor NFP performed an evaluation or investigation of available investment alternatives to the Large Cap Value Fund prior to replacing the Plan's existing investment options. The historical performance of the Large Cap Value Fund was never presented to the Fiduciary Committee before it was added to the Plan. The Fiduciary Committee minutes also do not indicate that the Wood Defendants made a decision—much less a reasoned decision after weighing all relevant factors—that the selection of the Large Cap Value Fund was in the best interest of Plan participants or prudent after considering all relevant factors.

137.   These documents also show that neither the Wood Defendants nor NFP expressed any intention to remove the existing MFS Value Fund from the Plan because the Fiduciary Committee lost confidence in the investment manager's ability to achieve performance, because of the fund's style, allocation and/or risk objections, or because of the fund's inability to maintain acceptable qualitative standards. These factors are specific criteria under the IPS governing when a manager may be removed. From June 30, 2017 through June 30, 2018, the MFS fund consistently outperformed its benchmark over the rolling one-, three-, five-,

- 49 -

and ten-year periods. Immediately prior to the MFS fund's removal, NFP specifically scored the fund 10 out of 10 (or "good"). The MFS fund also was not placed on the Plan's watch list prior to its removal from the Plan.

138.   The Large Cap Value Fund charges 29 bps. The Wood Defendants, NFP and flexPATH caused the Plan to invest in a higher-cost version of the underlying fund managed by Putnam Investment Management, LLC. This causes Plan participants to pay higher expenses than would be charged if the Plan invested directly in the lowest-share class of the underlying fund. For instance, Putnam Fiduciary Trust Company offers the Putnam Large Cap Value Trust in Class IB shares, which allowed plan fiduciaries to negotiate a lower investment management fee directly with Putnam Fiduciary Trust Company. As a result, the investment returns of the Putnam Large Cap Value Trust (Class IB shares) provided higher returns than the Plan's Large Cap Value Fund. The minutes of meetings of the Fiduciary Committee and materials presented during those meetings do not reflect any investigation or consideration by the Wood Defendants or NFP of the lower-cost version of the Large Cap Value Fund.

139.   The above-referenced facts demonstrate that the Wood Defendants and NFP failed to engage in a reasoned decision-making process prior to adding the Large Cap Value Fund the Plan, illustrating that the decision to include the Large Cap Value Fund only served to benefit NFP and flexPATH at the expense of Plan participants. By causing the Plan to invest in the Large Cap Value Fund, Defendants caused Plan participants to pay unnecessary investment management fees, thereby reducing their investment returns relative to the Putnam Large Cap Value Trust (IB).

II.   **The Wood Defendants and NFP caused the Plan to pay unreasonable investment management fees by using higher-cost versions of Plan investments.**

140.   Academic and financial industry literature demonstrate that high

- 50 -

expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2008); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1993 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed mutual funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

141.   When providing investments to plan participants, the importance of fees cannot be overstated. Indeed, "the duty to avoid unwarranted costs is given increased emphasis in the prudent investor rule" under the common law of trusts, which informs ERISA's fiduciary duties. Restatement (Third) of Trusts ch. 17, intro. note (2007); *see Tibble*, 135 S. Ct. at 1828 (*citing* Restatement (Third) of Trusts § 90 in finding a continuing duty to monitor under ERISA). As the Restatement explains, "cost-conscious management is fundamental to prudence in the investment function." Restatement (Third) of Trusts § 90 cmt. b.

142.   It is a simple principle of investment management that the larger amount an investor has available to invest, the lower the investment management fees that can be obtained in the market for a given investment vehicle. Large

- 51 -

retirement plans have substantial bargaining power to negotiate low fees for
investment management services. Multi-billion-dollar defined contribution plans,
such as the Plan, have even greater bargaining power.

143.    Mutual funds and collective investment trusts frequently offer multiple
share classes. Because the only difference between the share classes is fees,
selecting higher-cost shares results in the plan paying wholly unnecessary fees.
Accordingly, absent a compelling reason to opt for the higher-cost version, prudent
fiduciaries will select the lowest-cost share class available to the plan. As a
prominent legal counsel to defined contribution fiduciaries explained:

> The fiduciaries also must consider the size and purchasing
> power of their plan and select the share classes (or
> alternative investments) that a fiduciary who is
> knowledgeable about such matters would select under the
> circumstances. In other words, the "prevailing
> circumstances"—such as the size of the plan—are a part
> of a prudent decision making process. The failure to
> understand the concepts and to know about the
> alternatives could be a costly fiduciary breach.[29]

144.    Given the Plan's size, the Plan had tremendous bargaining power to
obtain share classes with far lower costs than that of higher-cost shares. Lower-cost
share classes of mutual fund and collective investment trust investments were
readily available to the Plan. Minimum investment thresholds for the lowest-cost
institutional shares are routinely waived by the investment provider even if not
reached by a single fund.

> For large 401(k) plans with over a billion dollars in total
> assets…mutual funds will often waive an investment

---

[29] Fred Reish, *Class–ifying Mutual Funds*, PLANSPONSOR (Jan. 2011).,
http://www.plansponsor.com/MagazineArticle.aspx?id=6442476537.

minimum for institutional share classes. It is also common

for investment advisors representing large 401(k) plans to

call mutual funds and request waivers of the investment

minimums so as to secure the institutional shares.

*Tibble v. Edison Int'l*, No. 07-5359, 2010 WL 2757153, at *9 (C.D. Cal. July 8,

2010), *affirmed* 729 F.3d 1110 (9th Cir. 2013).

145.   In fact, Vanguard expressly "reserves the right to establish higher or

lower minimum amounts for certain investors", including when the "plan sponsor's

aggregate assets within the Vanguard Funds will likely generate substantial

economies in the servicing of their accounts."[30]

146.   During the proposed class period, the Wood Defendants had the

fiduciary authority over the selection and retention of share classes used for the

Plan's investments. As the Plan's fiduciary investment advisor, NFP advised the

Wood Defendants regarding Plan investments and the reasonableness of Plan

expenses, including the share class to be used for each Plan investment as shown by

its advice related to the flexPATH Index target date funds. Despite the fact that

lower-cost shares for the exact same investment option were available to the Plan,

the Wood Defendants selected and continue to retain higher-cost shares for Plan

investments than were available to the Plan based on its enormous size.

147.   Although the Wood Defendants transitioned to M shares for the

flexPATH Index target date funds at or around February 2018, the Wood

Defendants provided the flexPATH Index target date funds in "I1" shares even

though lower-cost "R" shares were available prior to that date. For instance, as of

September 30, 2016, I1 shares charged 24–25 bps when the lower-cost R shares

charged 19–20 bps. Although this data was presented to the Wood Defendants, they

did not investigate the use of these shares for the Plan or take action to transition

---

[30] *See* Vanguard Funds Multiple Class Plan,
https://www.sec.gov/Archives/edgar/data/1409957/000093247113007109/multiplec
lassplanvanguardfun.pdf.

the Plan to lower-cost shares until early 2018. NFP also did not recommend that the Wood Defendants use or transition to the lower-cost R shares when they were available and known by NFP.

148.   During the fourth quarter of 2018, the Wood Defendants added the Vanguard Target Retirement target date funds to the Plan. By December 31, 2018, the Plan invested over $1 billion in these target date funds. From 2018 through the present, the Wood Defendants selected and maintained the Trust Plus shares that charge 7 bps when the lower-cost Select shares were available for 5 bps, a cost savings of almost 30%. The minutes of meetings of the Fiduciary Committee and the materials presented during such meetings indicate that neither the Wood Defendants nor NFP investigated the availability of the lower-cost Select shares for the Vanguard target date funds. Other similarly situated defined contribution plans, including those with smaller amount of assets invested in target date funds, used the Select shares of the Vanguard Target Retirement target date funds.

149.   Moreover, as indicated *supra*, the Wood Defendants used the flexPATH funds when lower-cost versions of the underlying funds were available to the Plan. The record of meetings of the Fiduciary Committee indicate that the Wood Defendants never inquired if the flexPATH funds were available directly from the underlying managers, and that NFP never presented such information to the Wood Defendants for consideration.

150.   According to the Plan's Forms 5500, none of the higher-cost shares of the Plan's investments identified herein paid revenue sharing that was used by the Wood Defendants to offset Plan expenses charged by service providers. Therefore, the use of higher-cost shares to pay expenses charged by Plan service providers cannot justify the Wood Defendants' conduct.

151.   Overall, the minutes of the meetings of the Fiduciary Committee and the materials presented to the Fiduciary Committee for the period of December 17, 2014 through November 1, 2018 do not reflect any consideration of the lower-cost

- 54 -

shares indicated herein for the identified Plan investments. No justification for the use of higher-cost shares was documented or otherwise reflected in those documents to justify the use of higher-cost shares when otherwise identical lower-shares were available to the Plan. Nor was there any documented reason that the lower-cost shares (or versions) were not otherwise available to the Plan.

152.   By providing Plan participants the more expensive share classes of Plan investment options, the Wood Defendants caused participants to lose substantial retirement savings.[31]

## CLASS ACTION ALLEGATIONS

153.   29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. §1109(a).

154.   In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §1132(a)(2), Plaintiffs seek to certify this action as a class action on behalf of all Plan participants and beneficiaries. Plaintiffs seek to certify the follow class:

All participants and beneficiaries of the Wood 401(k) Plan from February 16, 2015 through the date of judgment, excluding Defendants and members of the Committee of the Wood 401(k) Plan.

155.   This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.      The Class includes over 10,000 members and is so large that joinder of all its members is impracticable.

b.      There are questions of law and fact common to the Class because Defendants owed fiduciary duties to the Plan and to all participants

---

[31] Plan losses have been carried forward through December 31, 2020 using the investment return of an S&P 500 index fund, the Vanguard Institutional Index (VIIIX), to account for lost investment returns on those assets.

and beneficiaries and took the actions and made omissions alleged herein as
to the Plan and not as to any individual participant. Thus, common questions
of law and fact include the following, without limitation: who are the
fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether
the fiduciaries of the Plan breached their fiduciary duties to the Plan; what
are the losses to the Plan resulting from each breach of fiduciary duty; and
what Plan-wide equitable and other relief the court should impose in light of
Defendants' breaches of duty.

       c.    Plaintiffs' claims are typical of the claims of the Class because
each Plaintiff was a participant during the time period at issue in this action
and all participants in the Plan were harmed by Defendants' misconduct.

       d.    Plaintiffs are adequate representatives of the Class because they
were participants in the Plan during the Class period, have no interest that is
in conflict with any other member of the Class, are committed to the vigorous
representation of the Class, and have engaged experienced and competent
attorneys to represent the Class.

       e.    Prosecution of separate actions for these breaches of fiduciary
duties by individual participants and beneficiaries would create the risk of
(A) inconsistent or varying adjudications that would establish incompatible
standards of conduct for Defendants in respect to the discharge of their
fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C.
§1109(a), and (B) adjudications by individual participants and beneficiaries
regarding these breaches of fiduciary duties and remedies for the Plan would,
as a practical matter, be dispositive of the interests of the participants and
beneficiaries not parties to the adjudication or would substantially impair or
impede those participants' and beneficiaries' ability to protect their interests.
Therefore, this action should be certified as a class action under Rule
23(b)(1)(A) or (B).

156.   A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

157.   Plaintiffs' counsel, Schlichter Bogard & Denton, LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g). Schlichter Bogard & Denton has been appointed as class counsel in over 30 other ERISA class actions regarding excessive fees in large defined contribution plans. Courts in these cases have consistently and repeatedly recognized the firm's unparalleled success in the area of defined contribution excessive fee litigation.

158.   Judge Michael Ponsor of the United States District Court for the District of Massachusetts found that Schlichter Bogard & Denton had achieved an "outstanding result for the class," and "demonstrated extraordinary resourcefulness, skill, efficiency and determination." *Gordan v. Mass Mutual Life Ins., Co.*, No. 14-30184, Doc. 144 at 5 (D. Mass. Nov. 3, 2016). Chief Judge Michael J. Reagan of the Southern District of Illinois recognized that the firm had shown "exceptional commitment and perseverance in representing employees and retirees seeking to improve their retirement plans," and "demonstrated its well-earned reputation as a pioneer and the leader in the field" of 401(k) plan excessive fee litigation. *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 WL 43984750, at *1 (S.D. Ill. July 17, 2015). Judge Harold Baker of the Central District of Illinois acknowledged the

- 57 -

significant impact of the firm's work, finding that as of 2013, the nationwide "fee reduction attributed to Schlichter, Bogard & Denton's fee litigation and the Department of Labor's fee disclosure regulations approach *$2.8 billion in annual savings* for American workers and retirees." *Nolte v. Cigna Corp*., No. 07-2046, 2013 WL 12242015, at *2 (C.D. Ill. Oct. 15, 2013) (emphasis added).

159.   Other courts have made similar findings. *See, e.g., Marshall v. Northrop Grumman Corp*., No. 16-6794 AB (JCX), 2020 WL 5668935, at *4 (C.D. Cal. Sept. 18, 2020) ("The Court finds that Schlichter, Bogard & Denton is exceptionally skilled having achieved unparalleled success in actually pioneering complex ERISA 401(k) excessive fee litigation[.]"); *Kelly v. Johns Hopkins Univ.*, No. 16-2835, 2020 WL 434473, at *2 (D. Md. Jan. 28, 2020) (Schlichter, Bogard & Denton "pioneered this ground-breaking and novel area of litigation" that has "dramatically brought down fees in defined contribution plans"); *Bell v. Pension Comm. of ATH Holding Co.,* No. 15-2062, 2019 WL 4193376, at *2 (S.D. Ind. Sept. 4, 2019*)* (the firm are "experts in ERISA litigation"); *Spano v. Boeing Co.*, No. 06-743, Doc. 587, at 5–6 (S.D. Ill. Mar. 31, 2016) ("The law firm Schlichter, Bogard & Denton has significantly improved 401(k) plans across the country by bringing cases such as this one[.]") (internal quotations omitted); *Beesley v. Int'l Paper Co*., No. 06-703, 2014 WL 375432, at *2 (S.D. Ill. Jan. 31, 2014) ("Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to demonstrate extraordinary skill and determination."); *George v. Kraft Foods Global, Inc*., No. 08-3799, 2012 WL 13089487, at *2 (N.D. Ill. June 26, 2012) ("It is clear to the Court that the firm of Schlichter, Bogard & Denton is preeminent in the field" "and is the only firm which has invested such massive resources in this area."); *Will v. General Dynamics Corp.*, No. 06-698, 2010 WL 4818174, at *3 (S.D. Ill. Nov. 22, 2010) ("Schlichter, Bogard & Denton's work throughout this litigation illustrates an exceptional example of a private attorney general risking large sums of money and investing

- 58 -

1  many thousands of hours for the benefit of employees and retirees.").

2      160.   Schlichter Bogard & Denton handled the first full trial of an ERISA

3  excessive fee case, resulting in a $36.9 million judgment for the plaintiffs that was

4  affirmed in part by the Eighth Circuit. *Tussey v. ABB, Inc.*, 746 F.3d 327 (8th Cir.

5  2014). In awarding attorney's fees after trial, the district court concluded that

6  "Plaintiffs' attorneys are clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*,

7  No. 06-4305, 2012 WL 5386033, at *3 (W.D. Mo. Nov. 2, 2012). Following

8  remand, the district court again awarded Plaintiffs' attorney's fees, emphasizing the

9  significant contribution Plaintiffs' attorneys have made to ERISA litigation,

10  including educating the Department of Labor and federal courts about the

11  importance of monitoring fees in retirement plans:

12      Of special importance is the significant, national contribution made by

13      the Plaintiffs whose litigation clarified ERISA standards in the context

14      of investment fees. The litigation educated plan administrators, the

15      Department of Labor, the courts and retirement plan participants about

16      the importance of monitoring recordkeeping fees and separating a

17      fiduciary's corporate interest from its fiduciary obligations.

18  *Tussey v. ABB, Inc.,* No. 06-4305, 2015 WL 8485265, at *2 (W.D. Mo. Dec. 9,

19  2015).

20      161.   Schlichter Bogard & Denton was also class counsel in and handled

21  *Tibble v. Edison International*, 135 S. Ct. 1823 (2015), the first and only Supreme

22  Court case to address the issue of excessive fees in a defined contribution plan—in

23  which the Court held in a unanimous 9–0 decision that ERISA fiduciaries have "a

24  continuing duty to monitor investments and remove imprudent ones[.]" *Id*. at 1829.

25  Schlichter Bogard & Denton successfully petitioned for a writ of certiorari and

26  obtained amicus support from the United States Solicitor General and AARP,

27  among others. Given the Court's broad recognition of an ongoing fiduciary duty,

28  the *Tibble* decision will affect all ERISA defined contribution plans.

- 59 -

## COUNT I: BREACH OF FIDUCIARY DUTIES (29 U.S.C. §1104(A)(1))
## RELATED TO THE FLEXPATH FUNDS

162.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

163.   This Count alleges breach of fiduciary duties against all Defendants.

164.   Defendants were required to act "solely in the interest" of participants and to manage the assets of the Plan for the "exclusive purpose of providing benefits to participants and their beneficiaries, and defraying reasonable expenses of administering the Plan", and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims". 29 U.S.C. §1104(a)(1)(A)–(B). Defendants were directly responsible for selecting prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent designated investment alternatives, and taking all necessary steps to ensure that the Plan's assets were invested prudently. As the Supreme Court confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble,* 135 S. Ct. at 1829.

165.   The NFP Defendants breached their duties of loyalty and prudence under 29 U.S.C. §1104(a)(1)(A) and (B) and the Wood Defendants breached their duty of prudence under §1104(a)(1)(B) by selecting and retaining the flexPATH funds in the Plan. Instead of acting solely in the interest of Plan participants, Defendants provided the flexPATH funds as Plan investments because of the benefits they provided to the NFP Defendants, which came at the expense of participants' retirement savings. While the NFP Defendants received millions of dollars in Plan assets for their investment management business and advisory fees, participants sustained massive losses in retirement savings due to high fees and poor performance. Moreover, Defendants failed to engage in a reasoned decision-

making process to determine that using the flexPATH funds was in the best
interests of Plan participants or prudent and failed to determine whether participants
would be better served by other prudent and better performing alternatives available
to the Plan after considering all relevant factors. Defendants' decision to add or
recommend the retention of the proprietary flexPATH funds caused the Plan and
participants to incur significant losses.

166.   In particular, the Wood Defendants failed to discharge their fiduciary
duties by deciding and then ultimately allowing flexPATH to include its untested
and inferior proprietary target date funds in the Plan, and also by selecting and
retaining the other flexPATH funds (International Stock, Core Bond, and Large Cap
Value funds) that were inferior to prudent alternatives available to the Plan.

167.   flexPATH violated its fiduciaries duties by selecting and retaining the
flexPATH Index target date funds in the Plan, which were managed under an
untested investment strategy and were inferior to prudent alternatives available to
the Plan.

168.   NFP also violated its fiduciary duties by advising the Wood
Defendants to select and retain the flexPATH Index target date funds, and
separately, by advising the Wood Defendants to select and retain the other
flexPATH funds because of the benefits they provided to itself and flexPATH.

169.   Total Plan losses will be determined at trial after complete discovery in
this case and are continuing.

170.   Each Defendant is personally liable under 29 U.S.C. §1109(a) to make
good to the Plan any losses to the Plan resulting from the breaches of fiduciary
duties alleged in this Count and is subject to other equitable or remedial relief as
appropriate.

171.   Each Defendant knowingly participated in the breach of the other
Defendants, knowing that such acts were a breach, enabled the other Defendants to
commit a breach by failing to lawfully discharge its own fiduciary duties, knew of

- 61 -

the breach by the other Defendants and failed to make any reasonable effort under
the circumstances to remedy the breach. Thus, each Defendant is liable for the
losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

### COUNT II: BREACH OF FIDUCIARY DUTIES (29 U.S.C. §1104(A)(1)) RELATED TO THE USE OF HIGHER-COST VERSIONS OF PLAN INVESTMENTS

172.    Plaintiffs restate and incorporate the allegations contained in the
preceding paragraphs.

173.    This Count alleges breach of fiduciary duties against the Wood
Defendants and NFP.

174.    The NFP Defendants breached their duties of loyalty and prudence
under 29 U.S.C. §1104(a)(1)(A) and (B) and the Wood Defendants breached their
duty of prudence under 29 U.S.C. §1104(a)(1)(B) by selecting and retaining as Plan
investment options higher-cost shares of mutual funds and collective investment
trusts that charged unreasonable fees relative to other investment options that were
available to the Plan at all relevant times, including separately managed accounts,
collective investment trusts, lower-cost share classes for the Plan's mutual fund and
collective investment trust investments with the identical investment manager and
investments.

175.    Total Plan losses will be determined at trial after complete discovery in
this case and are continuing.

176.    Each Defendant is personally liable under 29 U.S.C. §1109(a) to make
good to the Plan any losses to the Plan resulting from the breaches of fiduciary
duties alleged in this Count and is subject to other equitable or remedial relief as
appropriate. Each Defendant knowingly participated in the breach of the other
Defendants, knowing that such acts were a breach, enabled the other Defendants to
commit a breach by failing to lawfully discharge its own fiduciary duties, knew of
the breach by the other Defendants and failed to make any reasonable effort under

the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT III: PROHIBITED TRANSACTIONS (29 U.S.C. §1106) RELATED TO THE FLEXPATH FUNDS

177. Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

178. This Count is asserted against all Defendants.

179. Section 1106(b) prohibits transactions between a plan and a fiduciary. 29 U.S.C. §1106(b). flexPATH was a Plan fiduciary and caused the Plan to use the flexPATH Index target date funds, thereby benefiting itself and NFP. NFP was a Plan fiduciary and advised the Wood Defendants on the selection and retention of the flexPATH Index target date funds and the use of the other flexPATH funds (International Stock, Core Bond, and Large Cap Value funds). flexPATH and NFP therefore dealt with the assets of the Plan in their own interest or for its own account, in violation of 29 U.S.C. §1106(b)(1); acted in a transaction involving the Plan on behalf of a party whose interests were adverse to the interests of the Plan, its participants and beneficiaries, in violation of 29 U.S.C. §1106(b)(2); and received consideration for their own personal account from parties dealing with the Plan in connection with transactions involving the assets of the Plan, in violation of 29 U.S.C. §1106(b)(3).

180. Section 1106(a) prohibits transactions between a plan and a party in interest. 29 U.S.C. §1106(a). NFP and flexPATH are parties in interest because they were Plan fiduciaries and entities who provided services to the Plan. 29 U.S.C. §1002(14)(A) and (B). The Wood Defendants and the NFP Defendants caused the Plan to use the flexPATH funds. Defendants therefore caused the Plan to engage in a transaction that they knew or should have known constituted an exchange of property between the Plan and a party in interest in violation of 29 U.S.C. §1106(a)(1)(A); engage in a transaction they knew or should have known

- 63 -

constituted the furnishing of services between the Plan and a party in interest in violation of 29 U.S.C. §1106(a)(1)(C); and engage in a transaction they knew or should have known constituted a transfer of Plan assets to a party in interest in violation of 29 U.S.C. §1106(a)(1)(D).

181. As a direct result of these prohibited transactions, Defendants caused the Plan to suffer losses.

182. Even if flexPATH did not act as a fiduciary over the selection and retention of certain flexPATH funds (*i.e.,* International Stock, Core Bond, and Large Cap Value funds), flexPATH is still liable as a non-fiduciary "party in interest", who knowingly participated in a prohibited transaction. Under 29 U.S.C. §1132(a)(3), a court may award "other appropriate equitable relief" to redress "any act or practice" that violates ERISA. A nonfiduciary transferee of ill-gotten proceeds is subject to equitable relief if it had actual or constructive knowledge of the circumstances that rendered the transaction or payment unlawful.

183. flexPATH had such actual or constructive knowledge that the Plan's investment in the flexPATH funds was unlawful. flexPATH knew or should have known that NFP, whose CEO and President own up to 75% of flexPATH and whose executive officers operate and control flexPATH, was engaged in unlawful self-dealing by causing the Plan to invest in the flexPATH funds to enrich themselves.

184. flexPATH has not dissipated the entirety of the proceeds on nontraceable items, and the proceeds can be traced to particular funds or property in flexPATH's possession.

185. Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties and prohibited transactions alleged in this Count and to restore to the Plan all profits through their use of Plan assets and is subject to other equitable or remedial relief as appropriate, including removal as a Plan fiduciary.

- 64 -

## COUNT IV: FAILURE TO MONITOR FIDUCIARIES

186.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

187.   This Count is asserted against the Wood Defendants.

188.   Wood Group U.S. Holdings, Inc., and previously Wood Group Management Services, Inc., oversaw the overall governance of the Plan and had the authority to delegate any of their fiduciary responsibilities. Wood Group U.S. Holdings, Inc. appointed the Fiduciary Committee with authority over the selection, monitoring and removal of Plan investments and service providers, including NFP as the Plan's fiduciary investment advisor.

189.   A monitoring fiduciary must ensure that the person to whom it delegates fiduciary duties is performing its fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when the delegate fails to discharge its duties. To the extent any of the fiduciary responsibilities of the Wood Defendants were delegated to another fiduciary, their monitoring duties included an obligation to ensure that any delegated tasks were being performed in accordance with ERISA's fiduciary standards.

190.   The Wood Defendants breached their fiduciary monitoring duties by, among other things:

   a. failing to monitor their appointees and delegees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and omissions with respect to the Plan;

   b. failing to monitor their appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the imprudent investment options in violation of ERISA;

   c. failing to ensure that the monitored fiduciaries considered the ready

- 65 -

availability of comparable and better performing investment options
that charged significantly lower fees and expenses than the Plan's
investments; and

d.  failing to remove appointees and delegees whose performance was
inadequate in that they continued to allow unreasonable fees to be
charged to Plan participants or imprudent investment options to be
selected and retained in the Plan, all to the detriment of Plan
participants' retirement savings.

191.  As a direct result of these breaches of fiduciary duty to monitor, the
Plan suffered substantial losses. Had the Wood Defendants and the other delegating
fiduciaries discharged their fiduciary monitoring duties prudently as described
above, the Plan would not have suffered these losses.

## COUNT V: BREACH OF FIDUCIARY DUTIES (29 U.S.C. §1104(A)(1)) RELATED TO THE SELECTION OF FLEXPATH

192.  Plaintiffs restate and incorporate the allegations contained in the
preceding paragraphs.

193.  This Count is asserted against the Wood Defendants.

194.  When selecting service providers, the Wood Defendants are held to the
same stringent fiduciary obligations when administering the Plan. These include the
requirement to act "solely in the interest" of participants and to manage the assets
of the Plan for the "exclusive purpose of providing benefits to participants and their
beneficiaries, and defraying reasonable expenses of administering the Plan", and
"with the care, skill, prudence, and diligence under the circumstances then
prevailing that a prudent man acting in a like capacity and familiar with such
matters would use in the conduct of an enterprise of a like character and with like
aims". 29 U.S.C. §1104(a)(1)(A)–(B).

195.  The Wood Defendants breached their duty of prudence under 29
U.S.C. §1104(a)(1)(B) by selecting flexPATH to serve as the Plan's discretionary

investment manager with authority over the Plan's QDIA because flexPATH had no meaningful experience as an investment manager for a defined contribution plan's target date fund option and the Wood Defendants failed to a make a reasoned decision that the selection of flexPATH was in the best interest of Plan participants or prudent, and failed to determine whether participants would be better served by a prudent discretionary investment manager available to the Plan after considering all relevant factors. This is particularly demonstrated by flexPATH's untested experience as an investment manager over a defined contribution plan's QDIA and inferior track record managing target date fund options offered to defined contribution plans.

196.    By deciding to add the flexPATH Index target date funds, causing the Plan to hire flexPATH as the Plan's discretionary investment manager over the selection of the Plan's QDIA, and subsequently authorizing flexPATH to select its proprietary investments, the Wood Defendants caused the Plan to invest in the flexPATH Index target date funds, thereby causing the Plan and participants to incur significant losses.

197.    Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

198.    Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

199.    Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

- 67 -

**JURY TRIAL DEMANDED**

200.   Under Fed. R. Civ. P. 38 and the Constitution of the United States, Plaintiffs demand a trial by jury.

**PRAYER FOR RELIEF**

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- find and declare that Defendants have breached their fiduciary duties as described above;

- find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty and prohibited transaction, and to otherwise restore the Plan to the position they would have occupied but for the breaches of fiduciary duty;

- order the disgorgement of all amounts paid by the Plan to NFP and flexPATH;

- determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

- order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under §1109(a);

- remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

- surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

- certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Schlichter, Bogard & Denton LLP as Class Counsel;

- award to the Plaintiffs and the Class their attorney's fees and costs

- 68 -

| | |
|---|---|
| 1 | under 29 U.S.C. §1132(g)(1) and the common fund doctrine; |
| 2 | • order the payment of interest to the extent it is allowed by law; and |
| 3 | • grant other equitable or remedial relief as the Court deems |
| 4 | appropriate. |

October 1, 2021                    Respectfully submitted,

By: /s/ Heather Lea
SCHLICHTER BOGARD & DENTON LLP
Jerome J. Schlichter (SBN 054513)
Troy A. Doles (admitted *pro hac vice*)
Heather Lea (admitted *pro hac vice*)
Sean E. Soyars (admitted *pro hac vice*)
Kurt C. Struckhoff (admitted *pro hac vice*)
100 South Fourth Street, Suite 1200
St. Louis, Missouri 63102
Telephone: (314) 621-6115
Facsimile: (314) 621-5934
jschlichter@uselaws.com
tdoles@uselaws.com
hlea@uselaws.com
ssoyars@uselaws.com
kstruckhoff@uselaws.com

*Counsel for Plaintiffs*

William H. Edmonson (SBN 243445)
*will@whelawfirm.com*
LAW OFFICE OF WILL EDMONSON
8335 Sunset Boulevard, Suite 350
West Hollywood, CA 90069
Telephone: (424) 248-9581

*Local Counsel for Plaintiffs*

- 69 -