1
2
3
4
5
6
7
8
9
10
11
12

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | | |
|---|---|---|
| ROBERT LAUDERDALE, et al., | ) | Case No. 8:21-cv-00301-JVS-KES |
| Plaintiffs, | ) | |
| | ) | FINDINGS OF FACT & |
| v. | ) | CONCLUSIONS OF LAW |
| | ) | |
| NFP RETIREMENT, INC., et al., | ) | |
| Defendants | ) | |
| | ) | |
| | ) | |
| | ) | |

Plaintiffs, former plan participants of a multi-employer 401(k) retirement plan, brought this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001.  They allege that the plan sponsor, Wood Group U.S. Holdings, Inc. f/k/a/ Wood Group Management Services, Inc. ("Wood"), and investment manager, flexPATH Strategies, LLC ("flexPATH"), breached their ERISA fiduciary duties by imprudently selecting and failing to remove affiliated "target-date funds," a popular investment 401(k) vehicle, from the plan, causing substantial losses to investments in their retirement accounts.

Having carefully considered and reviewed all the testimonial and documentary evidence presented by the parties in the matter, the Court now enters the following findings of fact and conclusions of law in this action.  Fed. R. Civ. P. 52(a).

## I. JURISDICTION & VENUE

1.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1332(e)(1).  The Court has personal jurisdiction over the parties, and venue is proper in this Court pursuant to 29 U.S.C. § 1332(e)(2) because the Plan was administered in this District, at least one of the alleged breaches took place in this District, and at least one defendant resides or may be found in this District.  This matter is properly before this Court as equitable issues.

## II. PROCEDURAL BACKGROUND

2.     Plaintiffs filed this lawsuit on February 15, 2021. (Dkt. No. 1.)  Some claims were resolved by way of summary judgment.  (Dkt. No. 273 (sealed).) Only the claims of breach of fiduciary duties related to the flexPATH funds under 29 U.S.C. § 1104(a)(1) and prohibited transaction related to the flexPATH funds under 29 U.S.C. § 1106 remained against flexPATH.  Only the claims of failure to monitor fiduciaries and breach of fiduciary duty related to the selection of flexPATH under 29 U.S.C. § 1104(a)(1) remained against Wood.  No claims

against NFP Retirement, Inc. ("NFP") remained.  In a nine-day bench trial, held on March 21, 2023 to March 29, 2023 and September 5, 2023 to September 6, 2023, the parties presented live testimony, documents, and exhibits.  The parties submitted proposed findings of fact and conclusions of law.  (Dkt. Nos. 395, 398, 400.)

### III. FINDINGS OF FACT

**A.     The Parties and the Wood 401(k) Plan**

3.     Plaintiffs[1] are participants in a defined contribution, individual account, employee pension plan within the meaning of 29 U.S.C. § 1002(7).  They are class representatives of all participants and beneficiaries of the Wood 401(k) Plan, f/k/a the Wood Group 401(k) Plan (the "Plan") from February 16, 2015, through the date of judgment ("Class Period").  Fed. R. Civ. P. 23(b)(1).  During the Class Period, Plaintiffs[2] invested in the flexPATH Index target-date funds ("TDFs").

4.     Wood is the "Plan Sponsor" and Plan administrator under 28 U.S.C. §§ 1102(a)(1), 1002(16).[3]  (Dkt. No. 296 at 3.)  Wood's Board of Directors delegated day-to-day administrative responsibility with respect to the Plan to the Retirement Plan Committee of the Wood Group 401(k) Plan ("Wood Committee"). The Wood Committee had the authority to select, monitor, and remove Plan investments and service providers.  (Dkt. No. 296 at 3; Trial Exs. 7–8.)  From 2015 to 2017, Elaine Lisenbe was the Chair of the Wood Committee.  (3/22 Tr. Vol. II

---

[1] Robert Lauderdale, Ting Shen Wang, Leonard Dickhaut, Joshua Carrell, Robert Crow, Aubin Ntela, and Rodney Aaron Riggins.

[2] Lauderdale, Wang, Dickhaut, Carrell, and Crow.

[3] Wood is a wholly-owned U.S. subsidiary of John Wood Group, plc, a multinational engineering and consulting firm.

2

15:20-17:5.)  In 2011, Lisenbe served as the Vice President of Finance and the Chief Financial Officer of Mustang, an engineering subsidiary of Wood.  (Id.) Grant Johnston was the Controller for Wood Group Management Services from 2011 to 2018.  (3/21 Tr. Vol. I 62:5-10.)

5.     flexPATH is a registered investment advisor with the SEC that was created to design, manage, and oversee custom asset allocation strategies designed exclusively for retirement plans. (Trial Ex. 656 at 4; Dkt. No. 296 at 4.)  flexPATH registered with the SEC in February 2015.  (Dkt. No. 296 at 4.)  It began managing client assets in June 2015 through the launch of the flexPATH TDFs.  From March 2016 to approximately December 2018, flexPATH was the Plan's discretionary investment manager under 29 U.S.C. § 1002(38) with delegated authority to select and monitor the Plan's Qualified Default Investment Alternative ("QDIA").  (Dkt. No. 296 at 5–6.)  Participants who do not make an affirmative choice of how to invest their retirement savings have their savings invested in the Plan's QDIA. (Trial Ex. 193 at 6.)

6.     flexPATH is affiliated with NFP, another registered investment advisor, which has been providing services to retirement sponsors and plans since 2000.  (Dkt. No. 296 at 4.).  Both are registered investment advisors.  (Id. at ¶¶ 8–9.)  Both companies operate out of the same office in Aliso Viejo, California. (Id.)  Vincent Giovinazzo and other partners formed NFP in 2000, while Giovinazzo and Nicholas Della Vedova founded flexPATH in February 2014.  (Id.; Trial Ex. 130 at 43.)  Giovinazzo and Della Vedova are co-Presidents of both NFP and flexPATH.  (Dkt. No. 296 at 4.)  Jeffrey Elvander is the Chief Investment Officer ("CIO") of both NFP and flexPATH.  (Id.)  Joel Shapiro is Senior Vice President of both NFP and flexPATH. (Id.)

7.     At flexPATH's inception, Giovinazzo and Della Vedova together owned 50% of flexPATH; as of January 1, 2016, they owned over 50%.  (Trial Ex. 130 at 43; Trial Ex. 140 at 17.)  They share in over 40% of flexPATH's profits.

3

(Trial Ex. 140 at 17.)  Other senior executives of NFP and flexPATH also have profit interests in flexPATH, including Elvander and Shapiro.  (Id.)

8.     In addition to being NFP's and flexPATH's CIO, Elvander leads the flexPATH Investment Committee ("IC"), which engages in extensive diligence concerning flexPATH's investment offerings, including the flexPATH TDFs. (3/28 Tr. Vol. II 28:1-29:9.)  In his current role at flexPATH, Elvander engages in near-daily monitoring of the flexPATH TDFs and regular monitoring of the entire TDF marketplace.  (Id. at 28:8-30:22.)

9.     Both NFP and flexPATH perform the Fit Analysis in determining the appropriate glidepath for their clients.  (3/28 Tr. Vol. I 59:20-60:5.)

10.    By the time flexPATH was founded, flexPATH's senior leaders had extensive experience advising retirement plans on investment issues, selecting and monitoring investments, and in managing multi-asset portfolios for plans and other institutional investors.  (3/24 Tr. Vol. I 53:15-55:8; 3/27 Tr. 95:4-96:8; 3/28 Tr. Vol. II 21:8-36:1; Trial Ex. 645 at 2–3.)

11.    On November 19, 2008, Wood adopted an Investment Policy Statement ("IPS").  (Trial Ex. 193.)  An IPS sets forth specific factors that must be considered by fiduciaries of defined contribution plans when selecting, monitoring, and removing plan investments.  It is an accepted practice in the retirement plan industry that plan fiduciaries follow an IPS when overseeing plan investments. The Wood Plan's 2008 IPS was "intended to assist the Plan's fiduciaries in establishing a prudent investment decision-making process," and set forth the criteria for the selection, monitoring, and removal of Plan investments.  (Id. at 3–4.)  When "selecting investment options for the Plan," the 2008 IPS specified that the "Investment Committee will consider" certain factors, including "investment option's investment objectives, performance relative to its index and peer group, risk characteristics, investment style, fees . . . manager tenure, style consistency and the degree of correlation with other Plan investment options."  (Id.

at 6–7.)  The same factors were to be used to monitor the Plan's investments.  (Id.)

**B.    Background of TDFs**

12.    TDFs are single diversified investment vehicles tailored to become more conservative as the fund approaches the employee's retirement date. (Declaration of Russell R. Wermers ("Wermers Decl."), Dkt. No. 329, ¶ 15.) Traditionally, participants tend to make haphazard investment allocation choices by, for example, equally allocating assets among investment options.  (Id.)  TDFs are intended to solve this problem by automatically shifting asset allocation over time as retirement approaches.  (Id.)  The shift in asset allocation over time is referred to as a TDF's "glidepath," which is a reflection of how a fund's mix of investments changes over time without any action required on the part of the participant.  (Id.; Declaration of Eric Dyson ("Dyson Decl."), Dkt. No. 323, ¶¶ 46-47; Declaration of John Chalmers ("Chalmers Decl."), Dkt. No. 323, ¶ 17.)

13.    Glidepaths are designed to reduce risk, resulting in correspondingly lower expected returns, as investors near retirement.  (Wermers Decl. ¶ 15.)  The economic reasoning behind reducing risk is that the ability to continue working and earning income decreases as participants age.  (3/24 Tr. Vol. I 66:18-67:10.) Therefore, a lower risk portfolio at an older age is beneficial because it is less likely to result in participants approaching retirement with uncertain savings and limited ability to offset potential investment losses by continuing to work.  (Id.; Wermers Decl. ¶ 15.)  TDFs provide the benefit of professional asset allocation with these considerations in mind.  (Chalmers Decl. ¶ 17; Dyson Decl. ¶ 47). TDFs can thus be helpful options for retirement plan participants who do not want to actively manage their retirement savings.  (3/27 Tr. 58:23-59:16; Wermers Decl. ¶¶ 15–16.)  For similar reasons, default enrollment in a TDF is accepted in defined contribution plans as a method for improving plan participant outcomes and reaching retirement goals.  (3/27 Tr. 58:23-59:16.)

5

14.     TDFs have a variety of different investment strategies, styles, risk profiles, and asset allocations. (Wermers Decl. ¶ 52.)  For instance, TDF glidepaths are managed either "to" or "through" the target retirement date. (Id.) "To" retirement glidepaths reach their lowest exposure to equity investments at the retirement date and then maintain a static allocation through retirement. (Trial Ex. 1189 at 1.)  Conversely, "through" retirement glidepaths continue to reduce equity exposure after the target date and into retirement. (Id.)  "Through" glidepaths are often more aggressive and contain greater risk because they tend to have higher equity exposure throughout the entire glidepath (i.e., even after a participant reaches retirement age). (Chalmers Decl. ¶ 34; 9/6 Tr. Vol. I 77:8-22.).

15.     Most TDFs are managed in a "fund of funds" structure where the asset allocations of the glidepaths are populated by underlying funds in each asset class. (Chalmers Decl. ¶ 23; Dyson Decl. ¶ 91; 3/24 Tr. Vol. II 60:18-61:7; Trial Ex. 226 at 46–47.).  Retirement plans using "off-the-shelf" TDFs have no control over those underlying fund choices—their only choice if they are dissatisfied with the performance of underlying investments is to change the entire TDF suite, which can be costly and disruptive. (3/24 Tr. Vol. II 60:18-61:7; Trial Ex. 226 at 46–47.). TDFs also vary in terms of the asset classes used in their glidepaths. (Trial Ex. 191; 9/6 Tr. Vol. I 28:17-22.)  In addition to equity and fixed income investments, TDFs can include allocations to real estate, commodities, inflation-protected securities, and other asset classes to provide diversification. (Wermers Decl. ¶¶ 61–62.)

16.     A TDF's underlying funds also can be managed actively or passively. (Id. ¶ 52; Trial Ex. 191.)  Actively managed TDFs usually attempt to generate higher returns than their stated benchmark; whereas, passively managed TDFs are comprised primarily of passive strategies that provide broad market exposure by selecting securities with the goal of generating returns that match the benchmark as closely as possible (for example, by purchasing securities that replicate the funds

benchmark).  (Trial Ex. 8 at 13, 15.)  Within each asset class, passive funds typically are lower cost than active funds.  (Chalmers Decl. ¶¶ 62; 3/27 Tr. 75:20-76:10; 3/28 Tr. Vol. II 42:11-43:1; 9/6 Tr. Vol. I 77:23-78:11.).

17.    As a result of the variations among participants and TDF offerings, an important criterion in selecting a TDF for a defined contribution plan is attempting to match a TDF to the participants' risk profiles and adopting an appropriate philosophy for evaluating the given risk profile.  (3/28 Tr. Vol. II 64:5-68:1, 68:8-70:25; Trial Exs. 191–192; Wermers Decl. ¶ 16.)  Plaintiffs' experts agreed that it is appropriate for plan fiduciaries in selecting a TDF suite for a retirement plan to consider participant investment behaviors and demographics.  (Declaration of Al Otto ("Otto Decl."), Dkt. No. 320, ¶ 76; 9/5 Tr. Vol. I 31:1-32:17.)  Moreover, the focus on assessing risk was highlighted by the Department of Labor's ("DOL's") 2013 guidance concerning TDFs (the "DOL TDF Guidance").  (Trial Ex. 1189.)  That guidance identified various considerations for plan fiduciaries to consider when selecting a TDF including (i) "how well the TDF's characteristics align with eligible employees' ages and likely retirement dates" and other characteristics of the participant population, such as deferral rates, salary levels, turnover rates, contribution rates, and withdrawal patterns; (ii) how risky the fund's glidepath is, including whether the glidepath is "to" or "through" and the level of risk associated with it (for example, conservative, moderate, or aggressive); and (iii) whether the TDF is custom, which "could . . . offer advantages by including component funds that are managed by fund managers other than the TDF provider itself, thus diversifying participants' exposure to one investment provider."  (Id. at 1–3.)

### C.    NFP Services and the Rise of flexPATH TDFs

18.    NFP has been performing the Fit Analysis since approximately 2010.  (3/27 Tr. 45:11-12.)  The Fit Analysis generally draws on data such as deferral rates, account balances, and other information relevant to participant behavior and characteristics to determine the appropriate glidepath risk level (conservative,

moderate, or aggressive) for a plan's participants.  (3/28 Tr. Vol. II 70:2-74:3, 116:24-124:23, 125:6-127:23.)  For example, participant deferral rate is one of the more important factors to consider in deciding on the best "fit" TDF.  (Id. at 39:20-40:23.)  Someone who saves for retirement at a lower rate and has a low account balance is less likely to reach his retirement goals without the benefit of higher returns, so it may be prudent for his savings to be invested in riskier, growth-oriented assets.  (Id.)  By contrast, someone with a higher deferral rate and account balance may be able to reach his retirement goals even while allocating more of his savings to less-risky assets, such as bonds.  (Id.)  The former risk profile may be well-suited to an aggressive glidepath, and the latter to a conservative one.  (Id.)

19.     After determining the appropriate glidepath risk level, NFP would identify potential options based on its analysis of TDFs matching that risk level across numerous categories.  (Id. at 69:20-72:22.)  Many of these categories are reflected in the TDF Matrix, including glidepath design, equity exposure, use of active or passive funds, use of proprietary funds, asset class coverage, and fees. (Id. at 64:5-65:10.)

20.     NFP also maintained a "Focus List," which identified investment managers in which it had greatest confidence after performing significant diligence, including TDF managers.  (Id. at 112:5-22.)  Moreover, NFP developed a "Risk Index" that assigned TDFs a numerical score based on several determinants of glidepath risk: equity exposure at retirement, glidepath scope, equity at the start of the glidepath, and equity at the end of the glidepath.  (Id. at 64:14-65:10, 65:23-66:3; Trial Ex. 517 at 24–26.)  NFP also used a "TDF Matrix," which contains a wide range of information about the glidepaths and asset allocations of dozens of TDFs, with additional commentary about their asset classes and investment styles.  (3/28 Tr. Vol. II 64:5-68:1, 68:8-69:19; Trial Ex. 191.)

21.     Based on their review of TDF options in the market and experience

using the Fit Analysis, Giovinazzo, co-founder of flexPATH and co-President of NFP and flexPATH, Della Vedova, co-founder of flexPATH and co-President of NFP and flexPATH, and Elvander, CIO of NFP and flexPATH, determined that available TDFs were not tailored to the needs of all retirement plan participants. (3/24 Tr. Vol. I 60:23-61:21; 3/24 Tr. Vol. II 60:18-61:7; 3/27 Tr. 74:13-75:8; 3/28 Tr. Vol. II 92:17-93:25; 9/5 Tr. Vol. I 31:1-17; Wermers Decl. ¶¶ 15–16.) All the existing, "off-the-shelf" TDFs had a single glidepath, which assumes all participants on a particular plan are homogeneous and have the same risk tolerance. (3/24 Tr. Vol. I 60:23-61:21; 3/27 Tr. 74:13-75:8; 9/5 Tr. Vol. I 31:1-17.)

22.     Giovinazzo, Della Vedova, and Elvander also found that many plans included participants with different risk profiles and characteristics.  (3/24 Tr. Vol. I 60:23-61:21; 3/27 Tr. 74:13-25; 3/28 Tr. Vol. II 89:22-91:7.)  In such cases, selecting a glidepath that was a good fit for the average participant would result in many participants being invested in a fund that was a poor fit for them given their risk tolerances and retirement goals.  (3/24 Tr. Vol. I 60:23-61:21; 3/27 Tr. 74:13-25; 3/28 Tr. Vol. II 89:22-91:7.)  Because TDFs generally do not identify their risk levels in their names, these participants had no real way of adjusting their investments to match their risk tolerance, or even of knowing that the fund they were invested in was a poor fit.  (3/24 Tr. Vol. II 127:15-128:10; 3/28 Tr. Vol. II 48:23-49:10.)

23.     In addition to finding that a single glidepath was rarely a good fit for all a plan's participants, NFP found that the TDFs offered in the market were often populated by underlying funds that could not be unbundled to replace any underlying fund that was underperforming.  (3/24 Tr. Vol. I 63:9-64:15; 3/28 Tr. Vol. II 92:17-93:25.)  TDF providers would populate their asset allocations with their own proprietary underlying funds, even if those funds were not best-in-class. (3/24 Tr. Vol. I 63:9-64:15; 3/28 Tr. Vol. II 27:5-13.)  And participants who invested in these TDFs had no way of investing in better underlying funds unless

the plan changed to a completely different TDF, which could be costly and disruptive for the plan.  (3/24 Tr. Vol. I 64:1-15; 3/27 Tr. 75:1-19; 3/28 Vol. II 93:10-25.)

24.    Some plans tried to solve for these problems by adopting custom models, in which an asset manager or recordkeeper creates an asset allocation and glidepath using the existing menu of investments offered to plan participants, but custom models were significantly constrained with respect to underlying investments and cost.  (3/24 Tr. Vol. I 68:15-69:17; 3/27 Tr. 70:4-71:5, 93:24-94:6; 3/28 Tr. Vol. II 86:8-23, 91:13-92:1; Trial Ex. 92 at 26.)  They also are not unitized, which makes calculating returns more complicated, and changes to the model can require changing a plan's lineup and vice versa.  (3/24 Tr. Vol. I 62:4-25; 3/28 Tr. Vol. II 109:10-15; 3/29 Tr. Vol. I 7:24-8:19; Trial Ex. 687 at 1.)

### D.    flexPATH TDFs

25.    flexPATH created its TDFs in 2015.  (3/24 Tr. Vol. I 69:19-24.) flexPATH TDFs were organized as collective investment trusts ("CITs") and are established and maintained by Wilmington Trust, N.A. ("Wilmington"), an unaffiliated third-party trustee.  (3/24 Tr. Vol. II 33:12-16; 3/27 Tr. 78:7-13; Trial Ex. 92 at 29, 37.).  Wilmington was the trustee of the funds while flexPATH was the sub-advisor who had authority to invest the fund assets and develop the investment strategies.

26.    The flexPATH TDFs offered three "risk-based glidepaths": aggressive, moderate, and conservative.  (3/24 Tr. Vol. II 60:15-61:7, 68:24-71:8; Trial Ex. 226 at 49; Trial Ex. 645 at 18; Trial Ex. 942 at 3–4.)  This allowed participants to select the "aggressiveness" of the fund in terms of exposure to riskier assets.  (3/24 Tr. Vol. II 68:24-71:8; 3/28 Tr. Vol. II 39:20-40:23; 9/6 Tr. 62:4-25.)  At the time in 2015, flexPATH's TDFs were the only funds to offer three different "glidepaths" for each  "vintage," the anticipated year of retirement. (3/28 Tr. Vol. II 89:22-93:9; 9/6 Tr. 95:10-15; Trial Ex. 226 at 48–49.)  The

flexPATH funds utilized a "funds of funds" structure, which meant that the fund allocated assets among other underlying funds managed by a manager.  (3/24 Tr. Vol. II 60:18-61:7; 3/28 Tr. Vol. II 61:20-62:10; 9/6 Tr. 28:17-22; Trial Ex. 226 at 47–49.)  BlackRock was selected as the glidepath manager for the funds.  (3/28 Tr. Vol. II 94:1-95:22, 98:12-100:5; Trial Exs. 762–763.)  These funds were designed and managed for each ten-year vintage.  (9/6 Tr. 95:10-15; Trial Ex. 226 at 48; Wermers Decl. ¶ 48 tbl.2.)  There were two versions of the TDFs offered by flexPATH: (1) the "Index+" funds, which were 30% actively managed and 70% passively managed and charged a higher expense ratio; and (2) the "Index" funds, which were all passively managed, cheaper, and comprised of all BlackRock "LifePath Index" TDFs.  (Trial Ex. 226 at 24, 49; Trial Ex. 645 at 18.)

27.    flexPATH chose BlackRock for several reasons, including that BlackRock was an industry leader in TDFs, having acquired the company that launched the first TDFs in the market.  (3/28 Tr. Vol. II 22:5-10, 24:1-25:2.)  BlackRock also differentiated itself from other providers by having a less aggressive approach to glidepath management, the versatility of its glidepath in a variety of market conditions (including high inflation), its focus on broader market exposure, and its competitive pricing.  (3/24 Tr. Vol. I 81:11-85:16; 3/28 Tr. Vol. II 94:1-95:22; Trial Ex. 184 at 1; Trial Exs. 762–763.)  NFP also had scored Blackrock's TDFs (the LifePath funds), and they were on NFP's Focus List, which meant NFP had high confidence in those investment options.  (3/24 Tr. Vol. II 27:24-28:9; 3/28 Tr. Vol. II 112:16-25; Trial Ex. 1172 at 2.)

28.    The flexPATH moderate glidepath was designed to match the glidepath used by the BlackRock LifePath TDFs, the longest-tenured TDF solution in the market.  (3/24 Tr. Vol. I 32:13-17.)  BlackRock also worked with flexPATH to create new conservative and aggressive glidepaths.  (3/28 Tr. Vol. II 96:12-98:11.)  flexPATH worked closely with BlackRock to refine the glidepaths based on flexPATH's input, including increasing the equity allocation at retirement in the

aggressive glidepath and proposing an allocation to international bonds.  (Id.)  But flexPATH ultimately rejected the allocation to international bonds after BlackRock simulations and consultation with BlackRock.  (Id.)

29.    flexPATH TDFs' three glidepath offerings were located on the same "efficient frontier"—i.e., the curve that reflects the maximum level of expected return for a given level of expected risk using the broad range of asset classes BlackRock selected for the TDFs.  (3/29 Tr. Vol. II 87:23-88:6.)

30.    In addition to offering multiple glidepaths, flexPATH named each series of TDFs based on its risk profile—Conservative, Moderate, and Aggressive.  (3/28 Tr. Vol. II 48:18-50:5)  This simple naming convention is meant to help participants recognize the level of risk associated with each suite of funds and select the appropriate glidepath for their own risk tolerance.  (Id.; 3/24 Tr. Vol. II 68:24-71:8.)  Plaintiffs' expert, Gerald W. Buetow ("Buetow"), used these and similar terms to denote the risk-level of investment options he previously helped develop.  (3/29 Tr. Vol. II 19:20-20:18, 86:9-87:7.)  The Aggressive glidepath, which has a greater allocation to assets with higher expected returns and thus higher risk, was valuable for Plan participants who had a higher risk tolerance or relatively lower retirement savings.  (Wermers Decl. ¶¶ 22-23 fig.2.)  Conversely, the Conservative glidepath was valuable for Plan participants who had lower risk-tolerance or greater level of retirement savings.  (Id. ¶ 23.)  The Moderate glidepath was well-suited for Plan participants whose risk tolerance or retirement savings were in-between the Aggressive and Conservative profiles.  (Id.)  The naming convention was helpful because most Plan participants lack the financial sophistication, resources, or desire to design glidepaths suited for their risk preferences and needs.  (Wermers Decl. ¶ 27; 9/6 Tr. Vol. I 95:1-9.)  Other witnesses gave similar testimony about the investing capabilities (or lack thereof) of the typical plan participant.  (3/27 Tr. Vol. I 76:11-77:3; 3/29 Tr. Vol. I 36:1-37:4.)  Plaintiffs' own testimony also supported the view that it was unlikely that

participants could mix and match vintages in an effective manner.  (3/23 Tr. Vol. I 13:8-18.)  Plaintiffs' expert, Buetow, admitted that participants generally lack the expertise required to manage their own investments. (3/29 Tr. Vol. II 21:19-26:23.)

31.  The flexPATH TDFs use seven asset classes, including asset classes intended to provide protection against inflation, such as real estate, commodities, and Treasury Inflation Protected Securities (TIPS).  (Trial Ex. 358 at 61; Wermers Decl. ¶¶ 60–62.)  The inclusion of these asset classes is consistent with standard industry practice, but flexPATH and BlackRock, believing that inflation poses a significant threat to retirement savings, opted to include larger allocations to these inflation-protection assets than do most other TDF providers.  (3/24 Tr. Vol. I 81:11-82:14; 3/28 Tr. Vol. I 40:15-41:6; 3/29 Tr. Vol. I 24:16-25:7; Trial Ex. 134.)  Certain TDFs do not contain allocations to these asset classes—the American Funds TDF, for example, does not contain inflation protection assets, and TDFs offered by Vanguard and T. Rowe Price include allocations to TIPS, but not to commodities or real estate.  (Trial Ex. 191 at 1, 11.)  The inclusion of commodities and real estate in the flexPATH TDFs in 2016 provided Plan participants with additional diversification benefits and the opportunity for higher expected returns with relatively lower risk.  (Wermers Decl. ¶¶ 60–62.)

32.  The flexPATH TDFs invest in seven underlying BlackRock index funds, each corresponding to one of the asset classes used in the glidepaths designed by BlackRock.  (Trial Ex. 358 at 70.)  flexPATH achieved additional cost savings by directing the flexPATH moderate TDFs to invest directly in BlackRock LifePath, which has the same glidepath and underlying funds.  However, flexPATH retains the ability to recommend that the trustee "unbundle" and invest directly in the underlying funds to the extent it wishes to replace any of the underlying BlackRock index funds.  (3/28 Tr. Vol. II 57:21-59:9.)

33.  Another key feature of the flexPATH TDFs is their organization as CITs for which Wilmington Trust serves as the trustee.  (3/27 Tr. 78:7-13.)  This

structure allows flexPATH to aggregate assets across multiple plans.  (<u>Id.</u> at 51:24-
52:8, 56:4-15, 124:12-125:6.)  By doing so, flexPATH can achieve economies of
scale and reduce costs for their clients and for plan participants, including by
negotiating lower fees from BlackRock.  (<u>Id.</u>)  Furthermore, unlike custom model
portfolios, CITs are also unitized, meaning that it is straightforward to track their
performance.  (3/28 Tr. Vol. II 90:24-92:16, 109:10-14.)

34.    flexPATH serves as the investment "subadvisor" of the flexPATH
TDFs and was appointed to select and monitor both the glidepath manager and
underlying funds within the TDFs.  (Trial Ex. 221 at 5.)  flexPATH advised the
funds in an ERISA 3(21) capacity.  (<u>Id.</u> at 4; 3/28 Tr. Vol. I 8:3-14.)  As the
subadvisor to the flexPATH TDFs, flexPATH retains the ability to recommend that
BlackRock be replaced in the event that it loses confidence in BlackRock's
glidepath management.  (3/27 Tr. 135:4-7.)  flexPATH is also able to recommend
changes to the underlying funds.  (3/28 Tr. Vol. II 59:14-64:4, 82:2-83:4.)  At
flexPATH's recommendation, Wilmington Trust can replace an underperforming
manager within the TDFs with a higher performing manager without any action
required by participants.  (<u>Id.</u> at 82:2-83:4.)

35.    As trustee, Wilmington Trust retains ultimate discretion over the
management of the flexPATH TDFs.  (3/27 Tr. 133:24-25.)  In practice, flexPATH
has made all decisions with respect to the construction and monitoring of the
TDFs.  (3/28 Tr. Vol. II 82:2-83:4.)  It retains the ability to recommend to
Wilmington Trust that any underlying manager or the glidepath manager be
replaced.  (<u>Id.</u>)  If Wilmington Trust does not object to a recommendation, it is
automatically ratified.  (<u>Id.</u>; Trial Ex. 221 at 6-7.)  Wilmington Trust has never
objected to a recommendation made by flexPATH.  (3/28 Tr. Vol. II 82:2-83:4.)
Indeed, flexPATH has exercised this ability on multiple occasions with respect to
the flexPATH Index+ TDFs, which contain actively managed funds.  (<u>Id.</u>)

36.    In 2015, almost immediately after their initial launch and well before

14

they were purchased by the Wood Plan, the funds reached their minimum asset levels required by Wilmington Trust.  (3/24 Tr. Vol. I 70:10-71:10.)

37.     As of late 2015, when Wood was considering adding the flexPATH TDFs to the Plan, flexPATH had approximately $500 million in assets in its TDF offerings.  (Trial Ex. 942 at 3-4, 9; 3/27 Tr. 101:16-102:14.)  By March 31, 2016, flexPATH had more than $1 billion in its TDF offerings.  (3/27 Tr. Vol. I 101:16-102:8.)  This was due to an initial investment of over $500 million in assets in flexPATH's TDFs from another plan in the fourth quarter of 2015.  (Id. at 99:17-100:2.)

38.     By the time Wood retained flexPATH as the 3(38) investment manager in late March 2016, over 100 plans had invested in flexPATH's TDF offerings, and flexPATH had approximately $1 billion in assets.  (3/27 Tr. 95:4-96:8; 101:4-10, 101:16-102:14; Trial Ex. 85.)  As of the second quarter of 2016, when the flexPATH TDFs were added to the Wood Plan, flexPATH's TDF products already had approximately $2 billion in assets.  (3/27 Tr. 101:4-10, 101:16-102:14.)

39.     Although flexPATH has thousands of clients, flexPATH does not use client names, including the Wood Plan, for marketing purposes.  (3/24 Tr. Vol. I 75:2-12; 3/27 Tr. 100:3-19.)

**E.     2015 Wood Plan Merger**

40.     Beginning in 2014, Wood began to prepare for a merger of all the plans operated by its subsidiaries.  It considered ways to consolidate several Wood-affiliated benefits plans, principally including  (1) the Wood Plan; (2) the Wood Group PSN, Inc. 401(k) Plan ("PSN Plan"); (3) the Elkhorn Holdings, Inc. Profit Sharing Plan ("Elkhorn Plan"); (4) and the Wood Group Mustang 401(k) Plan ("Mustang Plan").  (Dkt. No. 296 at 4; Trial Ex. 51 at 10; Trial Ex. 1358 at 9–10.)  Each of these plans served entirely different populations and had different needs and objectives.  (3/28 Tr. Vol. II 38:9-39:19; Trial Ex. 51 at 10; Trial Ex. 691 at

15

46-47.)  For example, the Wood Group, Elkhorn, and PSN plans had "a very low participation rate," and the group was largely "blue collar" workers.  (3/21 Tr. Vol. II 45:20-47:9, 49:3-12; 3/22 Tr. Vol. I 71:18-72:20.)  By contrast, the Mustang Plan participants were "primarily made of engineers" with college degrees, who were more financially sophisticated and desired more control over their investments.  (3/22 Tr. Vol. I 71:18-72:20.)  Specifically, the Wood Group had $200 million in assets and a 48% participation rate; the Mustang Plan had more than $530 million in assets and a 71% participation rate; the PSN Plan had $30 million in assets and a 50% participation rate; and the Elkhorn Plan had $132 million in assets and an 18% participation rate.  (Trial Ex. 51 at 10.)  Wood's goal was to offer a "Best in Class" retirement plan that was "as good at least" as the current plans, but "hopefully better," and that would offer improved efficiencies to lower "expenses for both the plan participants and other costs."  (3/21 Tr. Vol. II 55:1-10, 55:20-24; Trial Ex. 1358 at 9.)

41.    Before the merger, the Wood Committee engaged in extensive outreach to its employees in an effort to increase participation, but the low participation rate "continued to be a challenge."  (3/21 Tr. Vol. II 50:18-52:11; Trial Ex. 1634 at 5.)

42.    The Mustang Plan used custom model portfolios designed by Monroe Vos, which were risk-based with conservative, moderate, and aggressive options.  (Trial Ex. 899 at 42-53.)  The Monroe Vos custom portfolios included more than 100 choices, depending on a participant's retirement date and their preferred risk level.  (Id.)  About one-third of Mustang participants chose to invest in the model portfolios, which meant that investments in those portfolios comprised more than a quarter of the Mustang Plan assets.  (Id. at 41.)  The Wood Committee determined that replicating the Mustang Plan's multiple-risk level strategy would be advantageous to the diverse participant base of the merged Plan.  (3/21 Tr. Vol. II 58:24-59:4; 3/22 Tr. Vol. II 34:8-22.)

**F.     Selection of Investment Advisor and Investment Manager**

43.     In April 2015, Wood retained a third-party consultant, Amegy Investments, Inc., to review and analyze potential investment advisor and investment manager candidates for the merged Plan.  (3/22 Tr. Vol. I 13:21-14:6, 19:7-9; Trial Ex. 1358 at 9.)

44.     On April 6, 2015, Wood sent requests for proposal ("RFPs") to six vendors that it concluded might be suitable to provide ERISA 3(21) investment advisory services and ERISA 3(38) investment management services: Monroe Vos, Morgan Stanley, Aon Hewitt, Mercer, UBS, and NFP.  (Trial Ex. 51 at 4; Trial Ex. 630; Trial Ex. 1287.)  Monroe Vos and Morgan Stanley were the incumbent advisors for the Mustang Plan and the Wood Plan, respectively.  (3/21 Tr. Vol. II 59:23-60:2; Trial Ex. 51 at 19.)

**G.     RFP Process for Investment Advisor and Investment Manager**

45.     Wood, with the assistance of its consultant, sent an RFP to vendors that inquired about their ability to provide investment consulting, custom models, custom TDFs, fiduciary-role participant advice, and serve both as a 3(21) investment advisor and 3(38) investment manager.  (3/21 Tr. Vol. II 62:15-17; 3/22 Tr. Vol. II 38:1-2; Trial Ex. 630 at 9–10; Trial Ex. 645 at 17–18, 20–21.)  Wood's RFP materials reflected its priorities and considerations for the investment advisor, such as: (i) "QDIA considerations," including "the process used to determine the appropriate QDIA solution for the plan," the "risk factors are given significant emphasis," "[h]ow . . . the glide path [is] selected, monitored, and updated," and "[h]ow . . . the glide path, asset allocation, and underlying investment strategies [are] optimized to ensure maximum synergy between the different components"; (ii) whether the advisor would serve as a 3(38) investment manager for the Plan, including with respect to the QDIA; and (iii) whether the advisor offered custom TDF solutions.  (Trial Ex. 51 at 11, 21–26.)  Specifically, the RFP asked "[w]ill you act as an ERISA 3(38) fiduciary for the Plans under your investment

17

consulting services?" and "[w]hat has been your experience in this role? How many clients do you currently provide ongoing 3(38) services to?" (Trial Ex. 630 at 10.) Wood also specifically inquired of all potential advisor teams, including NFP, about their capabilities to build custom TDFs. (Trial Ex. 1304 at 2.) There was no separate RFP process for the selection of a 3(38) manager. However, it is common to use a single RFP to search for both 3(21) and 3(38) providers. (Declaration of Steven Case ("Case Decl."), Dkt. No. 328, at 8–9.) Even Plaintiffs' expert, Al Otto ("Otto"), conceded this point. (9/5 Tr. Vol. I 61:1-25 ("[T]he standards and process used by investment advisors and managers when selecting, and monitoring plan investments are the same regardless of whether the individual is serving in a 3(21) investment consultant or a 3(38) investment manager.").)

46. NFP's RFP response to the Wood Committee included, among many other things, a detailed summary of its capabilities to provide a custom TDF solution with multiple glidepaths, the Fit Analysis, and institutional pricing. (Trial Ex. 645 at 6, 12–21.) In particular, NFP told Wood that it could offer "[o]ur most recent innovation, flexPATH™, . . . a next-generation target date fund series that was constructed in partnership with Wilmington Trust Company and BlackRock." (Id. at 2, 4.) NFP explained that "[t]his flexPATH solution offers TDFs in the form of CITs, on a fully open architecture basis, and allowing for three glidepaths (conservative, moderate, aggressive, of some combination) at the participant level. . . . This solution was designed to comport with the 2013 DOL guidance (TIPS) on how fiduciaries should select and monitor target date funds." (Id. at 18.) Thus, when responding to the RFP, NFP answered for both itself and flexPATH. (3/27 Tr. Vol. I 83:18-84:5.) Wood understood that the answers that NFP provided were applicable to flexPATH because Wood recognized that the two companies were "basically the same" and "joined at the hip." (3/21 Tr. Vol. I 70:24-25, 71:7-19; 3/21 Tr. Vol. II 71:22-25, 93:6-22; Case Decl. at 14 ("Wood viewed NFP and flexPATH as closely related companies—which they were. If Wood was

18

comfortable with NFP, Wood could be comfortable with flexPATH.").)

47.    NFP's response to the RFP featured the qualifications of NFP and
flexPATH personnel, such as Daniel Kallus, who is an analyst at NFP and a
member of the flexPATH IC.  (Trial Ex. 645 at 8-9; Trial Ex. 942 at 3.)  NFP's
RFP response also explained the methodology that both NFP and flexPATH used
to evaluate investment funds, which included a Scorecard system.  (Trial Ex. 645 at
12-16.)  Additionally, NFP's RFP response included detailed information on the
structure of flexPATH TDFs.  (Id. at 18.)

48.    In its RFP response, NFP specifically stated the 3(38) services
provided by flexPATH and noted that its 3(38) services could be provided by
"flexPATH and affiliated companies" of NFP.  (Trial Ex. 92 at 37 n.1.)

49.    NFP also stated that its investment consulting philosophy is "plan
specific," which Wood later confirmed is the same as flexPATH's.  (Trial Ex. 645
at 13-14; Trial Ex. 942 at 3.)

50.    NFP confirmed that if hired, it would be willing to serve as a co-
fiduciary to the Plan "in an ERISA 3(38) capacity."  (Trial Ex. 645 at 6, 20–21,
30.)  Wood understood that this commitment was equally applicable to flexPATH.
(3/21 Tr. Vol. I 68:9-10 ("The investment advisor that was selected indicated their
ability to act as a 3(38), and their relationship with the company that we eventually
appointed as an investment manager was sufficient in our opinion.").)  This
commitment was important for Wood.  (3/22 Tr. Vol. II 39:3-11.)

51.    In May 2015, Wood and Amegy analyzed the responses.  (Trial Ex. 51
at 19.)  Wood, working with Amegy, selected several finalists for the investment
advisor position, including NFP.  (Trial Ex. 1358 at 9.)

52.    Out of six candidates, NFP scored the highest.  (Trial Ex. 51 at 19.)  It
was positioned to meet several "committee expectations," including the ability to
provide custom models, TDF analytics or custom target date strategies, QDIA
documentation, plan merger options and their impact on participants, support for

19

fiduciary process and documentation, and strategies to improve plan participation and deferral rates.  (Trial Ex. 51 at 19–26.)

53.     Amegy and Wood analyzed the 3(38) capabilities of the six candidates as well as each candidate's 3(38) client base and assets under management.  (Id. at 21–26.)

54.     The other candidates offered limited 3(38) services or had few or no clients.  For example, UBS offered limited 3(38) services and had no clients; Monroe Vos offered 3(38) services, but had no clients; Morgan Stanley had only 12 clients; and Mercer had only 16 clients in the defined contribution space.  (Id. at 20–26.)  Aon and NFP had the most clients of the six firms.  (Id.)  Aon was significantly more expensive than NFP and did "not offer participant advice."  (Id.)  Wood selected three finalists for the investment advisor position (Monroe Vos, Morgan Stanley, and NFP) and sent additional questionnaires.  (3/21 Tr. Vol. I 99:22-25; Trial Ex. 52; Trial Ex. 92.)

55.     On June 10, 2015, the three investment advisor finalists gave presentations to the selection team.  (Trial Ex. 92.)  All three candidates discussed 3(38) services, knowing that Wood was interested in each candidate's 3(21) and 3(38) services.  (Id. at 232, 247–49.)  NFP impressed Wood the most.  As part of the presentation, it confirmed that it had the ability to offer custom TDFs along with 3(38) investment manager services.  (Trial Ex. 644 at 47.)  Wood saw this as a positive because it had the potential to reduce fiduciary risk to the company by adding an additional level of professional fiduciary oversight.  (3/22 Tr. Vol. I 83:22-25, 102:7-10; 3/22 Vol. II 38:12-39:11.)

56.     NFP's finalist presentation also included information on the flexPATH TDFs, noting that the funds had three glidepaths—conservative, moderate, and aggressive—and came in an index and index+ option.  (Trial Ex. 92 at 29, 34.)  The presentation also included scores for the funds underlying the Index+ product.  (Id. at 35.)

57.     Later in June, Wood prepared an analysis of the three finalist candidates.  Wood concluded NFP was a strong candidate for consideration because of its ability to create "custom risk tolerance funds similar to the custom funds currently offered in the Mustang Plan," and the fact that it would "act as a 3(38) fiduciary for the custom funds." (Trial Ex. 56 at 2.)  In making this assessment, Wood did not differentiate between NFP and its affiliated company, flexPATH. (Id.; 3/21 Tr. Vol. I 68:8-13.)  Wood hired NFP in part because of its ability to offer the flexPATH TDFs through flexPATH. (3/22 Tr. Vol. I 73:6-9; 3/22 Tr. Vol. II 5:17-22.)  Morgan Stanley did not provide any options for a multiple glidepath target date solution for the Wood Plan. (Trial Ex. 55.)  Instead, John Mott, who represented Morgan Stanley, stated that he "[did] not believe in custom target date or custom models." (Trial Ex. 92 at 143.)  Mott recommended using single glidepath index TDFs. (Id.)  Monroe Vos did not recommend using any of the TDFs listed in its presentation and instead recommended that Wood use its proprietary "Risk Based Retirement Date Strategies." (Id. at 202.)

**H.    Investment Advisor Is Selected**

58.     Wood voted unanimously to select NFP as the new investment advisor, effective July 1, 2015. (3/21 Tr. Vol. II 63:9-12; 3/22 Tr. Vol. II 5:17-22; Trial Ex. 55; Trial Ex. 56; Trial Ex. 92.)

59.     Wood and NFP entered into an Investment Advisory Agreement ("IAA") for NFP to serve as the Plan's investment advisor, as defined by 29 U.S.C. § 1002(21)(A)(ii) [ERISA § 3(21)]. (Dkt. No. 296 at 4–5.)  The IAA was executed on July 16, 2015. (Trial Ex. 114 at 8.)  NFP was hired to provide investment advice regarding the selection, monitoring, and removal of investment options in the Plan. (Dkt. No. 296 at 4–5.)  NFP would provide Wood with "research and analysis with regard to investment advice and fiduciary due diligence services," including preparing an investment policy statement, providing employee plan and investment education, assisting with service provider selection, facilitating the

conversion process, providing a "Fiduciary Fitness Program" for Committee members, and general plan consulting.  (Trial Ex. 114 at 1–3.)  Pursuant to the IAA, NFP was paid an annual fee of $100,000 for its 3(21) services.  (Dkt. No. 296 at 4–5.)  This was a flat-fee arrangement, and the IAA expressly states that "[i]n no event will the compensation received be greater than the above stated fee level." (Trial Ex. 114 at 5.)

60.     At the time NFP was chosen to be the 3(21) advisor, Wood declined to add 3(38) services because "the fund lineup had not been confirmed" at that point.  (3/21 Tr. Vol. II 63:22-64:1; Trial Ex. 165 (June 26, 2015 internal NFP email noting that Wood was "going to start at 3(21) for the agreement, then once the fund decisions are made we can amend to include 3(38).").)

61.     Wood already reviewed the QDIA and TDF options in the incumbent plans, which included Fidelity, Vanguard, Principal, and Monroe Vos.  (3/21 Tr. Vol. II 66:6-12.)  For example, Wood Committee member Johnston stated that Vanguard was discounted at the beginning of the merger process because Wood was looking for custom models that would be familiar to the Mustang Plan participants since they had a "high participation rate" and "their plan assets were greater than the other three plans put together."  (Id. at 38:12-16.)  When NFP was hired, Wood informed NFP that "Fidelity Freedom [TDFs], Principal LifeTime [TDFs], Vanguard TDFs or any of the current core funds [were] not under consideration" by the Committee for use in the Plan lineup.  (Trial Ex. 913.)

## I.     NFP and flexPATH Personnel Prepared a QDIA Fit Analysis for the Wood Plan

62.     NFP presented its QDIA Selection and Fit Analysis to the Wood Committee on September 8, 2015.  (Trial Ex. 691 at 39–54.)  The "Fit Analysis" was NFP's analytical tool used to pair specific plans with TDFs and glidepaths based on demographics, risk profiles, and objectives of the Plan.  (Id.; 3/28 Tr. Vol. II 70:2-74:3.)  A Scorecard analysis of the underlying flexPATH fund managers,

22

including both active and passive managers, was presented.  (Trial Ex. 1 at 4; Trial Ex. 691 at 42-56.)  NFP conducted similar presentations in the months that followed.  (Trial Ex. 691 (Fiduciary Investment Review, 9/8/2015) at 42–57; Trial Ex. 936 (Fund Lineup Recommendations, 11/17/2015) at 24–36; Trial Ex. 67 (Fund Lineup Recommendations, 12/8/2015) at 26–39; Trial Ex. 81 (Fiduciary Investment Review, 2/25/2016) at 60–73.)

63.    flexPATH personnel helped prepare the Fit Analysis for the Wood Plan.  (Trial Ex. 691 at 42–57; 3/28 Tr. Vol. II 116:24-124:23, 125:6-127:23.)

64.    Based on the Fit Analysis, flexPATH determined that the best "fit" for the Wood Plan would be a TDF with a moderate glidepath.  (3/28 Tr. Vol. II 64:5-65:10, 69:20-75:1, 116:24-124:23, 125:6-127:23.)  Monroe Vos, one of the advisors who responded to the Wood Plan's RFP, also determined that a moderate asset allocation strategy was appropriate for the merged Plans.  (Trial Ex. 92 at 208.)

65.    One of the first slides of the presentation analyzes equity exposure and performance of six different TDF providers (Allianz, Wells Fargo, Voya, JP Morgan, Vanguard, and Alliance Bernstein) to illustrate how different glidepath approaches and levels of equity exposure in TDFs can expose participants to different levels of risk at retirement.  (Trial Ex. 691 at 43.)  The slide reinforced that different levels of equity exposure along a glidepath can lead to significant differences in returns for retirees.  (Id.)  For example, the downside risk/loss over a 10-year period ranged from -5% to -20% for two TDFs with a conservative glidepath versus -30% to -45% for two TDFs with an aggressive glidepath.  (Id.)

66.    The Fit Analysis also included a slide showing the average deferral rates of the merging Plans.  (Id. at 46–47.)  The Fit Analysis then presented the glidepaths of the four existing default options in the merging Plans, with all four being categorized as "aggressive," as measured by the criteria in the Fit Analysis.  (Id. at 48.)  That is, all had greater than 40% equity exposure at the target

23

1  retirement date.  (Id.)  As a result, the merging Plans' QDIA offerings, which

2  included TDFs from Vanguard, Principal, and Fidelity, were excluded from

3  consideration as the merged Plan's QDIA.  (Id.; 3/29 Tr. Vol. I 9:14-10:2.)

4      67.    The Fit Analysis also included information on TDF solutions that

5  allowed participants to select between conservative, moderate, or aggressive

6  glidepaths, including comparison with Empower target date models and the

7  flexPATH TDFs.  (Trial Ex. 691 at 49-51.)

8      68.    The Fit Analysis also presented the Scorecard Report for each of the

9  underlying managers for the flexPATH TDFs (both Index+ and Index), which

10  showed that those managers were performing well, with scores of 9 or 10 except

11  for one fund that scored an 8.  (Id. at 52-55.)

12      69.    The Fit Analysis was consistent with the DOL TDF Guidance, which

13  advises fiduciaries to consider (i) "how well the TDF's characteristics align with

14  eligible employees' ages and likely retirement dates"; (ii) "other characteristics of

15  the participant population, such as . . . salary levels, turnover rates, contribution

16  rates and withdrawal patterns"; and (iii) "whether a target date fund's glide path

17  uses a 'to retirement' or a 'through retirement' approach."  (Trial Ex. 1189 at 1–2.)

18  **J.    flexPATH's Analysis of the Merging Plans**

19      70.    flexPATH personnel, including Elvander and members of the

20  flexPATH IC, analyzed key information about the merging Plans that had been

21  provided by the Wood Committee and Empower, the Plan's recordkeeper.  (3/28

22  Tr. Vol. II 116:24-124:23, 125:6-127:23; Trial Ex. 682; Trial Ex. 1803.)

23      71.    flexPATH's analysis showed that there was a diverse participant pool

24  across the merging Plans, including substantial differences in deferral rates among

25  the plans.  (3/28 Tr. Vol. II 125:6-127:23.)  For example, about 77% of the Elkhorn

26  Plan was deferring less than 6% of their salary to retirement savings, whereas about

27  80% of participants of the PSN Plan were saving well-above that rate.  (Trial Ex.

28  691 at 46.)

24

72.     flexPATH also reviewed how participants of the Mustang Plan were using that Plan's custom risk-based models, which had conservative, moderate, and aggressive options.  (3/28 Tr. Vol. II 116:24-124:23.)  flexPATH's review of the data reflected the presence of participants on all three glidepaths of the Mustang custom models.  (3/28 Tr. Vol. II 116:24-124:23, 125:6-127:23; Trial Ex. 691 at 46; Trial Ex. 1803.)

73.     Although the Mustang Plan's QDIA was a balanced fund that held a static amount of equity and fixed income investments, approximately one-third of Mustang participants at any given time affirmatively chose to invest in the model portfolios and investments in those portfolios comprised over a quarter of the Mustang Plan assets.  (3/28 Tr. Vol. II 123:3-12; Trial Ex. 899 at 41.)  Elvander found this fact significant given the tendency of participants to remain in the QDIA rather than to affirmatively select a different investment.  (3/28 Tr. Vol. II 74:4-19, 121:22-124:2; Trial Ex. 899 at 41.)  flexPATH also understood that the Wood Committee wanted to offer participants an investment solution similar to the one offered through the Mustang Plan with multiple glidepaths.  (3/22 Tr. Vol. I 34:1-13, 37:3-7, 61:7-21, 95:7-13; 3/28 Tr. Vol. II 64:5-65:10, 69:20-75:1, 116:24-124:23, 125:6-127:23.)

74.     On August 11, 2015, Elvander commented on the initial data from the merging Plans, stating: "There is some really powerful stuff here, that suggests a more custom solution like flexPATH is needed."  (3/28 Tr. Vol. II 125:6-127:23; Trial Ex. 682 at 1.)

**K.     NFP and flexPATH Provided the Wood Plan with Information on TDFs**

75.     On November 17, 2015, NFP presented an updated Phase II lineup recommendation to the Wood Committee.  The presentation included an analysis of the existing fund lineup, the index funds underlying the flexPATH TDFs, and

25

another QDIA Selection and Fit Analysis.  (Trial Exs. 935–936.)  The new Fit Analysis contained similar information to the prior Fit Analysis, but also included a glidepath comparison of the pre-merger plans' QDIAs (Trial Ex. 936 at 32), an analysis of the Mustang Plan's custom models (Id. at 33), and a graphic depicting the three-glidepath structure of the flexPATH TDFs (Id. at 37).  The Fit Analysis did not include any TDF performance information.  (Trial Ex. 60 at 14–17.)  The "Fund Lineup Recommendations" included only a blank Scorecard for the Index+ TDFs.  (Id.)

76.    On December 14, 2015, NFP's John Livingston sent an e-mail to Wood Committee member Amy Henderson, in which he responded to a question the Wood Committee had raised "with respect to potential fee savings."  (Trial Ex. 67 at 1.)  NFP's Livingston suggested that if the Wood Committee was interested in using "a lower cost pure index approach. . ., flexPATH offers a pure index approach, flexPATH Index TDFs."  (Id. at 2.)  One of the "primary differences" between the Index and the Index+ TDFs was the cost: "average expense ratio in flexPATH Index TDFs is .24% compared to average expense ratio in flexPATH Index+ is .47%."  (Id.)

77.    NFP and flexPATH's CIO Elvander and NFP's analyst Daniel Kallus collaborated to draft a report to respond to the Wood Committee's questions.  (3/29 Vol. I 46:1-13.)  NFP provided the Wood Committee with information on numerous TDF providers and ultimately recommended the flexPATH Index TDFs.  (Trial Ex. 691 at 50–55; Trial Ex. 942 at 3–5.)  The Fit Analysis "evaluated the entire [TDF] landscape" of options available to Wood as part of a "TDF Matrix."  (3/28 Tr. Vol. I 58:11-19.)  The Fit Analysis also concluded that the TDFs used as QDIAs in the pre-merger plans (for plans that used a TDF as their QDIA) were not suitable for the new Plan lineup because those TDFs had aggressive glidepaths.  (3/29 Vol. I 9:14-10:2; Trial Ex. 691 at 46–48.)  The Fit Analysis also compared flexPATH TDFs to other custom models offering multiple glidepaths, but those

1    custom models did not compare favorably to the flexPATH TDFs from a cost
2    perspective.  (3/29 Vol. I 11:4-12:5.)

3        78.    This report, which Wood received on December 23, 2015, also
4    contained relevant information to the selection of flexPATH as the Plan's 3(38)
5    investment manager.  (3/24 Tr. Vol. II 120:18-122:14; Trial Ex. 942.)  The report
6    explained that the 3(38) "services and fees . . . are in addition to our current
7    services" and would be assessed according to a fee schedule based on the total
8    amount of plan assets.  (Trial Ex. 942 at 4.)  The report stated that flexPATH had
9    100 clients and approximately $500 million in assets in its TDFs.  (Id. at 4–9.)  The
10   report also explained that flexPATH used the "same scoring methodology and
11   process that is currently being utilized by The Wood Group for its stand-alone
12   investment menu."  (Id. at 13; 3/21 Tr. Vol. II 91:23-94:6.)  The report also
13   provided performance and fee comparisons of the flexPATH TDFs with the
14   Putnam TDFs under consideration at the time.  (Trial Ex. 942 at 4.)  But the
15   Putnam TDFs did "not match up well with the glidepaths found in the
16   existing/merging plans, all of which have aggressive glidepaths."  (Id.)

17       79.    On February 20, 2016, Henderson sent the other Wood Committee
18   members materials for the upcoming February 25, 2016 meeting.  (Trial Ex. 1358.)
19   Henderson included "information on the proposed TDFs to assist in the decision
20   making process," including "[t]hings to consider" about the Putnam, flexPATH
21   Index, and flexPATH Index+ TDF options.  (Id.)

22       80.    Based on the materials, the Wood Committee determined that the
23   Putnam funds might not produce savings because it "could not be guaranteed" that
24   the Plan would reach the minimum participant threshold in the TDFs required to
25   reap the savings benefit on recordkeeping fees offered by Empower.  (Trial Ex.
26   1634 at 29.)  The Fiduciary Investment Review did not contain information about
27   the underlying funds of the flexPATH Index TDFs.  (Trial Ex. 81 at 57–59.)
28   Scorecards for the BlackRock LifePath Index TDFs were not presented to the

Wood Committee.  (3/28 Tr. Vol. I 58:2-7.)

81.    On February 25, 2016, the Wood Committee met in-person with Nicolas Della Vedova, the co-President of NFP and flexPATH, and Daniel Kallus, a leading analyst at NFP and a member of the flexPATH IC, to discuss the recommended fund lineup, including the flexPATH TDFs.  (3/24 Tr. Vol. II 66:11-17; Trial Ex. 942.)  During the meeting, NFP and the Wood Committee reviewed "the pros and cons of the proposed Target Date Fund line-up."  (Trial Ex. 1634 at 29.)  Della Vedova understood that the Wood Committee was not only selecting the flexPATH TDFs but "selecting flexPATH as the 3(38) as well."  (3/27 Tr. 93:15-17.)

82.    The Wood Committee ultimately voted unanimously to add the flexPATH Index TDFs to the Plan and to use the moderate glidepath as the Plan's QDIA.  (Dkt. No. 296 at 5.)  The Wood Committee chose the flexPATH Index TDFs "to allow the plan to continue offering options with a risk tolerance found in the current fund line-up, so that participants do not perceive the change to be seen as a reduction in benefits."  (Trial Ex. 1634 at 29.)  The Wood Committee believed having a multiple glidepath TDF option would increase participation in the Plan, as they thought that participants in the Mustang plan valued the ability to select from among conservative, moderate, and aggressive risk-based funds in that plan.  (3/21 Tr. Vol. II 58:24-59:4; 3/22 Tr. Vol. I 34:1-13, 37:3-7, 61:7-21, 95:7-13; 3/22 Tr. Vol. II 34:8-35:1.)

**L.    Investment Manager, flexPATH, Is Selected**

83.    On March 23, 2016, a little less than a month after Wood unanimously voted to add the flexPATH Index TDFs to the Plan, Wood and flexPATH entered into an Investment Manager Agreement ("IMA") for flexPATH to serve as an investment manager under 29 U.S.C. § 1002(38) [ERISA § 3(38)].  (Dkt. No. 296 at 5; Trial Ex. 85 at 1.)

84.    The Wood Committee believed it was important that NFP's analyst

28

Kallus was "in all of our quarterly meetings" and served on the flexPATH IC because it would give the Wood Plan "a voice at the investment committee table for flexPATH" and the Wood Plan would be "represented at the flexPATH investment committee meetings." (3/22 Tr. Vol. II 70:23-71:3.)

85.    The Court credits the testimony of Defendants' process expert, Steven C. Case, who explained that "[i]t is more efficient from a time and cost perspective for a committee to retain a 3(38) investment manager familiar with the funds they are hired to manage than it is to retain a third party 3(38) fiduciary who may be less familiar with the funds to be managed." (Case Decl. at 12.)  Case further stated that "[t]here is no reason to believe that an RFP would have yielded a candidate better suited to monitor those TDFs than the individuals who created them." (Id. at 18.)  Even Plaintiffs expert, Otto, admitted that retirement plans he advised utilized products designed by their advisory firms.  (9/5 Tr. Vol. I 40:13-19, 42:1-11.)

86.    The IMA specified that flexPATH had "complete authority and discretion" to "provide asset allocation services by choosing investment options for the Plan that can qualify as a [QDIA]." (Trial Ex. 85 (Investment Management Agreement, 3/23/2016), at 1–2.)  Wood authorized flexPATH to use "affiliated investment options, including flexPATH CITs [collective investment trusts]." (Id. at 2.)

87.    The IMA expressly states that "flexPATH agrees and acknowledges that it and its affiliates will not charge the Client or the Plan additional fees if flexPATH CITs are selected in performing the Management Services." (Id.)  The IMA further specified that if "an affiliate of flexPATH" received any compensation in connection with the inclusion of the flexPATH TDFs, that compensation "will be paid out of amounts received by flexPATH for performance of the Management Services without additional cost to the Client or the Plan." (Id.)

29

88.     flexPATH's only compensation was the fee that it earned as a 3(38) delegated fiduciary to the Plan—flexPATH earned no additional fees in connection with the Plan's investment in the flexPATH TDFs. (3/27 Tr. Vol. I 96:9-25.) From June 2016 to November 2018, flexPATH was paid $500,631 for the services described in the IMA. (Dkt. No. 296 at 6.) For 2017, the only full calendar year in which flexPATH served as the investment manager for the Plan's QDIA, flexPATH was paid $213,878.62. (Id.) These payments were made pursuant to the compensation provisions in the IMA. (Id.) Plaintiffs' expert, Otto, agreed that the only compensation flexPATH received was their 3(38) fee, and that fee "was not contingent on whether they selected flexPATH target date funds or some other target date fund" for the Plan. (9/5 Tr. Vol. II 11:16-23.)

89.     The I1 share class for the TDFs initially used by the Plan had a subadvisor fee of 0%, meaning that the expense ratio for the TDFs did not include any fees to be paid to flexPATH. (Trial Ex. 111 at 2; Trial Ex. 221 at 21.) The I1 shares' expense ratio included a 10-basis point "sub-TA" fee, part of which was used to offset flexPATH's separately negotiated 3(38) fee and the rest of which was credited back to Plan participants. (3/29 Tr. Vol. I 79:23-82:4.) flexPATH also did not receive a subadvisor fee for the lower-cost M shares, which replaced the Plan's I1 shares in 2018. (3/27 Tr. 53:20-55:1; Trial Ex. 221 at 21; Trial Ex. 1 at 44 (reflecting M share fees were 11 bps for the Wood Plan).)

90.     flexPATH's decision to include flexPATH TDFs in the Plan had no impact on flexPATH's compensation. (3/29 Tr. Vol. I 38:20-39:16; Trial Ex. 111 at 3; Trial Ex. 221 at 21.) A firm affiliated with Plaintiffs' expert, Otto, similarly addressed potential conflicts of interest by ensuring that it did not increase its compensation by virtue of selecting any given investment option for a client. (9/5 Tr. Vol. I 78:23-79:3.)

91.     flexPATH was able to count the Wood Plan's assets as assets under management regardless of whether it selected the flexPATH TDFs. (3/24 Tr. Vol.

30

I 74:12-75:1.)

**M.  flexPATH's Process for Selecting the flexPATH TDFs**

92.  After being hired, flexPATH selected the flexPATH Index Moderate TDF as the QDIA for the Plan and also added the flexPATH Index Aggressive and Conservative TDFs as investment options for the Plan.  (Dkt. No. 296 at 5–6.)

93.  As explained above, flexPATH's selection of the flexPATH TDFs occurred with the benefit of analysis conducted prior to its hiring, performed by key flexPATH personnel.  (3/28 Tr. Vol. II 43:2-44:8.)

94.  flexPATH's process involved, among other things, analyzing participant data of the merging plans; conducting the Fit Analysis to determine an appropriate glidepath risk level for the QDIA; evaluating the existing QDIA options and certain custom models across the merging Plans; and considering TDF options available in the market that match the needs of the merged Plan.  (Id. at 38:9-44:8; 3/29 Tr. Vol. I 6:18-8:19.)

95.  Though flexPATH accepted and considered input from the Wood Committee, Elvander testified that he independently selected the flexPATH TDFs based on his analysis and extensive investment experience.  (3/28 Tr. Vol. II 46:13-47:2.)

1.  flexPATH Sought Fee Reductions and Considered Other TDF Options

96.  To address concerns raised by the Wood Committee about fees associated with the flexPATH TDFs, flexPATH sought and obtained fee reductions from BlackRock for the flexPATH TDFs in December 2015.  (3/27 Tr. 49:2-50:23; Trial Ex. 225 at 1.)  As part of this negotiation, flexPATH sent BlackRock a pricing memo that stated that "narrowing the fee gap with Vanguard" would allow flexPATH, BlackRock, and Wilmington to propel Index opportunities for plans with less than $100 million in TDFs.  (Trial Ex. 225 at 4.)  "With Index+," the memo continued, "a significant reduction in glidepath fees will result in an overall

fee structure that is more in-line with many of our competitors." (Id.) Those negotiations resulted in fee reductions to the flexPATH Index TDFs that ultimately benefitted the Wood Plan. (3/27 Tr. 49:2-50:23; Trial Ex. 981.)

97. flexPATH also compared the flexPATH TDFs against the Mustang Plan's current target date model solution created by Monroe Vos and available on the Empower platform. (Trial Ex. 687 at 1-2; Trial Ex. 941 at 8.) flexPATH assessed that, as compared to the flexPATH TDFs, those models were much more expensive and much higher in risk based on how the glidepaths de-risked. (3/29 Tr. Vol. I 11:4-12:5; Trial Ex. 687 at 1.) The flexPATH TDFs begin to de-risk at age 25 or 35, whereas the Empower model glidepaths begin to de-risk at age 55, meaning the de-risking (i.e., reduction in equity exposure) was very steep leading to the retirement date. (Trial Ex. 941 at 8.)

98. flexPATH also analyzed other potential TDF options and models for the Plan, as requested by the Wood Committee. (Id. at 2–8.) For example, flexPATH compared the performance and cost of the flexPATH Index+ TDFs to another target date solution that was of interest to the Wood Committee, such as the Putnam Retirement Advantage. (Id.) The Putnam TDF solution offered less participant choice because it "only offers a one-glidepath approach," whereas flexPATH allowed participants the ability "to select among multiple risk-based glidepaths." (Id.) Additionally, the Putnam TDF glidepath and equity allocation earned a conservative classification, which did not match well with the Plan's demographics or with any of the aggressive glidepaths of the then-current plans to be consolidated. (Id.) Moreover, the Putnam TDFs would have been more expensive than the flexPATH Index TDFs. (Id.; 3/29 Tr. Vol. I 15:9-17:14.)

99. By the time flexPATH was hired in March 2016, it had already collected and analyzed a significant amount of information about the Wood Plan that informed its decision to select the flexPATH TDFs. (3/28 Tr. Vol. II 46:13-

47:2.)  flexPATH was also aware that NFP had recommended the flexPATH Index TDFs, that the Wood Committee had unanimously approved the flexPATH Index TDFs for the Plan, and that the Committee was focused on low-cost passive TDF options based on their preference for the flexPATH Index TDFs over the flexPATH Index+ TDFs, which have an actively managed component.  (Id. at 46:20-25.)  Nothing changed in the Plan that would have impacted flexPATH's analysis, and it was unlikely that the recordkeepers that provided information to flexPATH would have had any new information about the merging Plans to provide.  (Id. at 43:2-44:8.)

100.   The flexPATH IC looked at TDF information on a regular basis. (Trial Ex. 1629.)  For example, after flexPATH was retained by the Plan and before the flexPATH TDFs were added to the Wood Plan, the flexPATH IC met on April 18, 2016 to discuss the performance of the flexPATH funds.  (Trial Ex. 1631 at 2-10.)

**N.   flexPATH's Scorecard System Methodology**

101.   One tool that flexPATH uses to analyze investment managers is a proprietary Scorecard System Methodology.  (3/28 Tr. Vol. II 32:3-21, 103:4-21; Trial Ex. 1319 at 11–13.)

102.   The Scorecard methodology was developed by Elvander, NFP and flexPATH's CIO.  (3/28 Tr. Vol. II 103:20-21; Trial Ex. 517 at 33.)  As an initial step, the methodology scores funds on a scale of 0 to 10, with 10 being the best. (Trial Ex. 8 at 11.)  Each fund's score is 80% quantitative, incorporating modern portfolio theory, quadratic optimization analysis, and peer group rankings.  (Id.) The other 20% of the score evaluates qualitative but objective characteristics of the fund such as manager tenure.  (Id.)

103.   The Scorecard methodology categorizes scores of 9 to 10 as "good" and 7 to 8 as "acceptable."  (Id.)  If an investment option fails to meet specific objective criteria, as determined by its Scorecard score (a score of 6 or lower) or

other diligence, flexPATH may place that investment option on a "watch list."
(3/29 Tr. Vol. I 70:23-24; Trial Ex. 8 at 11; Trial Ex. 1319 at 8.)  If the fund
remains on the watch list for four consecutive or five out of eight consecutive
quarters, then the fund will be considered for possible removal.  (Trial Ex. 8 at 8
("Considerable judgment should be exercised in the investment manager removal
decisionmaking process.") at 8; id. at 7 (asset allocation funds "will be carefully
reviewed before removal from the Plan (in the absence of a reasonable
alternative)"); Trial Ex. 1319 at 8.)

104.    Some funds are not eligible for scoring because of the lack of
sufficient performance history.  (Trial Ex. 8 at 7.)  For instance, the lack of a five-
year performance history meant that the flexPATH TDFs could not be scored
under the Scorecard system.  (3/24 Tr. Vol. II 8:7-9:8; Case Decl. at 25.)  Under
the IPS, "funds with short time history should be evaluated qualitatively."  (Trial
Ex. 8 at 7.)  However, Elvander, NFP and flexPATH's CIO, testified that the lack
of a score does not preclude those funds from being placed on the watch list.  (3/29
Tr. Vol. I 27:10-21.)

105.    The quantitative and qualitative factors differ slightly depending on
the investment strategy within the following broad categories: (i) asset allocation
strategies, (ii) active strategies, and (iii) passive strategies.  (Trial Ex. 8 at 12–16.)
Within each strategy, the Scorecard System uses criteria that are designed to assess
the overall appropriateness of a fund for inclusion into a defined contribution plan
by allowing flexPATH to assess investments from multiple perspectives and
determine the relative merits of manager and investment option.  (3/28 Tr. Vol. II
32:3-21, 103:4-21, 111:11-112:4; 3/29 Tr. Vol. I 85:4-86:15; Trial Ex. 1319 at 7.)

106.    For asset allocation strategies composed of multiple underlying funds
such as TDFs, the Scorecard System provides for two types of scores to assess
manager skill: an asset allocation score that measures the managers' asset
allocation capabilities through the performance of the operative strategy as a whole

and an underlying fund score that assesses the managers' selection capabilities by averaging the scores of the component funds.  (3/29 Tr. Vol. I 32:14-33:21, 85:4-86:15; Trial Ex. 739 at 3.)

### O.   flexPATH Investment Committee

107.   flexPATH performs its formal investment selection and monitoring, including of the flexPATH TDFs, through a highly qualified IC.  (Trial Ex. 517 at 33-34.)  Led by Elvander in his capacity as flexPATH's CIO, the flexPATH IC is comprised of five or six members and supported by several analysts.  (3/28 Tr. Vol. II 28:25-29:9, 35:9-36:24, 107:13-108:18.)  The flexPATH IC members are all CFA Charterholders with decades of investment experience.  (Id.; Trial Ex. 160 at 31.)  Daniel Kallus also served on the flexPATH IC, but he was an employee of NFP not flexPATH.  (Trial Ex. 160 at 31.)

108.   The flexPATH IC engaged in daily monitoring of the flexPATH TDFs and had regularly scheduled quarterly meetings, which were documented in agendas, meeting minutes, and executive summaries.  (3/28 Tr. Vol. II 29:10-30:22; 3/27 Tr. 47:5-15; Trial Exs. 1629, 1631, 1633.)

109.   Pursuant to flexPATH's IPS, the flexPATH IC performs quantitative and qualitative analytics and due diligence on the flexPATH TDFs, including ongoing due diligence on the glidepaths and managers used in the TDFs.  (Trial Exs. 1319, 1629, 1631.)

110.   The flexPATH IC used the Scorecard System to periodically evaluate investment managers across a range of qualitative and quantitative criteria.  (3/27 Tr. 47:5-15; 3/28 Tr. Vol. II 103:4-21.)  The flexPATH IC considered and discussed the Scorecard scores of each underlying fund in the flexPATH TDFs at each meeting.  (Trial Ex. 1629 at 14 ("flexPATH manager Q1 Scorecard was reviewed"); Trial Ex. 1631 at 3–4.)

111.   For investment options that cannot be scored under the Scorecard System, the flexPATH IC periodically evaluated them "from a quantitative and

qualitative perspective, where applicable." (3/28 Tr. Vol. II 109:3-14; Trial Ex. 1319 at 8.) The flexPATH IC also considered broader qualitative issues, such as a fund's investment philosophy, as part of its regular review of the flexPATH TDFs and their underlying funds. (3/24 Tr. Vol. I 82:15-25; 3/24 Tr. Vol. II 37:2-12; 3/28 Tr. Vol. II 32:3-21, 111:11-112:4.)

**P.  Revision of the Wood Plan's IPS**

112.   NFP began updating the Wood Plan's IPS to include its proprietary "Scorecard System Methodology" for evaluating investment options for the Plan. The 2016 IPS—effective on August 5, 2016—expressly incorporated NFP's Scorecard System. (Trial Ex. 8.) The Scorecard System was "a way of measuring the relative performance, characteristics, behavior and overall appropriateness of a fund for inclusion into a plan as an investment option." (Id. at 11.) It assigned a numerical score to each investment option on a scale of 0 to 10, with 10 being the best. (Id.) Eighty percent of the fund's score was quantitative; the other twenty percent was qualitative, "taking into account things such as manager tenure, the fund's expense ratio relative to the average fund expense ratio in that asset class category, and the fund's strength of statistics (statistical significance)." (Id.)

113.   All funds were required to be evaluated and selected utilizing the Scorecard System. (Id. at 5.) For each fund, "an investment manager 'score card' will be maintained and documented . . . to substantiate acceptable levels of manager performance and appropriate style characteristics." (Id. at 6.) If a fund failed to meet the criteria standards as determined by a score of 6 or lower, it would be placed on a "watch list." (Id. at 6, 11.) Funds that remained on the watch list for three consecutive quarters or four of the following seven quarters would be considered for removal. (Id.) TDFs (i.e., asset allocation funds or risk-based or age-based accounts) were to be "scored" and "evaluated as a group." (Id. at 6–7.)

114.   Service providers "should be monitored on a regular basis or more frequently if applicable." (Id. at 3.) The process of monitoring providers was

36

intended "to ensure that total Plan costs and services are competitive and reasonable." (Id.)  "Investment consultant service providers" were to be "monitored regularly," including the provider's "[i]nvestment due diligence processes; [f]iduciary guidance and services . . . and [c]ost," among other items. (Id.)

## Q.    flexPATH's Monitoring of TDFs

115.    flexPATH drew upon its ongoing comprehensive analysis of TDFs available in the marketplace.  (3/28 Tr. Vol. II 64:5-68:1, 68:8-70:25; Trial Ex. 191.)  Both NFP and flexPATH regularly review the TDF universe, analyzing fees, performance, and risk of available offerings.  (3/28 Tr. Vol. II 29:10-32:21, 64:5-68:1, 3/29 Tr. Vol. I 23:8-25:10.)  All the major TDF families are continuously scored and a focus list is created that identifies the TDFs that have the most positive attributes.  (3/28 Tr. Vol. II 31:13-32:2, 112:5-113:8; Trial Exs. 1013, 1044, 1172, 1173.)

116.    flexPATH relied on its TDF Matrix that analyzes over 60 TDFs and over a dozen models.  (Trial Ex. 191.)  The TDF Matrix reflects an analysis of each fund's glidepath, asset class coverage, and risk levels, and it also includes commentary on topics such as investment manager turnover or performance.  (Id.) For example, with respect to the Vanguard Target Retirement TDF, which was offered by one of the merging Plans, the commentary in the TDF Matrix details that fund's asset allocation strategy, including information about portfolio manager turnover and increases in exposure to certain asset classes, such as international equity and international fixed income.  (Id. at 11; 3/28 Tr. Vol. II 64:5-69:13.)

117.    As of the third quarter of 2016, shortly after the flexPATH TDFs were added to the Plan, the gross annual expense ratio for each of the flexPATH TDFs in the Plan's investment lineup was 24 bps (0.24%).  (3/27 Tr. 50:18-23; Trial Ex. 981 at 1.)  Of that fee, 10 bps could be used by the Plan to offset service provider fees, with the amount not so used to be credited back to the Plan.  (3/29 Tr. Vol. I

79:23-82:4; Trial Ex. 981 at 1.)  flexPATH's 3(38) fee, which was paid from that 10 bp portion of the fee, was approximately 3.5 bps.  (3/29 Tr. Vol. I 79:23-82:4; Trial Ex. 981 at 1.)  As a result, the annual expense ratio, net of rebates but including flexPATH's 3(38) fee, was 17.5 bps after the flexPATH TDFs were added to the Plan.  (3/29 Tr. Vol. I 79:23-82:4; Trial Ex. 981 at 1.)

118.    In the first quarter of 2018, the Plan switched to the M share class, which had an expense ratio of 11.7 bps, including flexPATH's 3(38) fee.  (3/27 Tr. 53:15-55:1; Trial Ex. 342 at 10–11.)

119.    The flexPATH TDFs should not have been rejected from consideration in 2016 solely because of their relatively shorter track record as distinct investment vehicles.  The DOL has recommended that plan fiduciaries consider using plan-specific custom TDFs, which by definition have no performance history.  (Trial Ex. 1189 at 3.)  Plaintiffs' expert, Otto, even conceded that custom funds do not have a track record as distinct investment vehicles before they are added to a plan, but they are commonly and appropriately offered in large defined contribution plans.  (Otto Decl. ¶ 75; 9/5 Tr. Vol. I 35:24-36:8, 39:5-10, 42:1-44:7, 9/5 Tr. Vol. II 21:12-23:11.)  Similarly, Plaintiffs' other expert, Buetow, offered opinions in other litigations that TDFs are an exception to his general rule that five years of performance history is required before a fiduciary can select a fund for a defined contribution plan.  (3/29 Tr. Vol. II 55:7-22, 56:8-57:5.)  In such a situation, Buetow previously said, the performance history of the manager was sufficient to decide whether to invest in the TDF.  (Id.)  Buetow also stated that one could look to the performance of the underlying funds in an asset allocation solution even if the asset allocation has no performance history.  (Id. at 59:9-24.)

120.    When the flexPATH TDFs were created in 2015, the seven BlackRock index funds underlying the flexPATH TDFs were well-established with significant assets under management and lengthy track records of success, as BlackRock is the world's largest index manager with trillions of dollars in index

funds.  (3/28 Tr. Vol. II 47:17-48:3; Trial Ex. 187 at 24.)  BlackRock is also a well-established glidepath manager and has been managing the BlackRock LifePath TDFs that underlie the flexPATH TDFs and provide the glidepath for the flexPATH Moderate TDF for over 30 years.  (3/28 Tr. Vol. II 24:15-25:2, 47:17-48:3; 9/5 Tr. Vol. I 37:3-13.)  The LifePath funds were also on NFP's Focus List. (3/28 Tr. Vol. II 112:16-25; Trial Ex. 1172 at 2.)

121.   The LifePath funds scored 6s and 7s in the Scorecard System as of Q3 2015.  (Trial Ex. 653 at 14-15.)  But Elvander explained that the lower scores for LifePath at that time were a result of BlackRock's decision to include a greater allocation to inflation protection assets than other TDF providers.  (3/29 Tr. Vol. I 32:14-33:21.)  Moreover, a "watch list" score, standing alone, is not a sufficient reason to exclude a fund from consideration.  (3/29 Tr. Vol. I 85:19-86:25; Trial Ex. 739 at 3–5.)  And as of 2016, the LifePath Funds were performing well and on NFP's focus list.  (3/28 Tr. Vol. II 112:16-25; Trial Ex. 1172 at 2.)  All the funds underlying the flexPATH Index TDFs scored well on the Scorecard System Methodology while they were in the Plan—predominantly 9s and 10s.  (3/29 Tr. Vol. I 23:4-7; Trial Ex. 160 at 43–44; Trial Ex. 1629 at 17, 20, 24, 28, 32, 36, 39, 42, 46, 49.)

### 1.   flexPATH IC

122.   The flexPATH IC reviewed flexPATH Quarterly Update presentations that included detailed information about the funds' glidepaths, asset allocation, manager selection process, underlying investments, Scorecard scores, investment performance, and expenses.  (3/29 Tr. Vol. I 20:22-23:3; Trial Ex. 187; Trial Ex. 341 at 56–84; Trial Ex. 358 at 55–84; Trial Ex. 1629; Trial Ex. 1631.) These presentations were, at times, provided to plan sponsor clients, including Wood. (Trial Ex. 358 at 55–84.)

123.   flexPATH also evaluated the fund-level performance of the flexPATH Index TDFs on quarter-to-date, year-to-date, and since inception time periods.

(3/28 Tr. Vol. II 29:10-31:12.)  This information was also provided to the Wood Committee in Fiduciary Investment Review presentations at every quarterly meeting while the flexPATH Index TDFs were in the Plan.  (Trial Ex. 358 at 45-46.)  flexPATH also compared the relative performance of the flexPATH Index TDFs to benchmarks, including a style benchmark.  (Trial Ex. 116 at 44.)  In addition, flexPATH evaluated the performance of both the underlying funds and at the fund level of all of flexPATH's competitors in the market on at least a quarterly basis. (3/28 Tr. Vol. II 31:13-32:2.)

124.    flexPATH also regularly compiled and analyzed information comparing returns, risk, glidepaths, asset allocations, investment styles, and numerous other investment characteristics of the flexPATH TDFs with other TDF offerings in the market.  (3/28 Tr. Vol. II 29:10-30:22, 94:5-95:5; 3/29 Tr. Vol. I 64:5-68:1, 68:8-69:19, 78:13-17; Trial Ex. 191; Trial Ex. 1631.)  flexPATH continually evaluated the underlying funds of the flexPATH Index TDFs.  At every flexPATH IC meeting, flexPATH ensured that the underlying index funds were meeting or exceeding the requirements in the flexPATH IPS using the Scorecard Methodology.  (Trial Ex. 1631 at 3–10, 52–53.)  On the rare occasions where an underlying fund scored lower than a 7, the flexPATH IC engaged in further analysis and discussion before determining any appropriate actions to take with respect to that fund.  (Trial Ex. 929 at 2.)

125.    The flexPATH IC regularly examined each passive fund to ensure that it was closely tracking its benchmark each quarter, in addition to examining qualitative factors such as "people, process and philosophy."  (Trial Ex. 1631 at 52, 57–58.)  The flexPATH IC also reviewed manager writeups providing a comprehensive summary of each underlying fund's qualitative characteristics and noting any recent developments affecting those characteristics.  (Trial Ex. 4 at 3, 5; Trial Ex. 184 at 2–3.)  Any special circumstances or significant leadership changes that might have implications for investment performance were reported to the

1   flexPATH IC, which then determined whether these special circumstances

2   impacted the quantitative analysis, any qualitative factors, or individual Scorecard

3   scores.  (Trial Ex. 4 at 3, 5; Trial Ex. 184 at 2–3.)  flexPATH also continually

4   considered other index managers to determine whether changing to a different

5   index manager could add value to flexPATH.  (3/28 Tr. Vol. II 83:11-21.)

6       126.   flexPATH periodically negotiated additional fee reductions.  (3/27 Tr.

7   49:15-21.)  While the flexPATH TDFs were in the Plan, flexPATH negotiated with

8   BlackRock to create a new share class for the TDFs with lower fees, which

9   benefitted the Wood Plan.  (Id. at 50:3-55:1.)

10       2.    flexPATH Monitored BlackRock

11       127.   The flexPATH IC regularly invited BlackRock to attend flexPATH IC

12   meetings to provide updates on the glidepaths' construction, their methodology for

13   reviewing and adjusting the glidepaths, and their ongoing research.  (3/28 Tr. Vol.

14   II 98:12-100:5; Trial Ex. 4 at 21.)  Nick Nefouse, the head of LifePath, attended

15   several flexPATH IC meetings to update flexPATH on BlackRock's glidepath

16   management.  (3/29 Tr. Vol. I 20:22-22:7.)

17       128.   flexPATH also independently reviewed and analyzed BlackRock's

18   glidepaths.  For example, in the Fourth Quarter of 2016, flexPATH prepared a

19   BlackRock Glidepath Due Diligence presentation for Retirement Plan Advisory

20   Group members, which evaluated BlackRock's investment resources and acumen,

21   comparing the flexPATH TDFs' glidepaths, asset allocations, and risk exposure to

22   that of competing TDFs.  (Trial Ex. 516 at 1–11.)  This presentation reflected that

23   flexPATH was continuing to evaluate other TDFs in the market, including by

24   evaluating their glidepaths to determine the TDFs' risk category.  (Id.; 3/24 Tr.

25   Vol. I 81:11-85:16; 3/28 Tr. Vol. II 64:5-68:1, 68:8-69:19, 94:1-95:22; Trial Ex.

26   184 at 1; Trial Ex. 191; Trial Ex. 762; Trial Ex. 763.)

27       129.   As glidepath manager, BlackRock regularly reviewed and periodically

28   revised the capital market assumptions and strategic asset allocation underlying the

1    flexPATH TDFs' glidepaths.  (3/28 Tr. Vol. II 99:4-100:5; Trial Ex. 157 at 8.)  The

2    flexPATH IC consulted with BlackRock on potential glidepath adjustments and

3    had to approve them before implementation.  (3/28 Tr. Vol. II 99:4-100:5; Trial

4    Ex. 157 at 8.)

5         130.   flexPATH was not obligated to implement any of BlackRock's

6    proposed glidepath changes.  (3/28 Tr. Vol. II 99:4-100:5.)  For example, if it did

7    not approve any of BlackRock's revisions to the BlackRock LifePath TDF

8    glidepath, then flexPATH could have declined to follow that glidepath for its

9    flexPATH Moderate TDF.  (Id.)  However, while flexPATH could have departed

10   from BlackRock's proposed glidepaths at any time, it chose to follow the

11   recommendations of BlackRock as glidepath manager.  (Id.)

12              3.    Underperformance of Style Benchmark

13        131.   Because of differences in risk levels between different TDFs,

14   flexPATH creates custom "style" benchmarks for each TDF with sufficient

15   performance history rather than comparing them all against a single benchmark.

16   (3/29 Tr. Vol. I 23:8-24:25, 60:17-61:19.)  These style benchmarks contain only

17   four core asset classes—U.S. equity, international equity, fixed income, and cash.

18   (Id. at 24:6-15.)  Comparing a TDF against the style benchmark that contains only

19   these core asset classes helps flexPATH to evaluate the asset allocation skill of

20   each fund manager.  (Id.)  Including all the asset classes used in a given TDF in

21   that TDF's style benchmark would diminish the usefulness of creating the

22   benchmark because it would no longer highlight any value added by the manager's

23   asset allocation skill.  (Id. at 25:16-26:4.)

24        132.   The flexPATH TDFs underperformed the style benchmark for a short

25   period of time because the style benchmark did not have comparable asset classes

26   that the flexPATH TDFs used for inflation protection.  (Id. at 24:16-25:15.)

27   flexPATH constructed the flexPATH Index TDFs with a dedicated inflation

28   protection component because it believes that inflation is a significant long-term

1  threat to retirement assets.  (3/24 Tr. Vol. I 81:11-82:14.)

2      133.   Even with the inflation protection, flexPATH believed that

3  performance remained "strong" for the flexPATH TDFs with "returns still

4  rang[ing] from almost 5% (conservative) to 15% for the more aggressive vintages."

5  (Trial Ex. 134 at 1.)  Around October 2017, flexPATH also "met with BlackRock,"

6  which reported that "they continue to feel that this inflation protection is

7  warranted, as it remains one of the single biggest threats to retirees if it begins to

8  creep back into the system."  (Id.; 3/29 Tr. Vol. I 26:5-27:9.)

9      134.   flexPATH was not required to remove the TDFs from the Plan based

10  on that performance difference.  Both of Plaintiffs' experts have stated that prudent

11  fiduciaries can—and should—give an underperforming fund a grace period before

12  removing them from the plan.  For example, Buetow believed the grace period

13  should be three years long, (3/29 Tr. Vol. II 52:11-54:6), while Otto's grace period

14  was 18 to 24 months (9/5 Tr. Vol. I 44:15-45:10).

15      **R.    Wood's Monitoring of the flexPATH TDFs**

16      135.   Wood's general practice was to meet quarterly to review the Plan's

17  investments.  (3/21 Tr. Vol. II 47:13-19; Trial Ex. 1634.)  However, Wood

18  cancelled the October 26, 2017 meeting due to the severe impact of Hurricane

19  Harvey on the Houston area.  (3/21 Tr. Vol. II 77:20-78:9.)  At the end of 2017,

20  Wood acquired Amec Foster Wheeler and needed to prepare to merge Plans and

21  Committees.  (Id.)  Thus, Wood did not hold its February 28, 2018 meeting.  (Id.)

22  The Court finds that the Committee's meeting schedule complied with the

23  monitoring requirements set forth in Wood's IPS.  The IPS did not require that

24  Committee meetings occur at any specified frequency.  Rather, the IPS required

25  only that the Committee monitor service providers, including investment

26  managers, on a "regular basis."  (Trial Ex. 8 at 3.)

27      136.   Before each Committee meeting, NFP provided Wood with a

28  Fiduciary Investment Review that contained performance data on each of the

43

1 Plan's investments, including the flexPATH TDFs.  (Trial Ex. 36; Trial Ex. 116.)

2     137.   Each Committee meeting then featured a presentation by NFP's
3 Kallus to elaborate on the Fiduciary Investment Review and answer Wood's
4 questions.  (Trial Ex. 1634 at 34, 37, 40, 44.)  Elvander also attended many Wood
5 Committee meetings.  (Id. at 46, 29, 50, 52.)

6     138.   The Committee members reviewed the Fiduciary Investment Review
7 materials before each meeting and "would ask questions often" after Kallus
8 presented the materials.  (3/21 Tr. Vol. II 73:16-23.)

9     139.   After the flexPATH TDFs were added to the Plan in June 2016, the
10 Committee's next regularly scheduled meetings were on July 28, 2016 and October
11 27, 2016.  At both meetings, Wood met with Kallus, who conducted a review of
12 the fund performance in the Plan.  (Trial Ex. 1634 at 33, 37.)

13     140.   Because the flexPATH TDFs were a new investment vehicle, Wood
14 understood that the funds needed to build a history before being benchmarked at
15 the fund level.  (3/22 Tr. Vol. I 25:13-25.)

16     141.   Before its January 2017 Committee meeting, Wood received a
17 Fiduciary Investment Review that appended a flexPATH Quarterly Update.  (Trial
18 Ex. 358 at 55–84.)  The flexPATH Quarterly Update included 1) extensive
19 information on flexPATH's investment manager practices, 2) detailed information
20 on the flexPATH Index TDFs (e.g., information on the design of the glidepath and
21 qualitative and quantitative performance data on the underlying funds), and 3)
22 background information on the flexPATH IC and their experience managing
23 investments.  (Id.)

24     142.   In the Fiduciary Investment Review before the April 2017 Committee
25 meeting, Kallus reported that the flexPATH TDFs appeared to be
26 "underperforming" the style-specific benchmark.  But as NFP explained at the time
27 and again at the July 2017 meeting, the flexPATH Index TDFs were performing as
28 anticipated because they include inflation protection features not found in other

TDFs.  (Trial Ex. 1632 at 36, 40, 44.)

143.   The Wood Committee understood and was "satisfied" with the explanation "that the asset class of the flexPATH funds contained inflation protection assets, TIPS, real estate assets that were designed to protect participants in the long run for inflation situations." (3/21 Tr. Vol. II 80:20-81:12; Trial Ex. 1632 at 40, 43.)

**S.    Removal of flexPATH TDFs**

144.   In December 2018, following Wood's acquisition of Amec Foster Wheeler ("AFW"), the Plan merged with the AFW 401(k) Plan.  (3/29 Tr. Vol. I 30:3-8; Trial Ex. 1812.)

145.   Before the merger of the two plans, the Wood Plan and AFW Plan offered different investment options to participants, including different TDFs. Wood provided flexPATH TDFs, and AFW provided Vanguard TDFs.  The Wood Committee asked NFP to propose a new lineup that would combine the best of both plans and continue to provide a best-in-class retirement savings option.  (Trial Ex. 27.)  The Wood Committee decided not to continue using the flexPATH TDFs as a result of its review for the AFW Plan merger.  (3/21 Tr. Vol. II 87:4-13.)

146.   In late 2018, the Wood Committee decided to replace the flexPATH TDFs with Vanguard TDFs.  (Dkt. No. 296 at 6.)  At the same time, flexPATH was terminated as investment manager.  (Id.)

**IV. CONCLUSIONS OF LAW**

**A.    Breach of Fiduciary Duty Under 29 U.S.C. § 1104(a)(1)**

147.   ERISA is designed to protect the interests of participants in employee benefit plans and their beneficiaries "by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans." Wright v. Or. Metallurgical Corp., 360 F.3d 1090, 1093 (9th Cir. 2004).  Accordingly, fiduciaries have a duty of loyalty and a duty of prudence.  29 U.S.C. § 1104(a)(1).

1.    Duty of Loyalty

45

148.    Fiduciaries "shall" act "solely in the interest of the participants" for the "exclusive purpose" of "providing benefits to participants."  29 U.S.C. § 1104(a)(1)(A)(i).  Plaintiffs must prove that the defendants' actions were motivated by disloyalty.  Tibble v. Edison Int'l, No. CV 07-5359, 2010 WL 2757153, at *24 n.19 (C.D. Cal. July 8, 2010) (citations omitted).  But if it is "possible to question the fiduciaries' loyalty," fiduciaries must "'at a minimum [] engage in an intensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries.'"  Howard v. Shay, 100 F.3d 1484, 1488–89 (9th Cir. 1996) (quoting Leigh v. Engle, 727 F.2d 113, 125–26 (7th Cir. 1984)); see also Reetz v. Aon Hewitt Inv. Consulting, Inc. (Reetz II), 74 F.4th 171, 182 (4th Cir. 2023) ("Aon's recommendation to streamline the investment menu may have incidentally benefitted its own interest. But, because that interest did not motivate Aon's recommendation, it did not violate the duty of loyalty."); Kopp v. Klein, 894 F.3d 214, 222 (5th Cir. 2018) (per curiam) ("[T]he potential for a conflict, without more, is not synonymous with a plausible claim of fiduciary disloyalty.").

149.    When assessing whether a fiduciary has complied with ERISA's duty of loyalty, "what matters is *why* the defendant acted as he did."  In re Wells Fargo ERISA 401(k) Litig., 331 F. Supp. 3d 868, 875 (D. Minn. 2018) (emphasis in original); Anderson v. Intel Corp. Inv. Pol'y Comm., 579 F. Supp. 3d 1133, 1156 (N.D. Cal. 2022) ("In order to allege that the [defendant] breached the duty of loyalty, Plaintiffs must allege that the [defendant]'s decisions were made because of self-dealing.")

150.    flexPATH argues that it genuinely and reasonably believed that the flexPATH Index TDFs were in the best interests of the Wood Plan participants. The Court credits the testimony of the individuals who founded flexPATH, Vincent Giovinazzo and Nicholas Della Vedova, and its CIO, Jeffrey Elvander, all of whom testified that they believed in good faith that the flexPATH TDFs were

46

the best funds for the Wood Plan.  (3/28 Tr. Vol. II 38:9-40:23, 47:10-16; Trial Ex. 677 (internal email stating that the flexPATH TDFs were "much better" than the existing options on the merging Wood Plans); Trial Ex. 682 (internal flexPATH email stating that data provided by Wood suggests the flexPATH TDFs would be a good fit for Wood).)

151.   Moreover, Elvander testified that he chose the flexPATH TDFs because of the participant data of the merging Plans; the participant demographics and investor preferences of the Wood Plan; an evaluation of the existing QDIA options of the merging Plans; consideration of TDF options available in the market that match the needs of the merged Plan, including an assessment of performance and fees; and input from the Wood Committee, including its preference for a multi-glidepath solution.  (3/22 Tr. Vol. I 34:1-13, 37:3-7, 61:7-21, 95:7-13; 3/28 Tr. Vol. II 38:9-44:8, 43:2-44:8, 46:13-47:16, 64:5-65:10, 69:20-75:1, 116:24-124:23, 125:6-127:23; 3/29 Tr. Vol. I 6:18-8:19, 9:14-10:2, 11:4-12:5; Trial Ex. 682; Trial Ex. 691; Trial Ex. 941; Trial Ex. 1803.)  See v. Wells Fargo & Co., No. 16-3981, 2017 WL 2303968, at *3 (D. Minn. May 25, 2017) ("[T]he fact that Wells Fargo chose affiliated funds as the default option is, without more, insufficient to show a breach of its fiduciary duty.  Although a fiduciary's choice of affiliated funds is relevant in showing that the fiduciary may have acted in its financial self-interest, Meiners must plead additional facts showing that the fiduciary's decision was based on financial interest rather than a legitimate consideration.").

152.   flexPATH did not financially benefit by selecting the flexPATH TDFs.  The evidence shows that flexPATH did not receive additional compensation from the Plan's investment in the flexPATH TDFs.  (3/27 Tr. 53:20-55:1, 96:9-25; 3/29 Tr. Vol. I 38:20-39:16, 79:23-82:4; 9/5 Tr. Vol. II 11:16-23; Trial Ex. 85; Trial Ex. 111 at 2–3; Trial Ex. 221 at 21; Dkt. No. 296 at 6.)  flexPATH's only compensation from the Plan was its asset-based delegated-fiduciary fee, which it was entitled to regardless of what funds it ultimately

selected as the Plan's QDIA.  (Trial Ex. 85 at 2.)  See <u>Reetz v. Lowe's Cos., Inc.</u> (<u>Reetz I</u>), No. 18-00075, 2021 WL 4771535, at *52–58 (W.D.N.C. Oct. 12, 2021) (finding that delegated fiduciary did not act disloyally by selecting a proprietary investment where it received no additional compensation beyond delegated-fiduciary fee).  The Wood Plan paid no additional fees to flexPATH beyond the negotiated IMA fee.  (Trial Ex. 85 at 2.)  Plaintiffs expert also testified that the way his company addressed a conflict was to not link compensation to what products the plan chose.  (9/5 Tr. Vol. I 78:23-79:3.)  Plaintiffs expert admitted at trial that Wood did the same thing in this case.  (<u>Id.</u> at 79:4-12; Trial Ex. 85 at 2 ("flexPATH agrees and acknowledges that it and its affiliates will not charge the Client or the Plan additional fees if flexPATH CITs are selecting in performing the Management Services.").)  See <u>Moitoso v. FMR LLC</u>, 451 F. Supp. 3d 189, 204 (D. Mass. 2020) ("It is not enough for a plaintiff to identify a potential conflict of interest from the defendant's investment in its own proprietary funds, as a plan sponsor may invest all plan assets with a single company . . . . Instead, the Court must take into account the fiduciary's subjective motivation in making a decision for the plan."); <u>Wildman v. Am. Century Servs., LLC</u>, 362 F. Supp. 3d 685, 701 (W.D. Mo. 2019) ("[I]t is common for financial service companies to offer their own investment funds in their retirement plans.").

153.    Plaintiffs argue that flexPATH selected the flexPATH TDFs because it needed seed money and to improve the marketability of the funds.  However, the evidence shows that the flexPATH TDFs were fully seeded almost immediately after they were created.  (3/24 Tr. Vol. I 70:10-71:10.)  Plaintiffs also have not identified any other investment opportunities that flexPATH needed the Wood Plan's assets to access.  By December 31, 2015, six months before the flexPATH TDFs were added to the Plan, flexPATH had nearly $500 million dollars in assets.  (3/27 Tr. 101:16-102:14; Trial Ex. 942 at 3–4, 9.)

154.    Moreover, the evidence shows that flexPATH did not use the Wood

48

1   Plan's investment to market flexPATH TDFs.  (3/24 Tr. Vol. I 75:2-12; 3/27 Tr.

2   100:3-19.)  The Court finds unpersuasive Plaintiffs expert, Otto, who claimed that

3   more assets under management may be used to attract other investments.  (Otto

4   Decl. ¶¶ 64–65.)  When Otto was asked about this claim during cross-examination,

5   he appeared to abandon this position.  (9/5 Tr. Vol. II 10:19-11:9.)  Nor does the

6   Court credit Otto's unsupported assertion that NFP is a broker dealer.  (Id. at

7   17:20-18:8.)

8       155.   By the time flexPATH selected the flexPATH TDFs for the Plan,

9   flexPATH had already been hired as a discretionary manager.  (Dkt. No. 296 at 5.)

10  Thus, the Plan's assets could already be reported by flexPATH as under

11  flexPATH's management regardless of how they were invested.  (3/24 Tr. Vol. I

12  74:12-75:1; 3/24 Tr. Vol. II 33:12-34:10.)  Finding no evidence to support this

13  argument, the Court concludes that flexPATH did not receive a marketability boost

14  from its increased assets under management.

15      156.   Plaintiffs argue that Elvander was conflicted because he was part of

16  the team at NFP that recommended the flexPATH TDFs to the Wood Committee.

17  (3/29 Tr. Vol. I 77:16-78:6.)  At the same time, he was instrumental in creating the

18  flexPATH TDFs as well as the Scorecard System that was supposed to be used to

19  evaluate them.  (3/28 Tr. Vol. II 89:13-21, 103:4-21.)  He had an ownership stake

20  in flexPATH (Trial Ex. 140 at 7), served as the CIO for NFP and flexPATH (Dkt.

21  296 at 4), and chaired the flexPATH IC (3/28 Tr. Vol. II 28:1-29:9).  He was also

22  the person at flexPATH who single-handedly selected the flexPATH Index

23  Moderate TDFs to be the Plan's QDIA.  (3/28 Tr. Vol. II 38:9-39:19, 46:13-47:2.)

24  However, none of these undisputed facts demonstrate that a conflict existed.  As

25  previously stated, this potential conflict was addressed because flexPATH's only

26  compensation from the Plan was its asset-based delegated-fiduciary fee, which it

27  was entitled to regardless of what funds flexPATH ultimately selected as the Plan's

28  QDIA.

157.   Plaintiffs argue that flexPATH's characterization of the Wood Plan as a "$900 million opportunity" shows that flexPATH acted with a disloyal motive. (Trial Ex 225.)  However, this email was written before flexPATH was hired. flexPATH was interested in being hired as a 3(38) investment manager at the time of the email.  (3/24 Tr. Vol. I 73:12-23.)  But the profit motive is not unlawful in and of itself.  Thus, flexPATH's motives to be hired as a 3(38) before it was retained by Wood as a fiduciary to the Plan cannot constitute a breach of fiduciary duty.  There is nothing disloyal about an investment manager trying to obtain new business.

158.   Plaintiffs argue that in December 2015, NFP formally announced a new program that incentivized NFP advisors to sell flexPATH by offering them bonus compensation whenever flexPATH TDFs were "implemented into" one of their retirement plan clients.  (Trial Ex. 5.)  However, Plaintiffs admit that the "additional compensation was paid out of funds that flexPATH earned from its 3(38) services."  (Id.; Plaintiffs' Post-Trial Brief, Dkt. No. 397, at 6.)  As stated above, the IMA made clear that the 3(38) management fee was not contingent on which funds were selected.  (Trial Ex. 85 at 2.)  Thus, any benefit was tied to flexPATH's 3(38) fee, which was not dependent on the selection of the flexPATH TDFs.  See Santomenno v. Transamerica Life Ins. Co., 883 F.3d 833, 841 (9th Cir. 2018) (finding that when a service provider's fee "is clearly set forth in a contract with the fiduciary-employer, collection of fees out of plan funds in strict adherence to that contractual term is not a breach of the provider's fiduciary duty").

159.   The Court agrees with flexPATH and holds that Plaintiffs failed to prove that flexPATH's selection of its TDFs were the result of disloyalty. flexPATH's statements that it would substantially increase assets under management does not support an inference of disloyalty in gaining the Wood Committee's business.  The objective facts support the decision to use flexPATH's own funds.  Where a business has competed fairly and ethically, it

50

Case 8:21-cv-00301-JVS-KES   Document 414   Filed 02/23/24   Page 52 of 70   Page ID #:19641

cannot be faulted for succeeding.

### 2.    Duty of Prudence

160.   The duty of prudence requires fiduciaries to exercise "the care, skill, prudence, and diligence" that a "prudent" person in a "like capacity" would use. 29. U.S.C. § 1104(a)(1)(B); Tibble v. Edison Int'l (Tibble I), 729 F.3d 1110, 1134 (9th Cir. 2013), vacated on other grounds, 575 U.S. 523 (2015).  The "prudent person standard" is "not concerned with results; rather, it is a test of how the fiduciary acted viewed from the perspective of the 'time of the [challenged] decision' rather than from the 'vantage point of hindsight.'"  Roth v. Sawyer-Cleator Lumber Co., 16 F.3d 915, 918 (8th Cir. 1994) (citations omitted). Courts focus on both the "merits of the transaction" and "the thoroughness of the investigation into the merits of the transaction."  Tibble v. Edison Int'l (Tibble III), 843 F.3d 1187, 1197 (9th Cir. 2016) (en banc) (quoting Howard, 100 F.3d at 1488).

161.   Fiduciaries are not always required to "pick the best performing fund" or the "cheapest possible fund available on the market."  Meiners v. Wells Fargo & Co., 898 F.3d 820, 823 (8th Cir. 2018).  That "one fund ultimately performed better than another fund, in the absence of a meaningful benchmark, do[es] not establish that the funds were an imprudent choice at the outset."  Baird v. Blackrock Institutional Tr. Co., N.A., 403 F. Supp. 3d 765, 780 (N.D. Cal. 2019). The "character and aims of the particular type of plan" that the fiduciary serves are important considerations when evaluating the alleged imprudence.  In re Comput. Scis. Corp. Erisa Litig., 635 F. Supp. 2d 1128, 1134 (C.D. Cal. 2009) (quoting Kirschbaum v. Reliant Energy, Inc., 526 F.3d 243, 253 (5th Cir. 2008)).

162.   The process by which fiduciaries use to make investment decisions must be thorough, which requires "a reasoned decision-making process."  Tatum v. RJR Pension Inv. Comm.,761 F.3d 346, 356 (4th Cir. 2014) (internal quotations omitted).  Fiduciaries must "conduct their own independent evaluation to

51

1    determine which investments may be prudently included in the plan's menu of

2    options." Hughes v. Nw. Univ., 595 U.S. 170, 176 (2022).  They must employ

3    "the appropriate methods to investigate the merits of the investment and to

4    structure the investment" at the time of the challenged transactions.  Wright, 360

5    F.3d at 1097 (quoting Donovan v. Mazzola, 716 F.2d 1226, 1232 (9th Cir. 1983)).

### a.    flexPATH

7        163.    Plaintiffs argue that flexPATH did not conduct an investigation before

8    selecting the flexPATH TDFs.  However, Elvander testified that flexPATH's

9    process involved months of analyzing participant data of the merging Plans (Trial

10   Ex. 682 at 1–2; Trial Ex. 691 at 46–47); discussing participant demographics and

11   investor preferences with Wood (3/28 Tr. Vol. II 116:24-124:23, 125:6-127:23;

12   Trial Ex. 1803); determining an appropriate glidepath risk level for the QDIA from

13   that data using the Fit Analysis (3/28 Tr. Vol. I 59:20-60:5; Trial Ex. 691 at 47);

14   evaluating the existing QDIA options of the merging Plans (Trial Ex. 691 at 48);

15   considering TDF options available in the market that match the needs of the

16   merged Plan, including an assessment of performance and fees (Trial Ex. 691 at

17   43–55); and considering input from the Wood Committee, including its preference

18   for a multi-glidepath solution (3/22 Tr. Vol. I 34:1-13, 37:3-7, 61:7-21, 95:7-13;

19   3/28 Tr. Vol. II 64:5-65:10, 69:20-75:1, 116:24-124:23, 125:6-127:23).

20       164.    flexPATH made this assessment by using the Fit Analysis, which

21   indicated that Plan participants were heterogenous and would benefit from a

22   moderate glidepath for the QDIA and a multi-glidepath solution for the Plan as a

23   whole.  The Fit Analysis, which considered a variety of metrics, such as Plan

24   demographics and objectives, is a type of detailed analysis of a plan's

25   circumstances.  (3/28 Tr. Vol. II 39:20-40:23, 64:5-65:10, 69:20-74:3, 116:24-

26   124:23, 125:6-127:23; Trial Ex. 191.)  See Plasterers' Loc. Union No. 96 Pension

27   Plan v. Pepper, 663 F.3d 210, 219 (4th Cir. 2011) (considering participant

28   demographics and the plan's unique circumstances supports a finding of

1   prudence); In re Comput. Scis. Corp. Erisa Litig., 635 F. Supp. 2d at 1134

2   (instructing courts to consider prudence "in light of the character and aims of the

3   particular type of plan" and "the long-term horizon of retirement investing"

4   (quoting Kirschbaum v. Reliant Energy, Inc., 526 F.3d 243, 253 (5th Cir. 2008))).

5       165.   Plaintiffs dismiss the Fit Analysis as flexPATH's "marketing tool"

6   that was meant to determine the appropriate flexPATH glidepath.  However, as

7   previously stated, the Fit Analysis was developed and refined by Elvander and

8   NFP's investment team and has been used for years to evaluate TDFs for hundreds

9   of different defined contribution plan clients.  (3/27 Tr. 45:11-12; 3/28 Tr. Vol. II

10   39:20-40:23, 64:5-65:10, 69:20-74:3, 116:24-124:23, 125:6-127:23; Trial Ex. 191.)

11   The Fit Analysis evaluated factors that the DOL TDF Guidance and industry

12   research have shown drives a plan's risk tolerance, including the average deferral

13   rate and the average account balance.  (Trial Ex. 1189 at 1–2.)  Elvander also

14   testified that the purpose of the Fit Analysis was not to determine the best

15   flexPATH glidepath but the best glidepath risk level generally.  (3/28 Tr. Vol. I

16   62:4-7.)  As a result, the Fit Analysis fully conformed with industry practice

17   concerning the selection of investment options for a retirement plan.  See Cal.

18   Ironworkers Field Pension Tr. v. Loomis Sayles & Co., 259 F.3d 1036, 1044 (9th

19   Cir. 2001) (holding that the district court did not err by relying on evidence that

20   "the Bloomberg system was the tool prevalently used in the industry" to conclude

21   that fiduciaries had acted prudently).

22       166.   flexPATH also considered that the Wood Committee, a Plan fiduciary

23   with detailed knowledge of its participants, had expressed the belief that its

24   participants would benefit from a multiple glidepath solution with passive

25   underlying funds and lower fees, as well as that participants of one of the merging

26   Plans were widely using custom risk-based models with conservative, moderate,

27   and aggressive glidepaths.  (3/22 Tr. Vol. I 34:1-13, 37:3-7, 61:7-21, 95:7-13; 3/28

28   Tr. Vol. II 64:5-65:10, 69:20-75:1, 116:24-124:23, 125:6-127:23.)  Thus, in

selecting the flexPATH TDFs, flexPATH was mindful of "the character and aims of this particular [] plan" as conveyed by another fiduciary—another important consideration that courts have found demonstrates prudence.  In re Comput. Scis. Corp. Erisa Litig., 635 F. Supp. 2d at 1134 (quoting Kirschbaum, 526 F.3d at 253).

167.    Plaintiffs argue that flexPath did not conduct a quantitative and qualitative evaluation of available TDFs before selecting the flexPATH TDFs. However, flexPATH's decision was informed by flexPATH's extensive diligence in developing and overseeing the flexPATH TDFs.  (3/24 Tr. Vol. I 60:23-61:21; 3/24 Tr. Vol. II 60:18-61:7; 3/27 Tr. 74:13-75:8; 3/28 Tr. Vol. II 29:10-32:21, 89:22-91:7, 92:17-93:25; 9/5 Tr. Vol. I 31:1-17; Wermers Decl. ¶¶ 15-16.) flexPATH spent years evaluating the TDF universe, assessing plan participant risk profiles, and evaluating innovative investment designs to improve participant outcomes.  (3/28 Tr. Vol. II 64:5-68:1, 68:8-70:25.)  flexPATH also carefully vetted potential glidepath managers for the flexPATH TDFs before selecting BlackRock due to its risk-focused approach and the broad market exposure used in its glidepath.  (3/24 Tr. Vol. I 32:13-17, 81:11-85:16; 3/28 Tr. Vol. II 22:5-10, 24:1-25:2, 94:1-95:22, 96:12-98:11; Trial Ex. 184; Trial Ex. 762; Trial Ex. 763.) flexPATH maintains a TDF Matrix that analyzes over 60 TDFs and more than a dozen TDF models, including their glidepaths, asset class coverage, risk level, investment manager turnover, and performance.  (Trial Ex. 191.)  flexPATH also evaluated and monitored the underlying BlackRock index funds through the Scorecard System, which gave flexPATH confidence that the flexPATH TDFs would closely track market indices and achieve the enhanced risk adjusted returns predicted by prevailing capital markets assumptions.  (3/24 Tr. Vol. II 27:24-28:9; 3/28 Tr. Vol. II 112:16-25; Trial Ex. 1172 at 2.)  Elvander testified that nothing changed in the Wood Plan that would have affected flexPATH's analysis.  (3/28 Tr. Vol. II 43:2-44:8.)  See Reetz II, 74 F.4th at 183 (holding that an investment manager's monitoring of proprietary fund performance and peer comparisons

leading up to the selection of the funds supports a prudent process); id. ("Imagine
that one week before becoming a fiduciary, an investment advisor does an
exhaustive review of options in the market.  Would anyone contend the advisor—a
week later when he becomes a fiduciary—must rereview the market?  No,
otherwise our instruction that when reviewing a decision for prudence, there can be
no 'uniform checklist' and 'a variety of actions can support a finding' of prudence
depending on the circumstances, would be meaningless." (quoting Tatum, 761 F.3d
at 358)).

168.   The Court finds that this type of extensive analysis and diligence in
designing proprietary funds supports finding a prudent process in selecting those
funds.  The Court's analysis in Reetz II is instructive:

> Aon thought it could do better. So in a sense, Aon went
> beyond the duty.  It didn't merely investigate, it created.  It
> tweaked the available options to chart its own path based on
> its market research.  And while Aon created the Growth Fund
> in 2013, it had been closely tracking the Growth Fund's
> performance since its inception and understood how it
> compared against benchmark and peer funds when it selected
> the Fund for Lowes.  Maybe—in hindsight—Aon was wrong
> that it could do better (or maybe it was right and hit the market
> at the wrong time).  Again, though, prudence looks for
> process, not results.  The process here was reasoned and
> calculated to maximize the benefits of the plan, so Aon cleared
> the prudence bar.

See id. at 183 (internal quotation marks and citation omitted).

169.   Though it would have been possible to select funds expected to
provide higher returns, doing so would have resulted in taking on more risk,
subjecting participants to higher volatility and a higher likelihood of losses as their

retirement dates approached.  In selecting funds for a retirement plan, it is
objectively reasonable for fiduciaries to select a fund that, among its other
attributes, is expected to reduce the risk of severe loss in down markets.  See, e.g.,
Jenkins v. Yager, 444 F.3d 916, 925-26 (7th Cir. 2006) (finding that defendant did
not breach fiduciary duties by retaining funds that underperformed for three years
because "investment strategy [] to find long-term, conservative, reliable
investments that would do well during market fluctuations" was not unreasonable
or imprudent).

170.   Plaintiffs argue that the flexPATH TDFs did not have a sufficient
performance history to be selected for the Plan.  However, the Court finds that
Plaintiffs argument is at odds with the DOL TDF Guidance, which advises
fiduciaries to consider custom TDF solutions, which, by definition, would not have
a five-year performance history.  (Trial Ex. 1189 at 3); see also Reetz I, 2021 WL
4771535, at *28, *33 (rejecting that the new fund was imprudent as it would be
inconsistent with DOL TDF Guidance).  Moreover, Plaintiffs argument is
undermined by their own experts who acknowledged that TDFs do not need a
long-term performance history before being added to a retirement plan.  (Otto Decl.
¶ 75; 9/5 Tr. Vol. I 35:24-36:8, 42:1-44:7, 49:21-50:21, 52:2-53:21.)  Specifically,
Plaintiffs' experts testified that there were alternative ways to evaluate a brand new
fund, including the performance of the underlying securities and the performance
of the individuals in other contexts.  (3/29 Tr. Vol. II 55:7-22, 56:8-57:5, 59:9-24;
9/5 Tr. Vol. I 39:5-10; 9/5 Tr. Vol. II 21:12-23:11.)  Thus, in these circumstances,
flexPATH TDFs' limited history as distinct investment vehicles did not prohibit
them from selection.  See also Reetz I, 2021 WL 4771535, at *55 (finding that
"fund-of-funds" vehicles are "common" in large defined contribution plans, and it
is sufficient for fiduciaries to review the "track record" of the "underlying
managers").  Although the flexPATH TDFs launched in 2015, the underlying
glidepath manager and funds' manager, BlackRock, had extensive experience in

investment management and the underlying funds all had long, positive performance histories.  (3/28 Tr. Vol. II 24:15-25:2, 47:17-48:3; 9/5 Tr. Vol. I 37:3-13; Trial Ex. 187 at 24.)

171.   Plaintiffs' alternative argument that the flexPATH TDFs were simply repackaged, higher-cost versions of the BlackRock LifePath TDFs was also unsupported by the evidence.  At the time the flexPATH TDFs were introduced to the Wood Plan in June 2016, the annual expense ratio, including the 3(38) service fee, was about 17.5 basis points.  (3/29 Tr. Vol. I 79:23-82:4; Trial Ex. 981 at 1.) The Wood Plan's total fee for the BlackRock LifePath funds would have been about 14 basis points without 3(38) services.  (3/29 Tr. Vol. I 18:23-19:12, 65:7-16.)  In the first quarter of 2018, the Wood Plan switched to a share class (M), which had an expense ratio of 11.7 basis points.  (3/27 Tr. 53:15-55:1; Trial Ex. 342 at 10–11.)  The Wood Plan's fee for the flexPATH TDFs, including flexPATH's 3(38) services, ranged from about 17.5 to 11.7 basis points.  Thus, the Court finds that the flexPATH TDFs did not cost the Wood Plan much more than the BlackRock LifePath TDFs would have cost.  Moreover, the Court also finds that the Blackrock LifePath TDFs are not fully comparable to the flexPATH TDFs given that BlackRock's 14 basis points fee did not include 3(38) services.  (3/24 Tr. Vol. II 33:5-34:10; 3/27 Tr. 42:12-45:10.)

172.   flexPATH subadvises the flexPATH TDFs, which use open architecture.  (3/28 Tr. Vol. I 8:3-14; Trial Ex. 221 at 4–5.)  In this capacity, flexPATH constantly monitors the flexPATH TDFs and has practical authority to replace underlying investments or even the glidepath manager without requiring plans or participants to change investment vehicles.  (3/24 Tr. Vol. II 35:15-39:3; 3/27 Tr. 45:18-49:19, 135:4-7; 3/28 Tr. Vol. II 59:14-64:4; 82:2-83:4.)  It was reasonable for flexPATH, as the Plan's 3(38) investment manager and delegated fiduciary, to value retaining that ongoing control over manager selection and asset allocation.  Reetz I, 2021 WL 4771535, at *54 (finding "strong reasons to believe

57

1  that retaining control over asset allocation and selection of underlying managers
2  was in the Plan's interest").

3      173.   flexPATH continually reviewed and analyzed the structure, design,
4  and performance of the flexPATH TDFs.  (3/28 Tr. Vol. II 29:10-32:2, 94:5-95:5;
5  3/29 Tr. Vol. I 20:22-23:3, 64:5-68:1, 68:8-69:19, 78:13-17; Trial Ex. 116 at 44;
6  Trial Ex. 184; Trial Ex. 187; Trial Ex. 191; Trial Ex. 341 at 56–84; Trial Ex. 358 at
7  55–84; Trial Ex. 1629; Trial Ex. 1631.)  See, e.g., Reetz II, 74 F 4th at 183-84
8  (affirming that fiduciary engaged in prudent monitoring process where, among
9  other things, fiduciary regularly monitored investment structure and performance);
10 Ramos v. Banner Health, 461 F. Supp. 3d 1067, 1097-1100 (D. Colo. 2020)
11 (same), aff'd, 1 F.4th 769 (10th Cir. 2021); Sacerdote v. N.Y. Univ., 328 F. Supp.
12 3d 273, 307-309, 317 (S.D.N.Y. 2018) (same).

13     174.   flexPATH monitored and evaluated BlackRock's performance as the
14 glidepath manager, including its asset allocation decisions.  (3/24 Tr. Vol. I 81:11-
15 85:16; 3/28 Tr. Vol. II 64:5-68:1, 68:8-69:19, 94:1-95:22, 98:12-100:5; Trial Ex.
16 184; Trial Ex. 516 at 1–11; Trial Ex. 762; Trial Ex. 763.)  See, e.g., Pizarro v.
17 Home Depot, Inc., 634 F. Supp. 3d 1260, 1277 (N.D. Ga. 2022) (granting summary
18 judgment for fiduciary on prudence claim where, among other things, fiduciary
19 evaluated BlackRock's glidepath "on at least a few occasions" during the class
20 period).  flexPATH also received regular updates from BlackRock and maintained
21 an ongoing dialogue regarding potential glidepath adjustments, which required
22 flexPATH's approval before implementation.  (3/28 Tr. Vol. II 99:4-100:5; Trial
23 Ex. 157 at 8.)

24     175.   flexPATH tracked BlackRock's fees as glidepath manager and
25 successfully negotiated fee reductions for the benefit of Plan participants.  (3/27
26 Tr. 49:15-21, 50:3-55:1, 56:4-57:14.)  See, e.g., Reetz I, 2021 WL 4771535, at
27 *55–58 (finding fiduciary engaged in prudent monitoring process where, among
28 other things, the challenged investment carried reasonable fees at all times and the

1  fiduciary made revisions to the investment structure given the economic climate).

2      176.   flexPATH monitored the underlying BlackRock Index funds within

3  the flexPATH TDFs.  (Trial Ex. 929 at 2; Trial Ex. 1631 at 3–10, 52–53.)  See, e.g.,

4  Reetz II, 74 F 4th at 183-84 (affirming that fiduciary engaged in prudent

5  monitoring process where, among other things, fiduciary regularly monitored

6  underlying investments in multi-asset class investment vehicle).

7      177.   Plaintiffs argue that flexPATH did not follow Wood's IPS because the

8  Scorecard methodology was only used to score the underlying funds instead of the

9  TDFs as a whole.  However, the Court finds that this approach followed the

10  process in Wood's IPS, which stated that "funds with short time history should be

11  evaluated qualitatively."  (Trial Ex. 8 at 7; see also id. ("Investments where no

12  score is applied due to specialty focus, short time history or other unique

13  circumstances should be reviewed using a qualitative framework.").)  Similarly,

14  flexPATH's IPS stated that "[i]nvestment styles or asset classes where no score is

15  applied (funds with limited time history or select specialty funds) will periodically

16  be reviewed from a quantitative and qualitative perspective, where applicable."

17  (Trial Ex. 1319 at 8.)  The flexPATH TDFs did not have sufficient time history to

18  be scored.  (3/24 Tr. Vol. II 8:7-9:8; 3/28 Tr. Vol. I 44:19-23; Case Decl. at 25.)

19      178.   Plaintiffs also contend that flexPATH should have put the flexPATH

20  Index TDFs on the watch list or removed them from the Wood Plan because they

21  were "underperforming."  The evidence did not support that the flexPATH TDFs

22  "underperformed" while they were in the Wood Plan.  (3/28 Tr. Vol. II 112:16-25;

23  3/29 Tr. Vol. I 23:4-7; Trial Ex. 160 at 43-44; Trial Ex. 1172 at 2; Trial Ex. 1629 at

24  17, 20, 24, 28, 32, 36, 39, 42, 46, 49.)  The IPS provides that funds should be put

25  on the watch list in two circumstances: (i) the fund fails to meet criteria standards,

26  as determined by its Scorecard Score, and/or (ii) a qualitative assessment outside of

27  the Scorecard Score supports adding the fund to the watch list.  (Trial Ex. 8 at

28  11–16; Trial Ex. 1319 at 7–8.)

179.   Although the top-level fund initially was not scored, the underlying funds predominantly scored 9s and 10s while the flexPATH TDFs were in the Wood Plan.  (3/29 Tr. Vol. I 23:4-7; Trial Ex. 160 at 43-44; Trial Ex. 1629 at 17, 20, 24, 28, 32, 36, 39, 42, 46, 49.)  To be placed on the watch list using the scoring criteria, a fund must score a 6 or lower or some other qualitative reason must exist. (3/29 Tr. Vol. I 70:23-24; Trial Ex. 8 at 11; Trial Ex. 1319 at 8.)  To be considered for potential removal from the Plan once on the watch list, a fund needed to score 6 or lower for four consecutive quarters or five of the last eight quarters.  (Trial Ex. 8 at 7–8; Trial Ex. 1319 at 8.)  None of the underlying funds here met those criteria, so they did not need to be placed on the watch list.

180.   Plaintiffs argue that the flexPATH TDFs should have been removed because they underperformed a style benchmark for several quarters.  However, the evidence showed that the underperformance was due to the fact that the style benchmark did not have certain asset classes, such as inflation-protected securities, that the flexPATH TDFs contained and that impacted performance.  (3/24 Tr. Vol. I 81:11-82:14; 3/29 Tr. Vol. I 23:8-25:15, 60:17-61:19.)  This did not mean that the flexPATH Index TDFs were poor performing funds.  The evidence shows that flexPATH believed the TDFs performance remained "strong" and understood that the TDFs performance versus the style benchmark was explained by flexPATH's decision to include inflation-protected securities in the flexPATH TDFs.  (3/29 Tr. Vol. I 26:5-27:9; Trial Ex. 134 at 1.)  As mentioned above, flexPATH preferred a risk-conscious strategy that was expected to provide downside protection and generate greater returns over a full market cycle.  (3/24 Tr. Vol. I 81:11-82:14.) See Jenkins, 444 F.3d at 925-26 (finding that defendant did not breach fiduciary duties by retaining funds that underperformed for three years because "investment strategy [] to find long-term, conservative, reliable investments that would do well during market fluctuations" was not unreasonable or imprudent).

181.   Even if the flexPATH TDFs were underperforming, the Court

concludes that it was not a breach of flexPATH's duty of prudence to retain the funds.  Plaintiffs own experts conceded that a fiduciary should wait at least two years in most circumstances before removing a fund based on performance issues. (3/29 Tr. Vol. II 52:11-54:6; 9/5 Tr. Vol. I 44:15-45:10.)  See, e.g., Jenkins, 444 F.3d at 926 ("Nothing in the record suggests that it was not reasonable and prudent to select conservative funds with long-term growth potential and to stay with those mutual funds even during years of lower performance.").

182.   Plaintiffs also argue that flexPATH's 3(38) fees were higher than the fees proposed by NFP as a 3(38) manager.  However, NFP's proposed 3(38) fee would have applied only to selecting an off-the-shelf single glidepath TDF suite. (3/24 Tr. Vol. II 59:24-62:13; Trial Ex. 92 at 113 (offering 3(38) services with "a version 1.0 asset allocation fund series").)  Meanwhile, the flexPATH 3(38) services required additional monitoring and other services, including flexPATH's negotiation of lower fees for Plan participants and its ability to change glidepath managers.  (3/27 Tr. 57:15-58:10.)  Moreover, NFP's RFP response shows a pricing structure similar to the 3(38) fees eventually negotiated with flexPATH. (Trial Ex. 92 at 113.)

183.   Based on the foregoing, the Court finds that flexPATH satisfied its duty of prudence in selecting and retaining the flexPATH TDFs.

### b.   Wood

184.   A co-fiduciary liability claim is derivative of an underlying breach-of-duty claim.  See Anderson v. Intel Corp. Inv. Policy Comm., No. 19-04618, 2021 WL 229235, at *14 (N.D. Cal. Jan. 21, 2021) ("Both derivative claims fail because Plaintiffs have failed to state an underlying ERISA violation.  As such, Plaintiffs have failed to state a claim for failure to monitor and co-fiduciary liability.").  Because Plaintiffs failed to show that flexPATH breached its fiduciary duty, their claim that Wood breached its fiduciary duty of prudence necessarily fails as a matter of law.

1    185.   Although the Court need not reach the issue of Wood's duty of

2    prudence, the Court would have found that Wood satisfied its duty of prudence

3    when selecting flexPATH as the Plan's 3(38) investment manager.

4    186.   Plaintiffs claim that Wood did not have a process for selecting

5    flexPATH as the 3(38) investment manager.  However, Wood had a process to

6    select the 3(38) investment manager that involved the same RFP process by which

7    Wood screened NFP as a potential investment advisor.

8    187.   NFP provided responses to the RFP for both NFP and flexPATH on

9    3(21) investment advisor and 3(38) investment manager services.  (3/21 Tr. Vol. II

10   62:15-17; 3/27 Tr 83:18-84:5; Case Decl. at 10–11.)  Wood asked specific

11   questions aimed at determining which vendor would be qualified for either role.

12   (9/5 Tr. Vol. I 61:1-64:10; Case Decl. at 10–11.)  The evidence shows that

13   questions designed to select a 3(21) investment advisor are well-suited to help

14   select a 3(38) investment manager.  (9/5 Tr. Vol. I 61:1-25; Case Decl. at 16.)

15   Based on the evidence, it is common to use a single RFP to select both a 3(21) and

16   a 3(38) provider.  (Case Decl. 4–5, 8–9; 10–11.)  Even Plaintiffs' process expert

17   admitted that all questions in the RFP addressing 3(21) services were equally

18   applicable to assessing 3(38) services.  (9/5 Tr. Vol. I 61:5-17.)  During the RFP

19   process, Wood reviewed and evaluated important information about flexPATH.

20   (9/5 Tr. Vol. I 77:4-10; Trial Ex. 92 at 37; Trial Ex. 645; Trial Ex. 942 at 3.)

21   188.   Wood received RFP responses from UBS, Mercer, Aon Hewitt,

22   Monroe Vos, and Morgan Stanley, in which they all discussed their ability to serve

23   as 3(38) investment managers.  (Trial Ex. 51.)  Amegy evaluated each candidate on

24   its ability to provide 3(21) investment advisor and 3(38) investment manager

25   services.  (Id.)  Wood also learned the approach that these providers would take

26   toward the selection of the Wood Plan's QDIA if retained as a 3(38).  (Trial Ex.

27   645 at 17–18, 20–21.)  Plaintiffs failed to present evidence demonstrating that a

28   separate RFP process was necessary to select a 3(38) investment manager.  Thus,

the Court concludes that Wood had all the information it needed to select a 3(38) investment manager.

189.   Additionally, there was a nine-month period between July 2015 and March 2016 in which the Wood Committee learned about flexPATH's roles and duties.  (3/24 Tr. Vol. II 66:11-17, 120:18-122:14; 3/28 Tr. Vol. II 70:2-74:3; 3/29 Vol. I 46:1-13; Trial Ex. 1 at 4; Trial Ex. 67 at 1–2, 26–39; Trial Ex. 81 at 60–73; Trial Ex. 691 at 42–56; Trial Ex. 935; Trial Ex. 936 at 24–36; Trial Ex. 942 at 3–5; Trial Ex. 1358; Trial Ex. 1634 at 29.)  The Court concludes that this process gave the Wood Committee sufficient information on competitors to consider when selecting a 3(38) investment manager.  See Tibble I, 729 F.3d at 1136 (holding that "uncontroverted evidence" of "discussions about the pros and cons" of investment alternatives is "fatal" to claims for breach of fiduciary duty of prudence based on the selection of an investment).

190.   The Wood Committee wanted a solution that fit the Plan's diverse participant population.  (3/21 Tr. Vol. II 58:24-59:4; 3/22 Tr. Vol. II 34:8-22.)  At the same time, the Wood Committee wanted to avoid the plan merger being seen as a takeaway of benefits from the Mustang Plan participants, which was the group with the highest participation rate and largest proportion of assets in the merged Plan.  (Trial Ex. 1634 at 29.)  The Wood Committee also wanted to increase participation among the non-Mustang Plan participants.   (3/21 Tr. Vol. II 58:24-59:4; 3/22 Tr. Vol. I 34:1-13, 37:3-7, 61:7-21, 95:7-13; 3/22 Tr. Vol. II 34:8-35:1.) Lastly, Wood wanted to reduce costs.  (3/21 Tr. Vol. II 55:1-10, 55:20-24; Trial Ex. 1358 at 9.)  Thus, Wood sought to provide multiple risk-level funds to the consolidated Plan based on the preferences and needs of the incoming Plan participants.  "[P]articipant choice is the centerpiece of what ERISA envisions for defined-contribution plan."  Tibble I, 729 F.3d at 1134–35; see also 29 C.F.R. § 2550.404a-1(b)(4) (authorizing fiduciaries to choose investments "consistent with the plan's investment objectives"); Hughes, 595 U.S. at 177 ("At times, the

63

circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise.").

191. The Wood Committee's preference for the flexPATH TDFs as its multiple glidepath solution was reasonable. The flexPATH TDFs provided broad exposure to low-cost, BlackRock Index funds, their diversified holdings helped mitigate risk in fluctuating market conditions over a long period of time, and they had naming conventions that were easy for Plan participants to understand. (3/21 Tr. Vol. II 80:20-81:12; 3/24 Tr. Vol. II 68:24-71:8; 3/28 Tr. Vol. II 47:17-48:3, 48:18-50:5; Trial Ex. 187 at 24; Trial Ex. 358 at 61; Trial Ex. 1632 at 40, 43.)

192. Having determined that the flexPATH TDFs were uniquely suited to meet the Plan's needs, the Wood Committee determined that flexPATH, as the creator of the flexPATH TDFs, would be best suited to serve as a 3(38) investment manager over the flexPATH TDFs. (3/21 Tr. Vol. II 64:18-69:3; Dkt. No. 296 at 5.) The evidence presented shows that 3(38) investment managers routinely utilize their own products. (9/5 Tr. Vol. I 40:13-19, 42:1-11; Case Decl. at 12.)

193. ERISA does not require plan fiduciaries to conduct an RFP process before hiring a service provider. Nor did the evidence at trial show that 401(k) plan fiduciaries must conduct an RFP process to retain 3(38) investment managers. (Case Decl. at 18.)

194. Having already conducted an RFP process exploring both 3(21) and 3(38) services, having learned how flexPATH and its competitors would approach the task of being a 3(38) and their philosophies toward selecting a QDIA, and having learned more about flexPATH through in-person meetings with NFP, the Wood Committee did not need to conduct another RFP process. Nor does the law require a separate RFP process for a 3(38) investment manager and 3(21) investment advisor.

195. Wood argues that there were no minutes of the Wood Committee's

decision to hire flexPATH as a 3(38) investment manager and there was no formal
meeting.  However, members of the Wood Committee testified that they did not
believe "there was a need for a formal meeting . . . ."  (3/21 Tr. Vol. I 89:1-7.)
Moreover, not every discussion was reflected in the minutes.  (Id. at 115:5-7; 3/22
Tr. Vol. II 7:9-13.)   Thus, the Court concludes that such evidence does not
constitute a breach of the duty of prudence.

### B.     Prohibited Transaction Under 29 U.S.C. § 1106

196.   In addition to imposing duties of loyalty and care, ERISA "expressly
prohibits certain transactions where the potential for abuse is particularly acute."
Wright, 360 F.3d at 1094.  ERISA broadly prohibits two kinds of transactions: (1)
transactions between a plan and a party-in-interest; and (2) transactions between a
plan and a plan fiduciary.  See 29 U.S.C. § 1106.

197.   A fiduciary "is not permitted to cause the plan to engage in a
transaction, if he or she knows or should know that the transaction constitutes a
direct or indirect . . . transfer to, or use by or for the benefit of, a party in interest of
any assets of the plan."  29 U.S.C. § 1106(a)(1)(D).  ERISA defines "party in
interest" to include persons furnishing "services" to a plan.  Id.  Congress "defined
'party in interest' to encompass those entities that a fiduciary might be inclined to
favor at the expense of the plan's beneficiaries."  Harris Tr. & Sav. Bank v.
Salomon Smith Barney, Inc., 530 U.S. 238, 242 (2000).  Section 1106(a) does not
require that the "party in interest" who receives the benefit to be the same entity
that causes the prohibited transaction.  See 29 U.S.C. § 1106(a)(1).

198.   Section 1106(b) prohibits self-dealing by a plan fiduciary regarding
plan assets.  Id. § 1106(b).  Specifically, it states that a fiduciary shall not "(1) deal
with the assets of the plan in his own interest or for his own account, (2) in his
individual or in any other capacity act in any transaction involving the plan on
behalf of a party (or represent a party) whose interests are adverse to the interests
of the plan or the interests of its participants or beneficiaries, or (3) receive any

consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." Id. § 1106(b)(1)-(3).

199.   The purpose of this section is to prevent a fiduciary "from being put in a position where he has dual loyalties and, therefore, he cannot act exclusively for the benefit of a plan's participants and beneficiaries." Danza v. Fid. Mgmt. Tr. Co., 533 F. App'x 120, 126 (3d Cir. 2013) (unpublished).  "The protective function of ERISA is at its height . . . when there is a risk of fiduciary self-dealing." Sweda v. Univ. of Pa., 923 F.3d 320, 324 (3d Cir. 2019).  A fiduciary who has conflicting loyalties must still adhere to the general duty of loyalty as described in section 404 of ERISA.  A party may be found to have breached the duty of loyalty, "even if the party has not committed a per se prohibited transaction under ERISA." Kanawi v. Bechtel Corp., 590 F. Supp. 2d 1213, 1223 (N.D. Cal. 2008).

200.   There is no dispute that flexPATH was a fiduciary at the time of the challenged transaction.  Rather, the parties dispute whether flexPATH stood to personally gain from its decision to select the TDFs.  See 29 U.S.C. § 1106(b).

201.   Similar to Plaintiffs duty of loyalty argument, Plaintiffs prohibited transaction argument is that flexPATH's decision to cause the Wood Plan to invest in flexPATH's own proprietary funds provided "seed money" for flexPATH to grow its business as a legitimate company and help bolster flexPATH's reputation in the industry.  For the same reasons previously mentioned, the Court concludes that flexPATH did not select its own TDFs for "marketability" or "seed money" purposes.  (3/24 Tr. Vol. I 70:10-71:10, 75:2-12; 3/27 Tr. 100:3-19.)  Plaintiffs did not present evidence that flexPATH relied on the increase in assets from the Plan for seed money or to market the flexPATH TDFs.  See, e.g., Dupree v. Prudential Ins. Co. of Am., No. 99-8337, 2007 WL 2263892, at *39 (S.D. Fla. Aug. 7, 2007), as amended (Aug. 10, 2007) (allegation that fiduciary invested plan funds in affiliated investment strategies for "seed money" to "assist in their marketing" was

insufficient to support prohibited transaction claim absent evidence that the investments were actually "made for the purpose of benefitting [the fiduciary]")

### C.    Failure to Monitor Fiduciaries

202.    ERISA imposes a "limited duty" upon fiduciaries "to monitor and review the performance of their appointed fiduciaries" to make sure that they are ensuring their fiduciary obligations.  In re Comput. Scis. Corp. Erisa Litig., 635 F. Supp. 2d at 1144.  This monitoring duty is derivative of the underlying breach-of-duty claim.  Id. at 1144.  Because Plaintiffs failed to show that flexPATH breached its fiduciary duty, their claim that Wood breached its fiduciary duty to monitor necessarily fails as a matter of law.

203.    Even if the claim against Wood was not derivative, the Court would find that Wood satisfied its duty to monitor flexPATH as the Plan's 3(38) investment manager.  An appointing fiduciary "must act with prudence in supervising or monitoring the agent's performance and compliance with terms of delegation."  Restatement (Third) of Trusts § 80 cmt. D(2).  The appointing fiduciaries should "review the performance of their appointees at reasonable intervals and in such a manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards."  In re Comput. Scis. Corp. Erisa Litig., 635 F. Supp. 2d at 1144 (citing In re Syncor ERISA Litig., 410 F. Supp. 2d 904, 912 (C.D. Cal. 2006) (internal quotation marks omitted)).

204.    Where an appointing fiduciary is aware of their appointee fiduciaries' conflicting loyalties, the appointing fiduciary is obligated to take "prudent and reasonable action" to determine whether they are fulfilling their obligations.  Leigh, 727 F.2d at 135–36.

205.    Plaintiffs argue that the Wood Committee had no performance information on the flexPATH TDFs.  However, the Wood Committee knew that flexPATH TDFs were new and would take time to build history.  (3/22 Tr. Vol. I

25:13-25.)

206.   Plaintiffs also argue that there was no action taken on the underperformance of the flexPATH TDFs.  But the flexPATH TDFs were performing as expected given the inflation period.  The evidence shows that the Wood Committee appropriately considered and evaluated the reasoning behind the underperformance.  (3/21 Tr. Vol. II 80:20-81:12; Trial Ex. 1632 at 40, 43.)

207.   The Wood Committee had a general practice of meeting quarterly to review the Plan's investments.  (3/21 Tr. Vol. II 47:13-19; Trial Ex. 1634.)  In January 2017, Wood received a Fiduciary Investment Review.  (Trial Ex. 358 at 55-84.)  In April 2017, Wood received another investment review with detailed information regarding the flexPATH TDFs.  (Trial Ex. 1632 at 36, 40, 44.)

208.   Although Wood cancelled two meetings, the reasons for doing so were justified.  (3/21 Tr. Vol. II 77:20-78:9.)  Moreover, Wood's cancellation of two meetings did not violate the Wood IPS.  (Trial Ex. 8 at 3.)  During this time, Wood continued to receive and review the extensive information provided in the Fiduciary Investment Reviews and other materials.  (3/21 Tr. Vol. II 73:16-23; Trial Ex. 36; Trial Ex. 116; Trial Ex. 1634 at 34, 37, 40, 44.)

209.   Plaintiffs argue that the Wood Committee never met with flexPATH. However, nothing in the law requires the Wood Committee to meet with its 3(38) investment manager but rather to monitor their performance.  Nor does any evidence show that such in-person meetings were necessary.  Moreover, the evidence showed that Elvander, CIO of NFP and flexPATH, did attend many Wood Committee meetings.  (Trial Ex. 1634 at 46, 29, 50, 52.)

210.   Plaintiffs argue that the Wood Committee ignored Mott's concerns that the flexPATH TDFs had "no long term history of performance" and that "best practice" was to invest in funds that have a "track record of at least 3 years."  (Trial Ex. 78.)  However, as previously stated, this argument is unavailing.  Plaintiffs also argue that Mott sent the Wood Committee information that BlackRock Lifepath

68

TDFs were the underlying funds and that offering BlackRock and Vanguard TDFs were cheaper than offering flexPATH TDFs.  (Trial Ex. 70 at 2–3; Trial Ex. 78 at 3, 6.)  But the evidence shows that Wood was paying 17.5 basis points for the flexPATH TDFs, not 24 basis points, which Mott believed.  (3/29 Tr. Vol. I 79:23-82:4; Trial Ex. 981 at 1.)  Plaintiffs expert even admitted that the Wood Plan would be receiving the flexPATH TDFs for less than the amount that Mott said it would cost to use the BlackRock TDFs.  (9/5 Tr. Vol. I 25:14-26:2.)  Therefore, the Court concludes that the Wood Committee satisfied its duty to monitor flexPATH as the Wood Plan's 3(38) investment manager.

## V. CONCLUSION

For the reasons stated above, the Court enters its findings of fact and conclusions of law as stated herein.  Defendants shall file a proposed judgment forthwith.  Plaintiffs shall file any objections thereto within 7 days of Defendants' filing.  If no objections are received within 7 days, the judgment will be entered immediately, and Federal Rule of Civil Procedure 52(b) will apply upon entry of judgment.

**IT IS SO ORDERED.**

Dated: February 23, 2024

JAMES V. SELNA
UNITED STATES DISTRICT JUDGE